# Exhibit H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OYSTER OPTICS, LLC,

        Plaintiff,

    vs.

CIENA CORPORATION,

        Defendant.

CASE NO. 4:17-cv-05920-JSW

**DECLARATION OF RICHARD GITLIN, SC.D. IN SUPPORT OF CIENA'S PRELIMINARY CLAIM CONSTRUCTIONS**

I, Dr. Richard Gitlin, a resident of La Jolla, California who is over 18 years of age, hereby declare as follows.

## I.    **INTRODUCTION**

I have been retained as an expert in the above captioned case by Ciena Corporation ("Ciena").  I understand that Oyster Optics, LLC has asserted three patents in this case: U.S. Patent Nos.  7,620,327 (the "'327 patent"); 8,374,511 (the "'511 patent"); and 8,913,898 (the "'898 patent") (collectively the "Asserted Patents").  I understand that these patents are involved in a claim construction proceeding.

I have been asked to consider and opine on claim constructions for the following disputed claim terms: "phase modulate" and "phase modulator" ('327 patent cl. 3, 16, 27, 37; '511 patent cl. 9; '898 patent cl. 3 and 17), "the optical signals" ('327 patent cl. 1, 14, 25, 36), and "the plurality of thresholds" ('327 patent cl. 22, 33; '898 patent cl. 23).

In forming my opinions, I have considered the patent specifications, claims, prosecution histories, various books and journals, and my experience in the field of optical telecommunications networks.  I reserve the right to consider additional materials as I become aware of them and to revise my opinions accordingly.

I am being compensated for my work at my usual consulting rate of $675 per hour for my time spent on this proceeding.  I am also being reimbursed for reasonable and customary expenses associated therewith.  No part of my compensation is dependent upon the results of this litigation or the substance of my testimony.

## II.    **EDUCATION AND EXPERIENCE**

Below, I have summarized my educational background, career history, publications, and other relevant qualifications.  My full *curriculum vitae* is attached as Appendix A to this report.

### A.    **Educational Background**

I received a Bachelor's Degree (with honors) in electrical engineering from the City College of New York, and a Master of Science in electrical engineering and a Doctor of Engineering Science from Columbia University.  I am currently a Distinguished University Professor, Emeritus at the University of South Florida ("USF").  From August 2008 to August

DECLARATION OF RICHARD GITLIN,
SC.D ISO OF CIENA'S PRELIMINARY
CLAIM CONSTRUCTIONS

2019, I was a State of Florida 21st Century Scholar, Distinguished University Professor, and the Agere Systems Endowed Chaired Professor of Electrical Engineering at USF. I have more than 50 years of experience in the field of telecommunications. Throughout my career, I have managed and led research in wireline and wireless systems, broadband data, and optical networking, with additional experience in multimedia communications, and various access technologies including wireless, twisted pair, coaxial cable, and fiber optic networks.

**B.    Career**

After receiving my doctorate from Columbia University in 1969, I joined Bell Laboratories ("Bell Labs"), which at the time was part of the Bell System, and eventually became AT&T Bell Labs, and then became Lucent Technologies-Bell Labs, then Alcatel-Lucent Bell Labs, and now Nokia Bell Labs. I was with Bell Labs in its various instantiations for 32 years. My first assignment was in the data communications ("modem") area and, during this time, I contributed to the invention of many key modem technologies. I was also involved in product realization, standardization, and the introduction of several modem products. I was the leader of the V.32 modem development team in the early 1980s, and I assembled the team that developed the V.34 modem, and I was a co-inventor of Digital Subscriber Line ("DSL") technology in 1985-1986.

In 1987, I moved to Bell Labs research to lead research on wireless systems, high-speed (broadband) packet switching, optical networking, and related areas. I held several senior executive positions in Bell Labs, and one of these positions was Senior Vice President for Communication Sciences Research. In this position, included in my responsibilities were all of Bell Labs wireless communications research projects, for both cellular and wireless local area network ("WLAN" or WiFi) systems, as well as wireline networking, and optical communications.

I led the effort to advance high-speed optical transmission systems by introducing and building on techniques that were well established in radio frequency (RF) communication systems, and in particular in wireless communications. Examples of my contributions to optical

DECLARATION OF RICHARD GITLIN,
SC.D ISO OF CIENA'S PRELIMINARY
CLAIM CONSTRUCTIONS

communications and networking include advanced modulation formats, line coding, enhanced forward error correction (FEC), equalization, optical multiple access networks, and introducing other digital signal processing techniques into optical systems.  The adoption and extension of these techniques from the Mb/s regime into the multi-Gb/s realm was driven by the desire to steadily lower the cost per end-to-end networked information bit in an environment of continuously increasing data traffic.

In this leadership position, I oversaw over 500 professionals, many of whom were involved in wireless communications and optical network research.  I established and oversaw the Bell Labs research group located in Utrecht, The Netherlands that was focused on creating WLAN technology.  In addition, I oversaw a cellular wireless research group located in Swindon, UK. The Bell Labs research groups working on wireless research in the United States also reported to me and included several researchers working on OFDM and multiple-input and multiple-output ("MIMO").

I was also the Chief Technical Officer (CTO) and Vice President R&D of the Data Networking Systems Business Unit, where I was responsible for product development, architecture and systems engineering, standards, and advanced development for data networking products including many broadband networking activities in packet and optical networking. This included the ATLANTA ATM chipset, Globeview–the world's first 20 gigabit/sec ATM switch (that used the ATLANTA chipset), wire-speed and quality of service (QoS)-aware IP routers and switches, multi-code technology for CDMA wireless data (IS-95B), and the BLAST wireless technology based on advanced spatial-domain (MIMO smart antenna) processing.

In addition to my responsibilities at Bell Laboratories and Lucent Technologies, from 1999 to 2001, I was a Visiting Professor of Electrical Engineering at Columbia University, where I taught courses, conducted research, and supervised doctoral students in the area of communications and wireless networking.  From 2001 to 2003, I was also an Adjunct Professor of Electrical Engineering at Columbia University.

DECLARATION OF RICHARD GITLIN,
SC.D ISO OF CIENA'S PRELIMINARY
CLAIM CONSTRUCTIONS

From 2001 to 2004, I was Vice President, Technology and Chief Technical Officer of NEC Laboratories America, Inc., where I had specific responsibility for wireless networking, broadband and IP systems, system LSI, quantum communications, and bio-informatics.

From 2002 to 2005, I served on the Board of Directors of PCTEL, a NASDAQ company (PCTI) focused on wireless technologies.

From 2005 to 2008, I was Chief Technical Officer of Hammerhead Systems, a Silicon Valley venture-funded start-up and market leader in providing innovative data networking solutions for wireline, wireless, and cable service providers.  At Hammerhead Systems, I was responsible for product-line vision and system architecture, developing core technologies, and representing product technology and directions with customers, partners, and standards bodies.

In 2008, I joined USF.  At USF I focused my research on 4G and 5G wireless systems and the Internet of Things (IoT), as well as at the intersection of wireless communications and networking with medicine to advance minimally invasive surgery and other cyber-physical health care systems.  I taught graduate courses in Digital Communications, Wireless Networking, and Random Processes.  I retired from USF in August, 2019.

Throughout my career, I have held various membership and leadership positions in various engineering organizations and I have received several significant professional awards and honors.  In 1986-1987, I was named a Fellow of the IEEE and also an AT&T Bell Laboratories Fellow. In 2005, I was elected to the U.S. National Academy of Engineering ("NAE"), and I was also a co-recipient of the Thomas Alva Edison patent award. I am also a Charter Fellow (2012) of the National Academy of Inventors ("NAI"). In 2017, I was inducted into the Florida Inventors Hall of Fame, and in 2019 I was an inaugural member of the Academy of Sciences, Engineering and Medicine of Florida.

I served as the Chair of the Communication Theory Committee of the IEEE Communications Society (COMSOC), as a member of the COMSOC Awards Board, the Editor for Communications Theory of the IEEE Transactions on Communications, as a member of the

Board of Governors of the IEEE Communications Society, and as a member of the Nominations and Elections Board.

I also served on the Advisory Committee for Computer Science and Engineering ("CISE") of the National Science Foundation.  I was a founding Editorial Board member of the Bell Labs Technical Journal, and I have served on the Editorial Boards of Mobile Networks and Applications and the Journal of Communications Networks.

### C.    Patents, Publications, and Presentations

I am a named inventor on 71 issued United States patents and am the author or co-author of over 170 journal and conference peer-reviewed articles.  A list of publications, including my 71 issued patents is included in my CV (Appendix A).  I also co-authored a graduate text on Data Communications, "Data Communications Principles," published by Plenum in 1992.  I have also given keynote presentations at numerous premier IEEE conferences, such as COMCAS 2019 (November 2019), WAMICON 2016, Wireless Communications and Networking Conference 2015 ("WCNC 2015"), Wireless Telecommunications Symposium 2015 ("WTS 2015"), Mobicom 2004, Wireless Communications and Networking Conference 2003 ("WCNC 2003"), and the Wireless Telecommunications Symposium 2010 ("WTS 2010").

I am the co-recipient of three prize paper awards including the 1995 IEEE Communications Society's Steven O. Rice Award, the 1994 IEEE Communications Society's Frederick Ellersick Award, and the 1982 Bell System Technical Journal Award.

## III.    PERSON OF ORDINARY SKILL IN THE ART

I was asked to provide my opinion on the level of one of ordinary skill in the art with respect to the invention of the Asserted Patents as of the early 2001s (up to and including July 9, 2001).  I understand that the person having ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art.  I further understand the factors that may be considered in determining the level of skill include: the types of problems encountered in the art, prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.  I understand that not all such

factors may be present in every case, and one or more of them may predominate.  Based on my

review of the types of problems encountered in the field of optical networking ('511 patent at

1:16–18, 2:21–27), prior solutions to those problems, the rapidity with which innovations were

made, the sophistication of the technology, and the educational level of active workers in the

field, I believe a person of ordinary skill in art would have had at least a B.S. in Electrical

Engineering or a related field with at least five years of experience in designing optical

transmission systems, or an M.S. in Electrical Engineering or a related field.  More education can

supplement practical experience and vice versa.  Depending on the engineering background and

level of education of a person, it would have taken a few years for the person to become familiar

with the problems encountered in the art and become familiar with the prior and current solutions

to those problems.

All of my opinions in this declaration are from the perspective of one of ordinary skill in

the art, as I have defined it here, during the relevant timeframe, i.e., early 2001 up to and

including July 9, 2001.

## IV.   BACKGROUND: FIBER OPTIC COMMUNICATION SYSTEMS OVERVIEW

The following is a brief overview of optical networking technologies and concepts known

to one of ordinary skill in the art during the relevant timeframe of the Asserted Patents.  Optical

network communication systems were known and used prior to July 2001.  *See e.g.*, '511 patent

at 1:20–2:18.  In fact, in early 2001 up to and including the filing date of the provisional

application No. 60/303,932, on July 9, 2001, one of ordinary skill in the art would have

understood that typical optical network communication systems included components such as a

transmitter, an optical fiber and a receiver.  These optical communication systems are sometimes

called "lightwave" systems to distinguish them from microwave, or wireless, systems.  I've

excerpted a high-level diagrammatic lightwave system from my textbook, Data Communication

Principles, which was published in 1992.

DECLARATION OF RICHARD GITLIN,
SC.D ISO OF CIENA'S PRELIMINARY
CLAIM CONSTRUCTIONS



*Gitlin, et al.*, Data Communication Principles at 53 (Plenum Press 1992) attached as Ex. A. As shown in this diagrammatic example, optical networks were known to consist of a transmitter, a fiber transmission medium, and a receiver. *Id.*

In a common mode, dubbed amplitude modulation, the transmitter receives electronic input data, e.g., a stream of zeros and ones, and converts the input data to on-off light pulses representing a stream of zeros and ones. *Id.* The light pulses are sent from the transmitter over the optical fiber to a receiver. *Id.* As the Asserted Patents explain, the received light pulses "either produce an electric output at the photodiode or they do not. As a result, an output electronic data stream of zeros and ones is generated." '327 patent at 1:36-39. In other words, the receiver recovers the data stream of zeros and ones transmitted by the transmitter.

In such known systems, a laser was the typical choice for a light source in a fiber optic communication transmitter. The information to be transmitted across the fiber optic channel of the communication system would have been encoded onto the light emitted from the laser. The process of encoding a light beam with information in such systems was also known as modulation. It was known that typical transceiver cards included a transmitter, e.g., a laser and components for modulating the laser light, and a receiver that converts the light from optical to electronic form to recover the data carried by the light.

## V.    OVERVIEW OF THE ASSERTED PATENTS

The Asserted Patents share a common specification and figures and are each entitled "Fiber Optic Telecommunications Card with Energy Level Monitoring." The Asserted Patents are generally directed to optical networking. '511 patent at 1:16–18, 2:21–27, 6:51-52, 7:20-21. According to the Asserted Patents, existing "systems have the disadvantage that the fiber can be

DECLARATION OF RICHARD GITLIN, SC.D ISO OF CIENA'S PRELIMINARY CLAIM CONSTRUCTIONS

easily tapped and are not secure." *Id.* at 1:50–51. Therefore, the Asserted Patents describe the invention as "providing secure optical data transmission over optical fiber" by using "tapping detection capabilities." *Id.* at 2:21–27.

The background of the Asserted Patents frames the problem to be solved as the vulnerability of optical fiber to security breaches through optical taps: "Existing amplitude modulated systems have the *disadvantage* that the fiber can be easily tapped and are not secure." '898 patent at 1:52-53. The Asserted Patents' Summary of the Invention states "[t]he present invention thus permits a card-based transmission system incorporating an energy level detector for optical tap detection." *Id.* at 3:9-13. The Summary further explains that "an object of the present invention is to provide a transceiver card for providing secure optical data transmission over optical fiber. Another alternative or additional object of the present invention is to provide . . . tapping detection capabilities." *Id.* at 2:24-29.

The Asserted Patents solve the problem of easily tapped fibers by using a transceiver that "operates in a phase-modulated mode" because "the phase-modulated signals have the advantage that breach detection by the energy level detector work more effectively, *since the amplitude of the optical signal is constant and thus a drop in the optical signal level is more easily detected.*" *Id.* at 4:44-52, my emphasis.

My understanding is confirmed by a 2002 white paper by the original patentee, Oyster Optics, Inc.'s (not to be confused with the plaintiff Oyster Optics, LLC), which describes Oyster Inc.'s technology. The paper explains, "with the initial introduction of fiber optic telecommunications systems came the belief that fiber-based transmissions are inherently secure." Ex. B at 1. But, "contrary to popular belief, fiber optic telecommunications systems are extremely vulnerable to being tapped and few private or public network operators, if any, can claim that their networks are 'tap free' or protected even minimally from optical tapping methods." *Id.* at 2. The paper goes on to explain that Oyster Inc. "developed and patented groundbreaking optical security, monitoring, intrusion detection and breach localization

DECLARATION OF RICHARD GITLIN,
SC.D ISO OF CIENA'S PRELIMINARY
CLAIM CONSTRUCTIONS

1    solutions." *Id.* at 10.  In other words, this paper described the problem of optical tapping that

2    Oyster Inc. intended to overcome with the Asserted Patents.

3        Oyster Inc. believed that nefarious intruders "wish to extract as much information for as

4    long as possible for a specific financial or political gain and with the goal of *not* being detected or

5    caught."  *Id.* at 2.  Oyster Inc.'s patented solution, as described in its paper, was to leverage the

6    phase modulation format, *having constant amplitude*, to allow for a tap detection system:

7
8
9
10

> [T]he light transmitting the data is in a patented secure phase
> modulated format different from any commercially available
> products. Because of the format of the light, Oyster Optics'
> technologies are therefore able to provide an extremely precise and
> sensitive tap detection system, which ***would not function with
> existing common equipment utilizing insecure amplitude or
> intensity modulated signals***.

11   *Id.* at 14, my emphasis. It is my opinion that Oyster Inc.'s paper is describing the problem and

12   solution also described in the Asserted Patents.  Namely, utilizing a type of phase modulation

13   where the amplitude remains constant and detecting taps by identifying drops in the signals

14   amplitude.  *See*, *e.g.*, '327 patent at 5:6-14 (an amplitude drop may indicate a tap).

15   **VI.**     <u>**CLAIM TERMS**</u>

16
17

     **A.**     **Phase Modulate/Phase Modulator**
           **'327 patent (in claims 3, 16, 27, and 37), the '511 patent (in claim 9), and the**
           **'898 patent (in claims 3 and 17)**

18
19
20
21
22
23
24

       A person of ordinary skill in the art (a POSITA) would have understood the "phase

modulate/phase modulator" terms to mean altering the phase of light while keeping the amplitude

of the light constant to create an optical signal having a phase that is representative of the data.

The device that accomplishes this modulation is called a phase modulator.  This is clear from how

this term is used in the Asserted Patents in suit and as described in standard references.  The

Asserted Patents describes the terms and benefits of phase modulate/phase modulator as follows:

25
26
27

> The transceiver of the present invention preferably operates in a
> phase-modulated mode . . . .  The phase-modulated signals have the
> advantage that breach detection by the energy level detector work
> more effectively, ***since the amplitude of the optical signal is
> constant*** and thus a drop in the optical signal level is more easily
> detected.

28

DECLARATION OF RICHARD GITLIN,
SC.D ISO OF CIENA'S PRELIMINARY
CLAIM CONSTRUCTIONS

1    '898 patent at 4:42-50, my emphasis. Likewise, when phase modulation is used, the Asserted

2    Patents never refer to a modulation format that includes amplitude modulation.  Rather, they

3    positively recite that the amplitude is constant as an "amplitude drop . . . may indicate at tap . . . ."

4    *See*, *e.g.*, '327 patent at 5:6-14.  The Asserted Patents describe an amplitude modulated mode and

5    a phase modulated mode, but do not describe modulating both amplitude and phase at the same

6    time.  '898 patent at 4:35-36 ("a modulator 16, for example an amplitude *or* phase modulator");

7    4:44-45 ("The transceiver of the present invention preferably operates in a phase-modulated

8    *mode*"), my emphasis.  A POSITA reading the Asserted Patents would have understood that the

9    constant amplitude characteristic of the phase modulated signals is important to making the

10   signals secure while in transit.

11         The Asserted Patents emphasize that a modulation format having a *constant* amplitude

12   prevents an intruder from being able to use a simple photodetector to intercept communications

13   by tapping the optical fiber.  Specifically, the Asserted Patents explain, "[e]xisting amplitude

14   modulated systems have *the disadvantage that* the fiber can be easily tapped and are not secure."

15   '898 pat. 1:52-53. These disclosures tell a POSITA that allowing the signal's amplitude to vary

16   with the data would expose the data to photodiode optical taps, frustrating the invention's ability

17   to provide secure, phase modulated optical data transmission.  The claims are consistent with the

18   above excerpts from the specification.

19         At the time of the Asserted Patents, it is my opinion that the "phase modulate" terms as

20   used in the Asserted Patents would have been understood to mean altering the phase of light

21   while keeping the amplitude of the light constant to create an optical signal having a phase that is

22   representative of data.

23         **B.    The Optical Signals**
             **'327 patent (in claims 1, 14, 25, 36)**
24

25         A POSITA would have understood that "the optical signals," as claimed, refers to the

26   claimed "transmitting optical signals."  And, absent referring to transmitted optical signals, a

27

28

DECLARATION OF RICHARD GITLIN,
SC.D ISO OF CIENA'S PRELIMINARY
CLAIM CONSTRUCTIONS

POSITA would not know what "the optical signals" refers to in the '327 patent's claims. The

'327 patent claims "the optical signals" as follows:

> 1. A transceiver card for a telecommunications box for transmitting data over a first optical fiber and receiving data over a second optical fiber, the card comprising:
>
> a transmitter for transmitting data over the first optical fiber, the transmitter having a laser, a modulator, and a controller receiving input data and controlling the modulator as a function of the input data, the transmitter *transmitting optical signals* for telecommunication as a function of the input data;
>
> . . .
>
> an energy level detector optically connected between the receiver and the fiber input to measure an energy level of *the optical signals*, wherein the energy level detector includes a plurality of thresholds.

*Id.* at claim 1, my emphasis.

> 14. A transceiver card for a telecommunications box for transmitting data over a first optical fiber and receiving data over a second optical fiber, the card comprising:
>
> a transmitter for transmitting data over the first optical fiber, the transmitter having a laser, a modulator and a controller receiving input data and controlling the modulator as a function of the input data, the transmitter *transmitting optical signals* for telecommunication as a function of the input data;
>
> . . .
>
> an energy level detector optically connected between the receiver and the fiber input input (sic) to measure an energy level of *the optical signals*, the energy level detector including a threshold indicating a drop in amplitude of a phase-modulated signal.

*Id.* at claim 14, my emphasis.

> 25. A transceiver card for a telecommunications box for transmitting data over a first optical fiber and receiving data over a second optical fiber, the card comprising:
>
> a transmitter for transmitting data over the first optical fiber, the transmitter having a laser, a modulator and a controller receiving input data and controlling the modulator as a function of the input data, the transmitter *transmitting optical signals* for telecommunication as a function of the input data;
>
> . . .

an energy level detector to measure an energy level of *the optical signals*, the energy level detector including a threshold indicating a drop in amplitude of a phase-modulated signal.

*Id.* at claim 25, my emphasis.

36. A transceiver card for a telecommunications box for transmitting data over a first optical fiber and receiving data over a second optical fiber, the card comprising:

a transmitter for transmitting data over the first optical fiber, the transmitter having a laser, a modulator and a controller receiving input data and controlling the modulator as a function of the input data, the transmitter *transmitting optical signals* for telecommunication as a function of the input data;

. . .

a splitter to split at least a portion of *the optical signals* to form a split optical signal, . . . .

*Id.* at claim 36, my emphasis.

A POSITA would have understood that the transmitted "optical signals" is the antecedent basis for "the optical signals" because there are no other optical signals claimed.  In each independent claim, prior to the recitation of "the optical signals," there is only one introduction of an element as "optical signals."  That element is the "optical signals" transmitted by the transmitter.  Nothing else is expressly introduced as "optical signals."  Thus, a POSITA would have understood that there is antecedent basis for "the optical signals."  A POSITA would have understood that the "optical signals" transmitted by the claimed transmitter is the antecedent basis for "the optical signals" as claimed.  A POSITA would not know what "the optical signals" refers to in the '327 patent's claims if they do not refer to the claimed "transmitting optical signals."

C.      **The Plurality of Thresholds**
        **'327 patent (in claims 22, 33)**
        **'898 patent (in claim 23)**

A POSITA would not have understood what "the plurality of thresholds" refers to in claims 22 and 33 of the '327 patent and claim 23 of the '898 patent.  Those claims are listed below.

DECLARATION OF RICHARD GITLIN,
SC.D ISO OF CIENA'S PRELIMINARY
CLAIM CONSTRUCTIONS

14. A transceiver card for a telecommunications box for transmitting data over a first optical fiber and receiving data over a second optical fiber, the card comprising:

. . .

an energy level detector optically connected between the receiver and the fiber input input (sic) to measure an energy level of the optical signals, the energy level detector including *a threshold* indicating a drop in amplitude of a phase-modulated signal.

22. The card as recited in claim 14 wherein *the plurality of thresholds* bound an acceptable energy range for the received light.

*Id.* at claim 22, my emphasis.

25. A transceiver card for a telecommunications box for transmitting data over a first optical fiber and receiving data over a second optical fiber, the card comprising:

. . .

an energy level detector to measure an energy level of the optical signals, the energy level detector including *a threshold* indicating a drop in amplitude of a phase-modulated signal.

33. The card as recited in claim 25 wherein *the plurality of thresholds* bound an acceptable energy range for the received light.

*Id.* at claim 33, my emphasis.

14. A transceiver card for a telecommunications box for transmitting data over a first optical fiber and receiving data over a second optical fiber, the transceiver card comprising:

. . .

an energy level detector configured to measure an energy level of the second optical signal, the energy level detector including *a threshold* indicating a drop in amplitude of the second optical signal.

23. The transceiver card as recited in claim 14 wherein *the plurality of thresholds* bound an acceptable energy range for the received second optical signal.

'898 patent claim 23, my emphasis.

A person of ordinary skill in the art would not have understood what "the plurality of thresholds" is referring to because there is no antecedent basis for this term. The closest antecedent basis is "a threshold" which does not indicate "a plurality of thresholds" to a POSITA.

Nothing else is expressly introduced as "a plurality of thresholds."  Thus, a POSITA would not have understood what is being referred to as "the plurality of thresholds."

I declare under penalty of perjury that the foregoing is true and correct.


Dated: February 10, 2020                              By: _Richard D. Gitlin_____
                                                          Dr. Richard Gitlin

DECLARATION OF RICHARD GITLIN,
SC.D ISO OF CIENA'S PRELIMINARY
CLAIM CONSTRUCTIONS