BLAIR M. JACOBS (admitted *pro hac vice*)
blairjacobs@paulhastings.com
CHRISTINA A. ONDRICK (admitted *pro hac vice*)
christinaondrick@paulhastings.com
JOHN S. HOLLEY (admitted *pro hac vice*)
johnholley@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1700
Facsimile: (202) 551-1705

RAYMOND W. STOCKSTILL (SB# 275228)
beaustockstill@paulhastings.com
PAUL HASTINGS LLP
695 Town Center Drive, 17th Floor
Costa Mesa, CA 92626
Telephone: (714) 668-6200
Facsimile: (714) 979-1921

Attorneys for Defendant
CIENA CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OYSTER OPTICS, LLC,

Plaintiff,

vs.

CIENA CORPORATION,

Defendant.

CASE NO. 4:20-cv-02354-JSW

**CIENA CORPORATION'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**


**I. INTRODUCTION ........ 1**

**II. THE ASSERTED PATENTS ........ 1**

**III. CLAIM CONSTRUCTION PRINCIPLES ........ 3**

**IV. DISPUTED CLAIM TERMS ........ 5**

- **A. "phase modulator for phase modulating light from the light source" (claim 1)/ "phase modulating light from a laser" (claim 17)/phase modulate terms (claims 8, 19) ........ 5**
- **B. "phase-modulated optical signals" (claims 1, 16) ........ 8**
- **C. "amplitude-modulating the light from the laser" (claim 1) / "amplitude-modulated signals" (claim 16) / "amplitude modulating light from the laser" (claim 17) ........ 8**
- **D. "a receiver having an interferometer" (claim 16) ........ 9**
- **E. "laser is directly adjacent the phase-modulator" (claim 8) ........ 12**
- **F. "control electronics to provide control signals, in accordance with the data stream, to the laser . . ." (claim 14) ........ 14**
  - **1. "Control Electronics" Is a Means-Plus-Function Term Subject to § 112, ¶ 6 ........ 15**
  - **2. "Control Electronics" Is Indefinite ........ 17**
- **G. "energy level circuit" (claim 1) / "energy level detector" (claim 17) ........ 19**
  - **1. "Energy Level Circuit/Detector" Are Means-Plus-Function Terms Subject to § 112, ¶ 6 ........ 20**
  - **2. Ciena's Proposed Corresponding Structure Should Be Adopted ........ 22**
- **H. "a low pass filter coupled to an output of the photodetector" (claim 18) ........ 22**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009)....................6

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
830 F.3d 1341 (Fed. Cir. 2016)....................15

*ALZA Corp. v. Andrx Pharms., LLC*,
603 F.3d 935 (Fed. Cir. 2010)....................4

*Aventis Pharma S.A. v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012)....................9

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010)....................8, 9

*Biomedino, LLC v. Waters Techs. Corp.*,
490 F.3d 946 (Fed. Cir. 2007)....................18

*Dionex Softron v. Agilent Tech., Inc.*,
811 Fed. Appx. 630 (Fed. Cir. 2020)....................17

*In re Donaldson*,
16 F.3d 1189 (Fed. Cir. 1994)....................18

*Egenera, Inc. v. Cisco Systems, Inc.*,
972 F.3d 1367 (Fed. Cir. 2020)....................20

*Eon Corp. IP Holdings LLC v. Silver Spring Network, Inc.*
815 F.3d 1314 (Fed. Cir. 2016)....................17

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
673 F.3d 1361 (Fed. Cir. 2012)....................16

*Fenner Invs., Ltd. v. Cellco P'ship*,
778 F.3d 1320 (Fed. Cir. 2015)....................6

*Fiber, LLC v. Ciena Corp.*,
792 Fed. Appx. 789 (Fed. Cir. 2019)....................16, 17

*Intelligent Automation Design, LLC v. Zimmer Biomet CMF and Thoracic, LLC*,
799 Fed. Appx. 847 (Fed. Cir. 2020)....................20

*Inventio AG v. ThyssenKrupp Elevator Am. Corp.*,
649 F.3d at 1357....................15

*In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011)....16

*Konami Gaming, Inc. v. Marks Studios, LLC*, 2017 WL 3174905 (D. Nev. July 25, 2017)....16, 18

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371 (Fed. Cir. 2007)....12

*Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209 (Fed. Cir. 2006)....4

*MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*, 687 F.3d 1377 (Fed. Cir. 2012)....4

*Markman v. Westerview Instruments, Inc.*, 517 U.S. 370 (1996)....1, 3, 14

*Med. Instr. & Diag. Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003)....18

*Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313 (Fed. Cir. 2005)....3, 7

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008)....3, 14

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003)....11

*Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509 (Fed. Cir. 2015)....11

*Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307 (Fed. Cir. 2007)....12

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696 (Fed. Cir. 1998)....20

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).... *passim*

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013)....20

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998)....13

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999 (Fed. Cir. 2016)....4, 8, 9

*Schriber-Schroth Co.* v. *Cleveland Trust Co.*,
311 U.S. 211 (1940) ... 3, 8

*SightSound Techs., LLC v. Apple Inc.*,
809 F.3d 1307 (Fed. Cir. 2015) ... 11

*Sitrick v. Dreamworks, LLC*,
516 F.3d 993 (Fed. Cir. 2008) ... 4, 8, 9

*Trs. of Bos. Univ. v. Everlight Elecs. Co.*,
896 F.3d 1357 (Fed. Cir. 2018) ... 4, 8, 9, 12

*Trustees of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ... 3

*U.S. v. Masonite Corp.*,
316 U.S. 265 (1942) ... 12, 14

*United States* v. *Adams*,
383 U.S. 39 (1966) ... 4

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ... 11

*Williamson v. Citrix Online LLC*,
792 F.3d 1339 (Fed. Cir. 2015) ... 14, 15, 16, 17

**Statutes**

35 U.S.C. § 112 ... *passim*

**TABLE OF EXHIBITS**[1]

| Exhibit | Document Description |
|---|---|
| **A** | Claim Construction Order dated August 10, 2020 and entered as docket entry number 127 in Oyster Optics, LLC v. Ciena Corporation, Case No. 4:17-cv-05920. |
| **B** | Claim Construction Memorandum Opinion and Order dated July 23, 2020 *Oyster Optics, LLC v. Infinera Corporation, et al*. No. 2:19-cv-00257-JRG (E.D. Texas) (Dkt. No. 88). |
| **C** | Declaration of Professor Keith Goossen |
| **D** | U.S. Patent No. 10,554,297. |
| **E** | U.S. Patent No. 6,665,500. |
| **F** | U.S. Patent No. 6,594,055. |
| **G** | Excerpts from the Treatise, Handbook of Optics |
| **H** | Declaration of Richard Gitlin, SC.D. In Support of Ciena's Preliminary Claim Constructions that was filed *Oyster Optics, Inc. v. Ciena Corporation*, Case No. 4:17-cv-05920-JSW (Dkt. No. 100-2). |
| **I** | Declaration of Professor Daniel Blumenthal, Ph.D |

[1] Exhibits A to H were filed with Oyster's Opening Claim Construction Brief. Dkt. No. 45. Exhibit I is being filed concurrently with Ciena's Responsive Claim Construction Brief.

Defendant Ciena Corp. ("Ciena") respectfully submits this brief in support of its proposed constructions for the disputed claim terms in U.S. Patent Nos. 6,665,500 ("the '500 patent") and 10,554,297 ("the '297 patent") (collectively "the Asserted Patents").

## I. INTRODUCTION

The parties' *Markman* positions reflect vastly different approaches to claim construction. For its part, Ciena faithfully applies the claim construction framework that the Federal Circuit established in *Phillips* and its progeny by proposing definitions for the disputed terms that are firmly grounded in the full intrinsic record—the Asserted Patents' claims, specifications, and prosecution histories.

Oyster, in contrast, consistently argues for "ordinary meaning" detached from anything in the patent and uninformed by the specification. Oyster's broad proposed constructions wrongly divorce the claim language from express descriptions of the inventions and ignore the inventor's criticisms of prior art and inventions that pre-existed these patents. Oyster's approach runs contrary to the fundamental public policy principle that inventors should receive protection only for that which they have actually invented. Oyster's approach also undermines the Supreme Court's edict in *Markman* that claim construction of disputed terms is for the Court, not the jury. *Markman v. Westerview Instruments, Inc*., 517 U.S. 370, 372 (1996). Rather than grounding its proposed constructions in the actual descriptions of the invention provided in the Asserted Patents, Oyster's proffered constructions rely upon misguided attorney argument and generic unsupported conclusory statements concerning a person of ordinary skill in the art.

## II. THE ASSERTED PATENTS

Oyster grossly expands the scope of purported invention by stating that the Asserted Patents are broadly directed to "transporting information by modulating light waves transmitted and received across transparent optical fibers." Dkt. 45 at 2:13-14. The concept of transporting information by modulating light waves was known well before the Asserted Patents. Ex. I at 7:3-12:19. Oyster is doubly wrong that claimed systems "demonstrate[] a significant advancement over the state of the art." Dkt. 45 at 2:12-17.

The '500 patent is directed to a "dual-mode fiber optic telecommunications system." *See,*

*e.g.*, Ex. E at Title. The transmitter is "for transmitting ***either*** phase-modulated ***or*** amplitude modulated optical signals." *Id*. at 2:27-28 (emphasis added). The '500 patent's receiver is "for receiving ***either*** phase-modulated ***or*** amplitude-modulated optical signals." *Id.* at 2:27-31 (emphasis added). This "can permit the transmitter to work with different types of receivers." *Id.* at 2:45-46. As Oyster notes, the patent mentions that in "certain circumstances a mixture of phase and amplitude modulation ***could be possible***. For example, amplitude modulated signals not related to the input optical data stream could be transmitted during the secure phase-modulation mode without necessarily affecting security." *Id.* at 4:35-42 (emphasis added). But the patent's musing about possibilities is not an actual disclosure of *how* to transmit a signal that has data modulated on the amplitude and phase. Indeed, Ciena's expert Dr. Blumenthal provided the unrebutted opinion that any mode with *both* amplitude and phase modulated signals is not enabled. Ex. I at 13:22-22:12; 25:1-23 (although the '500 patent mentions "a second mode that amplitude modulates and *then* phase modulates the signal, such a mode is not enabled" and "requires that the receiver has a multilevel detection circuit, which is not disclosed in the specification and would require undue experimentation by a POSITA"). In any event, the patent does not disclose *how* one could simultaneously transmit both amplitude and phase modulated signals.

The '297 patent is directed to specific solutions to detect and protect against optical taps. Ex. D at 4:20-6:61. Notwithstanding the '297 patent's assertion that existing "systems [had] the disadvantage that the fiber can be easily tapped and [were] not secure" (*id.* at 1:59-60), it was generally known prior to the alleged invention to monitor the status of signals being passed through an optical fiber and provide an alarm if the power level of the signal falls. Ex. I at 8:6-16. In fact, it was known for decades to monitor for changes in the power level to detect intrusion into a system. *Id.* at 8:17-18 (citing Ex. C (U.S. Patent No. 4,435,850) at 2:30-49). The invention of the '297 patent is thus a narrow implementation of tap detection capabilities. *Compare* Ex. D at 6:29-32 (the energy level circuit monitors "optical power" for changes "to indicate a potential optical tap, tamper or other degradation of the optical signal") *with* Ex. C to Ex. I (U.S. Patent No. 4,435,850) at 2:39-49 ("monitor[ing] the average optical power level at the receiver[] . . . any

deviation beyond the preset threshold or amplitude region is most likely due to an intruder tampering with the optical fiber"). The narrow and only innovation claimed in the '297 patent is to use known tapping detection technology with phase modulated signals having a constant amplitude. Ex. D at 4:53-61.

## III. CLAIM CONSTRUCTION PRINCIPLES

"The purpose of claim construction is to determine the meaning and *scope* of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (emphasis added). The Supreme Court instructs that "[t]he claims of a patent are *always* to be read or interpreted in the light of its specifications." *Schriber-Schroth Co.* v. *Cleveland Trust Co.*, 311 U.S. 211, 217 (1940) (emphasis added); *see also Markman* v. *Westview Instruments, Inc.*, 517 U.S. at 389 (claim construction entails an "analysis of the whole document, required by the standard construction rule that a term can be defined only in a way that comports with the instrument as a whole"). The Federal Circuit has likewise explained that words in a claim "are generally given their ordinary and customary meaning"—that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention…." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, *but in the context of the entire patent, including the specification*." *Id*. (emphasis added). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1362-64 (Fed. Cir. 2016); *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term…in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.").

This jurisprudence establishes a fundamental canon in claim construction: the specification provides critical context for construing claim language and determining scope.

Because the claims and the written description are part of one integrated document, "it is fundamental that claims are to be construed in the light of the specification[] and both are to be read with a view to ascertaining the invention." *United States* v. *Adams*, 383 U.S. 39, 49 (1966).

As this Court explained in the first case between Oyster and Ciena, "the Court has an *obligation* to assign 'a fixed, unambiguous, legally operative meaning to the claim' in order to '*ensure that questions of the **scope** of the patent claims are not left to the jury*.'" 4:17-cv-05920-JSW Dkt. No. 127 at 6:8-11 (emphasis added; citations omitted). In terms of "scope," the "specification...must teach those skilled in the art how to make and use the *full scope* of the claimed invention...." *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) (emphasis added). This statutory requirement is limited to what is claimed. For that reason, the "enablement inquiry necessarily *depends on an interpretation of the claims*." *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224, n.2 (Fed. Cir. 2006) (emphasis added). In other words, the *full scope* of the claim, as interpreted by the Court, must be enabled. *Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018); *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008).

The canon favoring constructions that preserve claim validity counsels against construing claim terms so broadly that the *full scope* is not disclosed or enabled. *See, e.g.*, *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) ("[T]he specification makes no mention of wireless communications," thus "[t]he canon favoring constructions that preserve claim validity therefore counsels against construing 'communications path' to include wireless communications."). In parallel with this canon, Federal Circuit precedent instructs that claims should be invalidated when the full scope of the claim as construed is not enabled. In *MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*, 687 F.3d 1377, 1381-83 (Fed. Cir. 2012), the claim was interpreted to cover all changes in resistance of "10% or more" (*e.g.*, 100% or 1000%), and it was the lack of any teaching of how to achieve the resistance change even a little bit above 10% that rendered the claim not enabled. In *Sitrick*, 516 F.3d at 999-1001, the claim was construed to cover both video games and movies, and Court determined that moves were not enabled. In *Trustees of Boston University*, 896 F.3d at 1360, 1362-65, the parties agreed

that the claim covered six permutations and the Court concluded one of those permutations was not enabled thus rendering the claims invalid.

## IV. DISPUTED CLAIM TERMS

### A. "phase modulator for phase modulating light from the light source" (claim 1)/ "phase modulating light from a laser" (claim 17)/phase modulate terms (claims 8, 19)

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "phase modulate" means "alter the phase of light to create an optical signal having a phase that is representative of data" | "Phase Modulator" Claim 1, 8<br>a device that alters the phase of light to create an optical signal having a phase that is representative of data. The phase modulator does not perform amplitude modulation.<br>"Phase Modulating" / "Phase Modulated" Claim 17, 19<br>altering the phase of light to create an optical signal having a phase that is representative of data, wherein the phase modulating does not include amplitude modulating. |

Oyster offers no construction for "phase modulator." Dkt. No. 45 at 5:17-8:23. At the same time, Oyster concedes that the claimed "phase modulator" in other patents by the same inventor "excludes use of amplitude modulation." *Id.* at 6:24-26; *see also id.* at 2:10-11 (the '500 patent concerns "the same general area of technology"). Moreover, this Court has previously acknowledged that "both parties agree that phase modulation uses phase (not amplitude) to communicate." 4:17-cv-05920-JSW Dkt. No. 127 at 18:10-11.

Rather than honoring past positions or offering a competing construction, Oyster asserts that the dispute with Ciena is the "exact dispute" resolved by Judge Payne in a Texas case between Oyster and Infinera. *Id.* at 5:24-6:4. This is incorrect. Judge Payne construed "phase modulate" (an action) not "phase modulator" (a physical device). Ex. B at 16. The distinction between "phase modulate" and "phase modulator" is critical because, as reflected in Ciena's proposed construction, there is no disclosure of a "phase modulator" device in the '500 patent that performs *both phase and amplitude modulation*. Rather, the amplitude modulation and phase modulation are performed by *different devices* (amplitude modulation via the laser controller and phase modulation in the phase modulator) in the '500 patent, an undisputed fact that undercuts all of Oyster's arguments regarding this term. *See* Ex. E at 2:33-34; 4:65-67; 5:21-25; 5:35-37; Ex. I at 24:7-25:1; *see also id.* at 15:1-7; 17:4-20:24.

Oyster's failure to address the undeniable disclosure of *different* devices serving as the amplitude modulator and phase modulator exposes the fallacies in Oyster's arguments. For example, Oyster points to the '500 patent's disclosure of a "phase and amplitude modulated transmission mode" and a singular instance of the phrase "mixed optical signal" at the receiver. Dkt. No. 6:5-23. But neither of these disclosures address the fact that different devices modulate amplitude and phase separately and at different times. Dr. Blumenthal explained this by noting (i) that when the bit data is set to three (binary "11") the signal is amplitude modulated ***and then*** phase modulated (Ex. I at 13:26-15:7; 17:4-12; 19:14-20:24) and (ii) that the "mixed" signal is the signal 25 in Fig. 2 consisting of an amplitude 23 and phase 22 signal set serially (back-to-back)[2] (*id.* at 21:1-13). As can be seen, the patent's express disclosure refutes Oyster's attorney argument that phase and amplitude modulation is "simultaneous." Dkt. No. 45 at 7:9-10. The fact that amplitude modulation and phase modulation are performed by *different devices* in the patent makes Oyster's argument inconceivable.

Neither party disputes that claims must be interpreted "in view of the specification." *Phillips*, 415 F.3d at 1315; *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("[T]he claims cannot enlarge what is patented beyond what the inventor has described as the invention."). Here, Oyster never disclosed, let alone enabled, a "phase modulator" that performs *simultaneous* phase and amplitude modulation. This is confirmed by the inventor's silence about such a hypothetical modulator in the specification and by the contrary explanation that phase and amplitude modulation occur in two separate "modes" via two separate devices. Ex. E at 2:41-45; 3:22-27; Ex. I at Table 1; Table 2; 13:20-17:13; 20:11-22:12; 23:7-11; 24:1-25:23; 27:1-18.

Oyster's claim differentiation argument regarding claim 18 is a *non sequitur* because the term "phase modulator" does not exist in claim 18. Dkt. No. 45 at 7:15-28. Moreover, claim differentiation "cannot enlarge the meaning of a claim beyond that which is supported by the patent documents…." *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1327 (Fed. Cir. 2015). Dr. Blumenthal studied the '500 patent and his unrebutted opinion is there is no support for a first

[2] Oyster even refers to the "mixed" signal as an "alternative stream." Dkt. No. 45 at 6:17-19.

mode that includes both amplitude and phase modulation. Ex. I at 13:25-27:18; *also compare* Ex. E at 2:48-51; 5:35-49; 5:63-64; 7:12; 7:62-65 (describing phase modulation in a first mode without any reference to amplitude modulation) *with id.* at 2:56-3:34; 4:5-12; 5:1-34; 5:49-50; 7:57-61 (describing amplitude modulation in a second mode). Oyster's argument that Ciena's construction renders claim 19 incomprehensible likewise fails because, as claim 19 explains, in the "second mode" the light is both amplitude-modulated and phase-modulated. This does not mean that a single phase modulator performs both amplitude and phase modulation and the patent describes no such scenario. Instead, claim 19 is consistent with Dr. Blumenthal's explanation that, in the second mode (bit data = 11,) the light is pulsed ***and then*** phase modulated. Ex. I at 15:1-25:23. Said differently, amplitude modulation in the '500 patent is always done by **pulsing the laser—**any phase modulation that might occur in the phase modulator in the second mode when the bit data is 11 occurs later, **separate and apart from the amplitude modulation performed by pulsing the laser.** *Id.* at 30:13-23. For at least these reasons, the Court should adopt Ciena's proposed construction of "phase modulator."

Once the patent is properly understood to disclose *separate* amplitude and phase modulators, construction of the "phase modulating" term must logically be tied to the patent's disclosure of the modulator device that performs such modulation. As detailed above, the specification discloses (i) phase modulating the signal, e.g., bit data = 00, (ii) amplitude modulating the signal, e.g., bit data = 01 or 10, or (iii) amplitude ***and then*** phase modulating the signal, e.g., bit data = 11. Only Ciena's proposed construction properly excludes amplitude modulation from the phase modulation process consistent with the specification. *Medrad*, 401 F.3d at 1319.

Oyster's untethered interpretation of claim scope is clearly erroneous and seeks to cover an invention nowhere described in the patent. According to Oyster, "[j]ust as phase modulation does not exclude amplitude modulation, amplitude modulation does not exclude phase modulation." Dkt. No. 45 at 9:11-12. If Oyster's view were correct, then the "first" and "second" modes described in the patent would be superfluous and indistinguishable. For example, viewing claim 17 through Oyster's lens results in: "a first transmission mode so as to

transmit [amplitude and] phase-modulated optical data" and "a second alternate transmission mode so as to transmit [phase and] amplitude-modulated optical data." This bizarre result, necessitated by the broad scope proposed by Oyster's construction, would render claim 17 nonsensical. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct [elements]' of the patented invention.") (citations omitted). Oyster's proposed construction is also inconsistent with the specification and attempts to improperly capture something other than what the patentee described as the invention.

Oyster's overly broad construction seeks to improperly capture something other than what is described in the patent. By divorcing these terms from the description of the patent specification, Oyster's construction creates a non-enabled phase modulator that cannot be correct. *Trs. of Bos. Univ.*, 896 F.3d at 1360, 1362-65. In contrast, Ciena's proposed constructions stay true to the important policy consideration that inventors receive protection for only what is actually invented and disclosed.

**B. "phase-modulated optical signals" (claims 1, 16)**

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "phase modulate" means "alter the phase of light to create an optical signal having a phase that is representative of data" | "optical signals having a phase that is representative of data. The amplitude of the optical signals is not representative of data" |

This term is similar to the "phase modulating" term above. Again, "[t]he claims of a patent are *always* to be read or interpreted in the light of its specifications." *Schriber-Schroth Co.*, 311 U.S. at 217. And case law counsels against construing claim terms so broadly that the full scope includes concepts that are not even disclosed in the specification. *Ruckus Wireless*, 824 F.3d at 1004; *Sitrick*, 516 F.3d at 999. Ciena's construction stays true to the full and enabled scope of the term and should be adopted for the reasons detailed above.

**C. "amplitude-modulating the light from the laser" (claim 1) / "amplitude-modulated signals" (claim 16) / "amplitude modulating light from the laser" (claim 17)**

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "altering the amplitude of light to create an | "altering the amplitude of light to create an |

| | |
|---|---|
| optical signal that is representative of data." | optical signal having an amplitude that is representative of data. The use of amplitude modulation does not include phase modulation." |

The proper construction for these terms, similar to the two discussed above, turns on whether (i) the specification discloses and enables a scope for amplitude modulating that also includes phase modulating and whether (ii) it is proper to construe amplitude-modulating and phase-modulating to have the same broad scope. *Ruckus Wireless*, 824 F.3d at 1004; *Becton*, 616 F.3d at 1254; *Sitrick*, 516 F.3d at 999. First, the proper construction cannot be so broad that it includes permutations of amplitude modulation that are neither disclosed nor enabled (Ex. I at 22:17-30:23), but this is exactly what Oyster urges. *Trs. of Bos. Univ.*, 896 F.3d at 1360, 1362-65. Second, just as phase modulation cannot have a scope that is so broad that it is interchangeable with amplitude modulation, amplitude modulation cannot have a scope that is so broad that it is indistinguishable from phase modulation. Oyster's proposed construction results in this impermissible outcome. Dkt. No. 45 at 9:11-12. As with the two terms discussed above, Ciena respectfully requests the Court to adopt Ciena's construction.

**D. "a receiver having an interferometer" (claim 16)**

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "a receiver having a device that performs a measurement using the interference phenomena produced between one or more signal beams of light and one or more reference beams of light" | "A receiver having a device that splits received light into a first wave and a second wave, delays the first wave relative to the second wave, recombines the delayed first wave and the second wave, and detects an intensity of the recombined waves." |

From the outset, Oyster's arguments and proposed construction violate well-established claim construction tenets. Critically, Federal Circuit precedent does not require explicit redefinition or disavowal as Oyster suggests. Dkt. 45 at 9:26-28. *See, e.g., Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) ("This clear expression need not be in *haec verba* but may be inferred from clear limiting descriptions of the invention in the specification or prosecution history."). In *Phillips*, the Federal Circuit rejected a patentee's contention that a claim term be given its full range of ordinary meaning absent lexicography or disclaimer instead

holding, *en banc*, that "the specification is ***always*** highly relevant to the claim construction analysis" and is, in fact "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d 1315 (emphasis added).

In this case, the intrinsic record supports Ciena's proposed construction while proving Oyster's incorrect. The '500 patent describes "the present invention" as providing a receiver that "includes an interferometer" that reads the phase modulated optical signals and *delayed* amplitude modulated signals. Ex. E at 3:46-55. Only one embodiment of the claimed interferometer is described in the specification, and the interferometer is, again, described in the context of part of the "present invention [which] provides a receiver compatible with existing transmitters." *Id.* at 6:20-25. This description of the "present invention" goes on to explain that the patented receiver has an interferometer, and "[t]he interferometer 40 has a coupler/splitter 34, functioning as a **splitter**, and a coupler/ splitter 36, functioning as a **coupler**." *Id.* at 6:36-39. The incoming optical signals, e.g., 22 (teal), "enter interferometer 40 [red] at an input 41 of splitter 34. Splitter 34 splits the light entering input 41, so that the signals 22 [] travel over both a first fiber 43 and a second fiber 45." *Id.* at 6:53-57. This description of the claimed interferometer comports with the splitting of the incoming signal into a first wave and second wave as in Ciena's construction.

Fig. 2

*Id.* at FIG. 2 (annotated).

The "[s]econd fiber 45 includes a delay fiber 46 which may include a fiber loop of a desired length. Delay fiber 46 then provides an input to coupler 36 which recombines the delayed signal (purple) with the non-delayed signal (green) propagating through fiber 43 … at output 42. The physical delay imposed by the interferometer 40 in the second light path through fiber 45, with its delay loop 46, with respect to light passing through the first light path through fiber 43." *Id.* at 6:59-67. This description of the claimed interferometer comports with the delaying the first wave relative to the second wave and the recombining of the two waves, as in Ciena's proposed

construction. Ciena's proposed construction further requires detecting an intensity of the recombined waves, and this function of the patented interferometer is described in detail in the specification. *Id.* at 7:19-29.

The '500 patent further limits the scope of invention by explaining that the receiver of the "present invention" is compatible with the transmitter disclosed in U.S. Application No. 09/765,153, which published as U.S. Patent No. 6,594,055 (Ex. F). *Id.* at 6:20-25. Just like the '500 patent, the '055 patent describes only *one* interferometer that splits received light into a first wave and second wave, delays the first wave relative to the second wave, recombines the two waves, and detects an intensity of the recombined waves. This is consistent with only Ciena's proposed construction. Ex. F at 5:7-67; *see also* Ex. I at 38:7-39:20. "When a patent … describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1308 (Fed. Cir. 2007).

Oyster's contention that claim 16 is broad enough to cover *any interferometer* that measures interference between a signal beam and reference beam should be categorically rejected. Dkt. 45 at 10:10-27.[3] The inventor of the '500 patent disavowed claim scope broad enough to capture any interferometer by disparaging prior art describing other types of interferometers. *See Openwave Sys., Inc. v. Apple Inc*., 808 F.3d 509, 513 (Fed. Cir. 2015); *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1317 (Fed. Cir. 2015). Specifically, the '500 patent disparages prior art communications systems that use Sagnac interferometers. *See* Ex. E at 1:47-2:3. For example, the '500 patent criticizes other interferometer systems as having the "disadvantage that they require the light to travel over a loop, whether back and forth in a single fiber or over a long length looped fiber" and for being expensive to build and not working well with existing systems. *Id.* 1:59-61; 2:1-3. Oyster's proposed construction cannot be correct because it would recapture claim scope abandoned by disparaging prior art interferometric-based

[3] It should not surprise that Oyster's open-ended construction is an attempt to capture Ciena's receiver design in infringement, notwithstanding the fact that Ciena's receiver employs fundamentally different techniques through different components than the claimed interferometer.

systems, such as the prior art Sagnac interferometers, that clearly measure interference. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (noting that a district court should protect "the public's reliance on the definitive statements made during the prosecution by precluding the patentee from "recapturing" an interpretation disclaimed during prosecution through claim construction.")

The '500 patent simply does not enable every possible way of recovering data in a receiver and Oyster's construction fails for this separate reason. *Id.* at 39:27-40:2. Indeed, Federal Circuit precedent makes clear that the specification must enable the full scope of the claimed invention. *See, e.g. Trs. of Bos. Univ.*, 896 F.3d at 1360, 1362-65; *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1378-79 (Fed. Cir. 2007).

The situation here involves a specification that in all respects tells us what the claims mean, buttressed by statements made disparaging other types of interferometers. To attribute to the claims a meaning broader than any indicated in the patent and its disclosure to the Patent Office "would be to ignore the totality of the facts of the case and exalt slogans over real meaning." *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1316 (Fed. Cir. 2007). Oyster's proposed construction, unbounded by the '500 patent's disclosure, contravenes the fundamental principle that inventors should receive protection only for what they have actually invented. *U.S. v. Masonite Corp.*, 316 U.S. 265, 277 (1942) ("[T]he public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention."). For all of the reasons set forth above, only Ciena's proposed construction comports with the '500 patent's disclosure of "a receiver having an interferometer" and should be adopted.

**E. "laser is directly adjacent the phase-modulator" (claim 8)**

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "laser is next to the phase-modulator with no component in-between" |

Oyster wrongly cites a pre-*Phillips* case for the incorrect proposition that claim construction involves *only* an analysis of the actual words of the claim. Dkt. 45 at 11:15-16. The *en banc* Federal Circuit rejected Oyster's characterization in *Phillips*, finding that the

specification is always highly relevant to claim construction analysis and, perhaps more important to the analysis here, that the specification is usually dispositive when a proposed construction most naturally aligns with the specification's description of the invention. *See Phillips*, 415 F. 3d at 1316; *see also Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent.").

Ciena's proposed construction naturally aligns with the patent's clear description of the invention. Starting with the claim, the patent plainly states that the "laser is ***directly*** *adjacent* to the phase-modulator." Ex. E at 8:58-59. By inserting the adverb "directly" before "adjacent," the patentee clearly informed the public that the invention of this dependent claim included a laser and phase modulator that are next to each other with no intervening components. The deliberate addition of "directly" demonstrates the inventor intended a narrower scope than what Oyster argues as the claim could have been written more broadly to not require the laser to be *directly* next to the phase modulator.

The '500 patent specification further confirms Ciena's proposed construction by explaining that the phase modulator 16 is "*directly next to* ***or*** part of the same package as laser 12." *Id*. at 4:61-64. When read in conjunction with the intentional decision to claim a transmitter in which the laser and phase modulator are "directly adjacent" to each other, one of skill in the art would conclude that there are no components between the phase modulator and laser. Ex. I at 41:19-23. Finally, Ciena's proposed construction is yet further confirmed by Figure 1 in the '500 patent, which shows the laser 12 and phase modulator 16 directly next to one another with no components in between.




Ex. E at Fig. 1(annotated).

Oyster's proposed construction should be rejected because it attempts to run from the disclosed—and claimed—inventive concept, leaving Oyster free to argue for claim scope broader than the totality of what is described. Oyster is wrong that plain English words do not require construction. Indeed, Federal Circuit precedent makes clear that plain English words warrant construction when the parties dispute claim scope. *O2 Micro*, 521 F.3d at 1360. Moreover, some plain English terms can have technical meanings in particular fields. Here, while "directly adjacent" arguably has plain meaning in certain contexts, it has a more specialized meaning in optical telecommunication networks and thus requires construction. *See Markman*, 52 F.3d at 967 (interpreting "inventory" as used in patent claim to mean "articles of clothing" rather than cash or inventory receipts). The Court need look no further than Oyster's Opening Brief to confirm this conclusion, as Oyster contends that claim term "directly adjacent" does *not* mean next to, thus creating a significant dispute which cannot be left to the jury to resolve. Dkt. 45 at 12:7-10. Ciena's proposed construction should be adopted because it properly describes the invention as described throughout the intrinsic record. *Masonite Corp.*, 316 U.S. at 277.

**F. "control electronics to provide control signals, in accordance with the data stream, to the laser . . ." (claim 14)**

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| Plain and ordinary meaning. The term is not indefinite and not subject to 35 U.S.C. § 112, paragraph 6. | The claim limitation "control electronics to provide control signals, in accordance with the data stream, to the laser…" invokes 35 U.S.C. § 112, sixth paragraph.<br><br>**Function:** to provide control signals, in accordance with the data stream, to the laser…"<br>**Structure:** The written description fails to disclose the corresponding structure, material, or acts for performing the claimed function. Therefore, the claim is indefinite. |

The parties dispute whether "control electronics" is a means-plus function term and, if so, whether the specification fails to identify corresponding structure thus rendering the term indefinite. A claim term lacking the word "means" is subject to § 112, ¶ 6 where it "fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing the function.'" *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348

(Fed. Cir. 2015). If a term lacks the word "means," a rebuttable presumption exists that § 112, ¶ 6 does not apply. *Id.* However, this presumption can be rebutted if the intrinsic and extrinsic evidence so warrant. *Inventio AG v. ThyssenKrupp Elevator Am. Corp.*, 649 F.3d at 1357 ("It is proper to consult the intrinsic record, including the written description, when determining if a challenger has rebutted the presumption that a claim lacking the term 'means' recites sufficiently definite structure.").

If § 112, ¶ 6 applies, claim construction for a § 112, ¶ 6 term is a two-step process. "The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*, 792 F.3d at 1351-52. If the patentee fails to disclose adequate structure corresponding to the claimed function, the claim is indefinite. *Id.*

### 1. "Control Electronics" Is a Means-Plus-Function Term Subject to § 112, ¶ 6

The absence of the word "means" in the "control electronics" term creates a rebuttal presumption that § 112, ¶ 6 does not apply. Because the disputed "control electronics" limitation recites a function to be performed without providing sufficiently definite structure for performing that function, the presumption is easily rebutted by the preponderance of the evidence. *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016). Thus, the "control electronics" term should be construed as means-plus-function.

Claim 14 recites "control electronics to provide control signals, in accordance with the data stream, to the laser and modulator to modulate the laser in accordance with data stream." "'Control electronics' has no known structural meaning" (Ex. I at 45:7-22), and thus is not understood in the art as the name of a sufficiently definite structure for performing the functions recited. Further, the word "control" is simply an adjective describing electronics that is again repeated to describe the provided signals. Indeed, the two appearances of the word "control" could be removed from the claim limitation with no change to the meaning of the claim. The word "control" therefore cannot impart structure to "electronics." The claim thus confirms that the "control electronics" phrase merely recites function without reciting sufficient structure to perform that function.

Further, this claim limitation is not analogous to cases involving a "controller" or "processor" where recited function could be performed by a general purpose controller or processor – *e.g.*, "processing," "receiving," or "storing" – then "processor" might be understood to provide sufficient structure. *See In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (holding asserted claims "do not run afoul of the rule against purely functional claiming, because the functions of 'processing,' 'receiving,' and 'storing' are coextensive with the structure disclosed, *i.e.*, a general purpose processor."). The term "control electronics" is a nonce word with even less structure than a controller because of the vague addition of "electronics" to the term. *Williamson*, 792 F.3d at 1350-51 ("distributed learning control module" is subject to § 112, ¶ 6); *Fiber, LLC v. Ciena Corp.*, 792 Fed. Appx. 789, 795 (Fed. Cir. 2019) (claimed "control" is a "generic box"); *Ergo Licensing, LLC v. CareFusion 303,* Inc., 673 F.3d 1361, 1363-64 (Fed. Cir. 2012) ("The recitation of 'control device' provides no more structure than the term 'control means' itself, rather it merely replaces the word 'means' with the generic term 'device."'); *Konami Gaming, Inc. v. Marks Studios*, LLC, No. 2:14-cv-01485-JAD-CWH, 2017 WL 3174905, at *6 (D. Nev. July 25, 2017) ("game controller" is "a nonce term to mean a 'computer means' of carrying out computer-implemented functions"). Moreover, the recited functionality is not a function inherent to "control electronics" or even a "controller" or "processor," but instead requires programming to implement the recited function of "provid[ing] control signals, in accordance with the data stream, to the laser…." Because the "control electronics" limitation fails to recite sufficient structure for performing this functionality, § 112, ¶ 6, applies.

The specification confirms the functional nature of the claim language. First, Figure 2 depicts "modulator and laser control electronics 18" as a black box and does not label the outputs of that functional box. Further, the specification never once uses the claim terms "control electronics" or "control signals." But the specification does refer to electronic controller 18 or controller 18 in two contiguous sentences. Ex. D at 4:47-52. And, with respect to the recited function related to the laser, that *de minimis* disclosure merely states that controller 18 "*may provide power* to laser 12." *Id.* at 4:50 (emphasis added); *see also* Ex. I at 45:7-22. There is no

disclosure that controller 18 functions "to provide control signals, in accordance with the data stream, to the laser…." There is no dispute that powering a laser is entirely different from the claimed function. As such, the "control electronics" term fails to provide any structures or algorithms let alone sufficiently definite structure or algorithms for performing the recited function. Ex. I at 45:7-22. Oyster likewise offers no testimony to rebut Ciena's expert testimony explaining the above and Oyster's assertion that the Blumenthal Declaration is conclusory is false, unsupported attorney argument. Dkt. 45 at 17:3-5.

Oyster urges a construction of plain and ordinary meaning without providing a proposed definition, thus effectively arguing that no construction is necessary. Oyster's proposal should be rejected because the claimed "control electronics" invoke § 112, ¶ 6. Additionally, Oyster's proposal should be rejected because "control electronics" has no plain and ordinary meaning and the lack of a definition effectively leaves the term unmoored giving Oyster unfettered license to identify any hardware or software as meeting this definition. *Eon Corp. IP Holdings LLC v. Silver Spring Network, Inc*. 815 F.3d 1314, 1319 (Fed. Cir. 2016) (reversing district court's finding that claim term was entitled to plain and ordinary meaning and holding that district court's duty is to construe terms that are in controversy and resolve disputes about claim scope.").

**2. "Control Electronics" Is Indefinite**

Because § 112, ¶ 6, applies the Court must (1) identify the claimed functions, and then (2) "determine what structure, if any, disclosed in the specification corresponds to the claimed function[s]." *Williamson*, 792 F.3d at 1351. The claimed function is "to provide to provide control signals, in accordance with the data stream, to the laser and modulator to modulate the laser in accordance with data stream." Ciena's briefing focuses on the first part of the claimed function because the specification indisputably fails to disclose how the "control electronics" "provide control signals, in accordance with the data stream, to the laser…." And, as a result, case law requires a finding that the term is indefinite. *Id*. at 1351-52 ("Where there are multiple claimed functions, as we have here, the patentee must disclose adequate corresponding structure to perform all of the claimed functions. If the patentee fails to disclose adequate corresponding structure, the claim is indefinite."); *Fiber*, 792 Fed. Appx. at 795 (finding a § 112, ¶ 6 term

indefinite because there was insufficient corresponding structure in the specification for the function of the claimed "control"); *Dionex Softron v. Agilent Tech., Inc.*, 811 Fed. Appx. 630, 632 (Fed. Cir. 2020) (affirming that the § 112, ¶ 6 term "control unit" is indefinite); *Konami Gaming*, 2017 WL 3174905 at *4-*6 (for claims directed to digital slot machines, finding term "game controller" to be a nonce term subject to § 112, ¶ 6, and finding term was indefinite because the specification, while describing the functions the controller had to perform, failed to provide any detail as to how the function was performed, *i.e.*, what algorithm it used). The specification's lack of disclosure here perhaps explains why Oyster fails to suggest any § 112, ¶ 6 construction, even in the alternative.

Oyster argues the disputed term avoids indefiniteness because it is "hard-to-believe" that "control electronics" are a "black box." Dkt. 45 at 17:24-25. That is pure speculation and unsupported attorney argument and should be rejected. Oyster next argues that the disclosure of controller 18 is "exemplary structure." *Id*. at 18:4. But Oyster cites no evidence and makes no argument that controller 18 performs the recited function. This is likely because, as demonstrated above, the specification does not disclose that controller 18 performs the recited function as the specification only discloses that controller 18 provides power to the laser, nothing more. In this circumstance, indefiniteness is the only proper result. *Med. Instr. & Diag. Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid [the price for use of the convenience of broad claiming afforded by § 112, sixth paragraph], but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification. Such is impermissible under the statute."); *In re Donaldson*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) ("[I]f one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language. If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112."). Further, to the extent Oyster argues otherwise, "the inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be

capable of implementing a structure." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 953 (Fed. Cir. 2007).

### G. "energy level circuit" (claim 1) / "energy level detector" (claim 17)

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| Plain and ordinary meaning. The claim limitations are not means-plus function.<br>In the alternative, if the terms are subject to 35 U.S.C., sixth paragraph:<br>**Structure:**<br>a photodetector, an amplifier, and a comparator, or equivalents thereof. *See, e.g.*, '297 patent at 2:50-51; 3:30; 3:66-67; 5:40-46; 5:51-67; 6:3-16; Fig. 3.<br>**Function:**<br>detecting an energy level of the optical data signal. *See, e.g.*, '297 patent at 3:30-37; 5:20-21; 5:40-46. | The claim limitations "energy level circuit" and "energy level detector" invoke 35 U.S.C. § 112, sixth paragraph.<br>**Structure:**<br>a circuit on the circuit board that includes a photodetector, an amplifier, and a comparator. *See, e.g.*, '297 patent at 2:50-51; 3:30; 3:66-67; 5:40-46; 5:51-67; 6:3-16; Fig. 3 (circuit 33 having photodetector 153, amplifier 155, and comparator 156 and/or 157).<br>**Function:**<br>detecting an energy level of the optical data signal. *See, e.g.*, '297 patent at 3:30-37; 5:20-21; 5:40-46. |

First, the parties dispute whether the "energy level" terms are means-plus-function terms subject to 35 U.S.C. § 112, ¶ 6. Second, should § 112, ¶ 6 apply, the parties dispute the corresponding structure of the claimed "energy level circuit/detector."

As an initial matter, the "energy level detector" claim limitations in this case and the prior case are *different*. The claims in the two cases use vastly different modifying language that follows the term "energy level detector." *Compare* Ex. D at claim 1 *with* 4:17-cv-05920-JSW Dkt. 127 at 3-4 (claim 1 of the '327 and '898 patents). Thus, contrary to Oyster's argument (Dkt. 45 at 13:18-14:9), the prior case is irrelevant to this case as the § 112, ¶ 6, inquiry is claim specific. Further, each of Oyster's other arguments about what happened in the prior case are factually incorrect. *Id*. And, setting aside those mischaracterizations, Oyster's reference to Ciena's prior expert tutorial is improper as this Court's rules provide the tutorial cannot be used for any purpose. J. White's Standing Order for Patent Cases at ¶ 7. Finally, this case involves a *different* term—energy level circuit—a newly coined phrase never used in the specification of the asserted patent and appearing nowhere in any claim in the prior case.

### 1. “Energy Level Circuit/Detector” Are Means-Plus-Function Terms Subject to § 112, ¶ 6

While some cases have held that “circuit” terms may connote structure, there is no *per se* rule that claiming a “circuit” prohibits construction under § 112, ¶ 6:

> *Abacus* establishes that in determining whether the word “circuit” invokes means-plus-function claiming, the pivotal issue is “whether the [circuit limitation] as properly construed recites *sufficiently definite* structure.” *Personalized Media Commc’ns, LLC v. Int’l Trade Comm’n*, 161 F.3d 696, 704 (Fed. Cir. 1998) (emphasis added). A description of the circuit’s operation may provide sufficiently definite structure, *Abacus*, 462 F.3d at 1356, as can certain “adjectival qualifications,” *Apex*, 325 F.3d at 1374 (“interface circuit”). Nevertheless, not just any adjectival qualification or functional language will suffice. *See Abacus*, 462 F.3d at 1362–63 (Michel, C.J., dissenting).

*Power Integrations, Inc. v. Fairchild Semiconductor Int’l, Inc.*, 711 F.3d 1348, 1364-65 (Fed. Cir. 2013). Thus, “the question is not whether [“energy level circuit”] is utterly devoid of structure but whether the claim term recites sufficient structure to perform the claimed functions.” *Egenera, Inc. v. Cisco Systems, Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020). Applying this analysis, the Federal Circuit has found “circuit” and “detector” terms subject to § 112, ¶ 6. *Intelligent Automation Design, LLC v. Zimmer Biomet CMF and Thoracic, LLC*, 2020 WL 486830, *2 (Fed. Cir. 2020) (finding that “a control circuit for determining a time when the torque reaches a maximum by an average means for determining an average value as a function of a current value and a new value” to be a means-plus-function limitation). Oyster is thus wrong in suggesting that a “circuit” is always structural for purposes of a § 112, ¶6 analysis. (Dkt. 45 at 15:4-16).

Here, the terms “energy level circuit/detector” fail to recite sufficiently definite structure which performs the claimed function and thus must be construed under § 112, ¶ 6. Claim 1 recites a generic term (“energy level circuit”) that provides insufficient structure to perform the recited function “to detect an energy level of the optical data signal.” Claim 1 merely repeats the “energy level” language as characterizing both the claimed circuit and the recited function and thus fails to identify any structure. Claim 17 employs the same repetition and recites “energy level detector” that detects “an energy level of the optical data signal.” None of this specifies sufficient structure for how to detect/detecting an energy of an optical data signal. And the

undisputed record confirms that one of ordinary skill in the art would not understand "energy level circuit/detector" to connote sufficient structure for the recited function. Ex. I at 44:7-45:6.

Moreover, the differences in Claims 1 and 17 confirm the functional nature of the disputed terms. Namely, Claim 1 recites two elements—a receiver and an "energy level circuit" that *includes* a photodetector and comparator that perform *different* functions and does not specify how those functions relate to "***detect[ing]*** an energy level of the optical data signal." Claim 17, on the other hand, specifies a receiver, energy level detector, photodetector and comparator signal as part of four different steps performed by different structures. The context of the claims thus illustrates the generic functional nature of the disputed terms.

Oyster also argues that the "coupled" to an "optical fiber language" language confirms the disputed terms are structural. This argument fails because nothing in the claims describes *how* the detection of an energy level of an optical signal is performed. Again, the question is not whether the "energy level circuit/detector" terms are devoid of structure, *but whether the claim term recites sufficient structure to perform the claimed functions*.

A review of the specification confirms that the "energy level circuit/detector" terms should be construed under § 112, ¶ 6. First, there is no dispute that "energy level circuit" is a phrase Oyster coined as the specification never uses the term. And the use of the word circuit only adds to the confusion. Ex. D at 5:29-30. The specification likewise never uses the phrases "to detect/detecting an energy level of the optical signal" or even the phrases "to detect" or "detecting." All of this further confirms "energy level circuit/detector" are black box terms within the context of the claims. Second, the specification also makes clear that the claimed detecting function connotes detecting a change in the energy level, not just merely measuring the energy. For example, the specification states: "The present invention thus permits a card-based transmission system incorporating an *energy level detector for optical tap detection*…." Ex. D at 3:18-20 (emphasis added). The specification further states the "energy level detector provided on the card *for measuring light energy in a fiber* is connected electronically to an alarm, *so that when a drop or increase [i.e., a change] in the energy level is detected*, which may indicate a tap, the card may provide an alarm signal…." *Id*. at 3:30-34 (emphasis added). The specification teaches

that the photodetector measures the optical signal and outputs "an electrical voltage whose level correlates to the optical power at the input to the photodetector," an amplifier scales that electrical voltage signal, and a comparator compares the electrical voltage signal to a reference voltage to detect changes in the energy level. *Id.* at 5:29-6:44.

That a person of ordinary skill in the art would have to read these teachings in the patent specification to understand what the black box "energy level circuit/detector" is and does with regard "to detect/detecting an energy level of the optical data signal" only confirms the lack of structure in the claim terms. Ex. I at 44:7-45:6. Oyster provides no expert testimony to the contrary.

The Court's should therefore construe these terms under § 112, ¶ 6, and reject Oyster's attempt to avoid ascribing sufficiently definite meaning to these terms.

**2. Ciena's Proposed Corresponding Structure Should Be Adopted**

Having agreed to the same function if § 112, ¶ 6, applies, Oyster offers no reason to exclude Ciena's proposed "circuit on a circuit board" language. Claims 1 and 17 both recite a "printed circuit board" so the issue is whether the "energy level circuit/detector" terms are limited to hardware as Ciena contends whereas Oyster apparently urges that the terms should include both hardware and software. The "energy level circuit/detector" terms are clearly limited to hardware, including a photodetector, an amplifier, and a comparator all on a circuit board. Ex. D at 2:31-36, 50-53; 3:18-26, 30-37, 66-67; 5:20-67; 6:1-47; Fig. 3. *See also infra* Section IV.G.1 discussing the specification. Ciena's proposed construction should thus be adopted.

**H. "a low pass filter coupled to an output of the photodetector" (claim 18)**

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| Plain and ordinary meaning | a circuit that performs low pass filtering an output of the photodetector. |

Oyster argues that the term "a low pass filter coupled to the output of the photodetector" has an ordinary meaning but fails to provide understanding of what that ordinary meaning is. Dkt. 45 at 18:12-17. As with Oyster's preceding arguments, this argument ignores or mischaracterizes the intrinsic record in an effort to divorce the scope of invention from what was

disclosed to the public in obtaining the ’297 patent. Adopting Oyster’s “ordinary meaning,” however, would incorrectly require the Court to divorce dependent claim 18’s claim language from both other claims in the ’297 patent and from the patent specification. *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.*, 527 F.3d 1300, 1308 (Fed. Cir. 2008).

A proper *Phillips* analysis, one seeking to align construction of this term with the patent’s description of the invention, confirms that Ciena’s proposed construction should be adopted. Starting with the claim language, claim 18 depends from claim 17. Claim 17 claims a telecommunications method that includes a receiver affixed to a printed circuit board, an energy level detector affixed to the printed circuit board, and a photodetector that generates a photodetector voltage indicative of the energy level of the optical signal, and a comparator signal generated based on the photodetector voltage and a reference voltage. Ex. D at 8:49-59. Claim 18 adds a low pass filter coupled to an output of the photodetector that generates an average value signal of the energy level of the optical data signal that is used for the comparator signal. *Id.* at 8:61-67. The plain language of claims 17 and 18, read in context, inform one of ordinary skill that the claimed receiver, energy level detector, photodetector and low pass filter are all affixed to the same printed circuit board. Ex. I at 46:4-11. The low pass filter and photodetector are components of the energy level detector, and claim 17 expressly states that the energy level detector is affixed to the printed circuit board. Claim 18 expressly states that the low pass filter coupled to an output of the photodetector generates an average value signal—clearly it does this through filtering an output of the photodetector.

The specification confirms that the claimed low pass filter is a circuit that performs low pass filtering on the output of the photodetector. Consistent with the plain claim language, the specification explains that depending on the electrical bandwidth of the photodetector, “the electrical signal may be filtered by a low pass filter 154 to provide an average voltage level which represents the average optical power measured by photodetector 153. Ex. D at 5:45-51. The specification further states that the “present invention” preferably included placing an energy level detector on the same printed circuit board as the transmitter and receiver. *Id.* at 3:57-67.

In the claimed analog embodiment, the energy level detector's (33) photodetector (153) is coupled to the low pass filter (154). *See, e.g., id.* at Fig. 3.



Figure 3

The '297 patent expressly explains that low pass filter 154 filters the electric signal from the photodetector. *Id.* at 5:46-51. The combination of the specification's description of the "present invention" as affixing the energy level detector to the circuit board, the '297 patent's disclosure that the low pass filter is filtering a signal output by a photodetector of the energy level circuit, and the claim's requirement that the low pass filter is "coupled to" an output of the photodetector, would have informed one of skill in the art that the claimed low pass filter is "a circuit that performs low pass filtering of an output of the photodetector," as proposed by Ciena. Ex. I at 46:21-27; *see also Honeywell Int'l, Inc. v. ITT Indus. Inc.*, 452 F.3d 1312, 1318-19 (Fed. Cir. 2006) (defining ordinary and customary meaning based on specification's description of "the present invention").

Oyster's argument attempts to distort the plain language of the '297 patent and should thus be rejected. Critically, Oyster concedes that energy level detector 33 is described as a circuit but argues, without support, that "the low pass filter *may be a component of a circuit*, but need not be a circuit itself." Dkt. 45 at 20:14-20. This argument fails because the actual language of the patents' claim and specification states that the energy level detector is "affixed" or "placed" on the printed circuit board. Logically, this means that components of the energy level detector are similarly affixed to the printed circuit board, confirming that the low pass filter is a circuit.

Finally, Oyster's attorney argument that Ciena's proposed construction "excludes digital filtering implementations" paints an incorrect picture of both Ciena's proposed construction and the language of the '297 patent specification. While it is true that the '297 patent does mention

that "other digital filtering techniques could replace or supplement the filtering provided by [the low pass] analog filter," (Ex. D at 6:39-41), one of ordinary skill in the art would have understood this disclosure to mean that filtering techniques, other than low pass filtering, were possible. This is confirmed by the patents' description of this digital embodiment (notably omitted in Oyster's briefing) as "a digital circuit ***equivalent*** to FIG. 3…." *Id.* at 6:33 (emphasis added).

In any event, Oyster's argument is a red herring. The express language of claim 18 requires a "low pass filter" and the specification only discloses techniques for performing low pass filtering with an analog circuit. Moreover, dependent claim 18 is required to narrow claim 17, from which it depends. *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1242 (Fed. Cir. 2003). With this understanding and the '297 patent's disclosure of low pass filtering with an analog low pass filter circuit, one of ordinary skill in the art would have realized that claim 18's requirement to "couple" the low pass filter to an output of the photodetector is referring to the analog implementation and not any *other* technique, i.e., a technique other than low pass filtering, that could be performed digitally. Ex. I at 47:7-16. Said another way, Ciena's proposed construction for the low pass filter term from claim 18 does not exclude the digital filtering implementation pointed to by Oyster because that implementation is not related to the analog energy level detector claimed in claims 17 and 18.

Divorcing the low pass filter from the printed circuit board to which it is affixed, as proposed by Oyster, would have the impermissible result of "extend[ing] [Oyster's] monopoly beyond the invention" disclosed." *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 371 (1938). As can be seen above, Oyster is plainly incorrect that Ciena's proposed construction "deviates" from plain meaning; instead, Ciena's proposed construction clarifies the plain meaning in a manner making the claim language, not to mention the scope of the '297 patents' invention, more understandable to the jury. *See Eon Corp. IP Holdings*, 815 F.3d at 1320 (reversing "plain and ordinary meaning" construction and holding that terms with disputed claim scope must be construed to prevent leaving the issue of claim scope to the jury).

DATED: February 22, 2021

PAUL HASTINGS LLP

By: */s/ Blair M. Jacobs*
Blair M. Jacobs
*Attorney for Defendant Ciena Corporation*