UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| OYSTER OPTICS, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>CIENA CORPORATION,<br><br>    Defendant. | Case No. 20-cv-02354-JSW (LB)<br><br>**DISCOVERY ORDER**<br><br>Re: ECF Nos. 90, 97-3 |

### INTRODUCTION

In this patent-infringement case, the non-practicing entity Oyster Optics claims that Ciena sells fiber-optics telecommunications systems and components that allegedly infringe Oyster's patents.[1] In its infringement contentions, Oyster identified multiple products but charted only the WaveLogic 5 Nano as a representative product. The parties dispute whether Ciena must produce technical documents and revenue-and-sales information for all the identified products. Oyster contends that it must because the charted product is representative of all products. Ciena counters that the charted product is not a representative product for "non-WaveLogic 5 Nano" products because the WaveLogic 5 Nano is meaningfully different from the uncharted products. It thus

---

[1] Compl. – ECF No. 1 at 3–4 (¶¶ 13–14); Joint Case-Mgmt. Statement – ECF No. 30 at 2. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

ORDER – No. 20-cv-02354-JSW (LB)

withheld discovery about the uncharted products on this ground.[2] The court previously held that Oyster did not meet its burden to show that the charted product was representative. The court then allowed supplemental briefing on whether the charted product was representative of other products listed (but not charted) in Oyster's infringement contentions.[3]

In the new briefing, Oyster contends that the charted product is representative because all products use the same forms of phase and amplitude in two separate modes.[4] Given that this is a discovery referral, not a merits determination, the court allows the discovery.

## STATEMENT

In September 2020, Oyster filed its infringement contentions and alleged that the WaveLogic 5 Extreme, WaveLogic AI, WaveLogic 3, and WaveLogic 3 Extreme products (collectively the "non-WaveLogic 5 Nano products") and the WaveLogic 5 Nano infringed the patents-in-suit. It charted only the WaveLogic 5 Nano as a "representative" product.[5] In October 2020, Oyster sought discovery for all products.[6] In November 2020, Ciena refused discovery for the non-WaveLogic 5 Nano products on the ground that the charted WaveLogic 5 Nano product was not representative.[7]

On April 22, 2021, the trial court stayed the case during inter partes review (IPR) of both patents-in-suit.[8] During the stay, the parties dismissed the claims and counterclaims regarding one patent (and terminated the IPR of that patent).[9] In September 2021, the PTAB invalidated claims 1, 2, 4, 6–9, and 17–19 of the remaining patent, U.S. Patent No. 6,665,500.[10] Oyster then moved to lift the stay, and Ciena asked to maintain the stay pending a ruling from the Federal Circuit.

---

[2] Disc. Letter Br. – ECF No. 90 at 1–4.

[3] Order – ECF No. 95 at 1, 5–7.

[4] Disc. Letter Br. – ECF No. 97-3 at 3–6.

[5] *Id.* at 1, 4; Prelim. Disclosures, Ex. B to *id.* – ECF No. 90-2 at 3.

[6] Reqs. for Prod. Nos. 31–39, 50, Ex. A to Disc. Letter Br. – ECF No. 90-1.

[7] Resps. to Reqs. for Prod., Ex. G to Disc. Letter Br. – ECF No. 90-7 at 3–4 (¶ 33).

[8] Orders – ECF Nos. 65, 84.

[9] Order – ECF No. 71.

[10] Order – ECF No. 84 at 1–2.

On November 1, 2021, the trial court lifted the stay, in part because Oyster conditionally limited its case to claims 5 and 16 of the '500 patent. After analyzing the possible outcomes in the Federal Circuit, the trial court concluded that the only way to narrow the litigation was to lift the stay.[11] It also considered other factors, including the stage of the litigation, and cited Oyster's acknowledgment that the case was "in the early stages of litigation at the time it was stayed." The court then held, "[t]hat fact alone will not justify perpetuation of a stay because the case would remain frozen in its nascent stage if the Court continued the stay."[12] It also observed that Ciena had "not argued that it would be prejudiced or would suffer a tactical disadvantage if the Court lifts the stay," in part because the parties were not competitors and in part because the median time for disposition at the Federal Circuit is "slightly over one year."[13]

On January 18, 2022, the trial court adopted the parties' proposed schedule for claim construction (beginning with exchanging proposed claim terms and preliminary claim constructions on February 25, 2022, and ending with the claim-construction hearing on June 2, 2022).[14]

The pending discovery dispute is about whether Ciena must produce technical documents and revenue-and-sales information about the non-WaveLogic 5 Nano products that it did not chart (and only identified) in its infringement contentions. The parties began discussing the dispute before the case was stayed, and "Oyster brought the issue to Ciena's attention during the process of having the stay lifted."[15] An email dated March 4, 2021 (before the stay) shows that the parties agreed to set up a meeting the next week to discuss Oyster's amending its infringement contentions for the '500 patent. In a November 15, 2021 email, Oyster again raised the issue, remarking that there was no case schedule and no prejudice to Ciena from an amendment. It followed up with another email on December 2, 2021. Ciena responded on December 14, 2021, saying that Oyster knew about the products, should have charted them in its September 2020

---

[11] *Id.* at 4–5.

[12] *Id.* at 2.

[13] *Id.* at 4–5 (citations omitted).

[14] Order – ECF No. 88 at 15.

[15] Disc. Letter Br. – ECF No. 90 at 3.

infringement contentions, and wrongly asserted that the charted product was representative of the listed products.[16] Ciena's invalidity contentions were based only on the WaveLogic 5 Nano products, and claim construction is proceeding only on the narrower claim scope.[17]

The parties tried to resolve the dispute by meeting and conferring several times in January 2022, and Oyster offered to chart all products identified in the September 2020 contentions.[18] In support of the first discovery letter brief, Oyster submitted proposed charts that rely on documents that predate the September 2020 contentions, including publicly available documents.[19] Ciena's Rule 30(b)(6) witness testified in January 2021 that the "charted and uncharted products have meaningful technical differences."[20]

Oyster provided additional information in the latest discovery letter brief about why the charted product is representative of the other products. A "key inventive aspect of the [the '500 patent] is the use of a 'phrase modulation mode' and an 'amplitude mode' at separate times. This is 'one of the primary aspects of the two independent claims that Oyster charted in its original infringement contentions,' and the 'elements of these independent claims remain at issue.' (The claims at issue are claims 5 and 16, and Oyster contends that claim 5 depends on claims 1 and 4 and thus includes the limitations of the claims "as well as the additional limitation of 'a switch for switching between the first and second modes' (claim 4), which is 'operator activated' (claim 5)."[21] Oyster illustrates this with in the following chart:

---

[16] Email String, Ex. C to *id.* – ECF No. 90-3.

[17] Disc. Letter Br. – ECF No. 90 at 5.

[18] *Id.* at 1–3.

[19] Chart for U.S. Patent No. 6,665,500, Ex. H to Disc. Letter Br. – ECF No. 90-8 at 6–7, 10–11 (documents from April 2017, May 2019, January 2020, November 2019, and January 2017).

[20] Disc. Letter Br. – ECF No. 90 at 4; Rule 30(b)(6) Dep., Ex. I to *id.* – ECF No. 90-8 at 4:17–5:6 (pp. 46:17–47:6).

[21] Disc. Letter Br. – ECF No. 90 at 3.

| '500 Patent, Claim 1 | '500 Patent, Claim 16 |
|---|---|
| 1.[pre] An optical data transmitter comprising:<br><br>[a] a laser;<br><br>[b] a phase modulator for phase modulating light from the light source; and<br><br>[c] a controller having an input for receiving an electronic data stream, the controller in a *first mode controlling the phase modulator so as to create phase-modulated optical signals in* the light from the laser as a function of the electronic data stream and<br><br>[d] the *controller in a second alternate mode amplitude-modulating the light from the laser as a function of the electronic data stream*,<br><br>[e] the first mode and the second mode occurring at different times. | 16. [pre] A *dual-mode* optical transmission system comprising:<br><br>[a] a transmitter having a laser for transmitting *amplitude-modulated signals in a first mode and phase-modulated signals in a second mode* and a controller for switching an output of the laser between the first mode and the second mode, the second mode occurring at a different time than the first mode;<br><br>[b] an optical fiber connected to the transmitter; and<br><br>[c] a receiver having an interferometer being connected to the optical fiber.[22] |

Oyster contends that the charted WaveLogic 5 Nano is representative of the non-WaveLogic 5 Nano products because they all use "the same forms of phase and amplitude modulation in two separate modes." "Specifically, Oyster's original infringement contention stated that the WaveLogic 5 Nano's use of 'QPSK' of 'Quadrature Phase Shift Keying' was the 'first mode' creating phase-modulated optical signals [as shown in this chart]:"

| 1[d] the controller in a first mode controlling the phase modulator so as to create phase-modulated optical signals in the light from the laser as a function of the electronic data stream and | In the WaveLogic 5 Nano, the controller in a first mode controls the phase modulator so as to create phase-modulated optical signals in the light from the laser as a function of the electronic data stream.<br><br>For example, in the WaveLogic 5 Nano, ████████████████████████████████ |

Oyster also contends that "the use of a form of Quadrature Amplitude Modulation ('QAM') was the 'second alternate mode amplitude modulating the light,'" and illustrates the point in this chart:

---

[22] *Id.* at 3–4 & n.1.

[23] *Id.* at 4 (citing Chart for '500 Patent, Ex. 2 to *id.* – ECF No. 98-2 at 9 (p. 8)).

ORDER – No. 20-cv-02354-JSW (LB)        5

| | |
|---|---|
| 1[e] the controller in a second alternate mode amplitude-modulating the light from the laser as a function of the electronic data stream, | In the WaveLogic 5 Nano, the controller in a second alternative mode amplitude modulates the light from the laser as a function of the electronic data stream.<br><br>For example, in the WaveLogic 5 Nano, ██████████████████████████ |

It contends that its proposed supplemental contentions explain with identical text that the non-WaveLogic 5 Nano products meet these limitations based on their use of APSK and QAM.[25]

Oyster describes how the charted product is representative of other requirements:

> With respect to the other requirements, such as a laser and a controller, both Oyster's original and supplemental contentions demonstrate the existence of these limitations typically by reference to documents about coherent optical transceivers in general (at times not even authored by Ciena), as these are necessary components of optical transceivers. See Ex. 2 at 4 (citing "Introduction to DWDM technology" re the laser component), at 8 (citing "Implementation Agreement for CFP2-Digital Coherent Optics Module" regarding the controller); Ex. 3 at 8, 14; Ex. 4 at 7-8, Ex. 5 at 6-7, Ex. 6 at 7-8, 11. In other words, these are standard components of coherent optical transceivers, just like the representative WaveLogic 5 Nano.
>
> Likewise, Oyster supports the "switching limitations" of claims 4 and 5 by pointing to the same evidence as limitation 1[e] about how the first mode and the second mode do not occur at the same time—again something which is consistent and the same for all of the accused products. Ex. 2 at 12-14, Ex. 3 at 19-24, Ex. 4 at 18-25, Ex. 5 at 16-23, Ex. 6 at 17-25. Ciena does not dispute that its accused products use either QPSK or QAM at any particular time – they are not used simultaneously.[26]

No fact depositions have been taken about the non-WaveLogic 5 Nano products "relative to these patent claims."[27]

## ANALYSIS

The issue is whether Oyster has shown — for discovery purposes only — that the charted product is representative of the non-WaveLogic 5 Nano products listed in Oyster's infringement contentions. If it is, then Ciena must produce the discovery. The court allows the discovery.

Patent Local Rule 3–1 requires that a party claiming patent infringement serve infringement contentions that, among other things, identify:

---

[24] *Id.* (citing Chart for '500 Patent, Ex. 2 to *id.* – ECF No. 98-2 at 10 (p. 9)).

[25] *Id.* at 5.

[26] *Id.*

[27] *Id.*

> (b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. This identification shall be as specific as possible. Each product, device, and apparatus shall be identified by name or model number, if known. Each method or process shall be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process[.]
>
> (c) A chart identifying specifically where and how each limitation of each asserted claim is found within each Accused Instrumentality, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function.

This rule generally "require[s] specific identification of particular accused products." *Oracle Am., Inc. v. Google, Inc.*, No. 10-cv-3561-WHA, 2011 WL 4479305, at *2 (N.D. Cal. Sept. 26, 2011) (emphasis removed). It does not "tolerate broad categorical identifications" or "the use of mere representative examples." *Id*. Rather, "a full list of accused products must be disclosed as part of a party's infringement contentions" if they are known to the plaintiff. *Id*.

"[R]epresentative products may only be charted 'when supported by adequate analysis showing that the accused products share the same critical characteristics.'" *Cap Co. Ltd., v. McAfee, Inc.*, No. 14-cv-5068-JD, 2015 WL 4734951, at *2 (N.D. Cal. Aug. 10, 2015) (quoting *Network Protection Scis., LLC v. Fortinet, Inc.*, No. 12-c-01106-WHA, 2013 WL 5402089, at *2 (N.D. Cal. Sept. 26, 2013) (cleaned up)). "That analysis cannot just be based on the patentee's say-so." *Id*. "[I]n order to rely on a claim that one accused product represents another for purposes of Rule 3-1(c), a patentee must do more than state as much. A patentee must state how." *Silicon Labs., Inc. v. Cresta Tech. Corp.*, No. 14-c-03227-PSG, 2015 WL 846679, at *2 (N.D. Cal. Jan. 1, 2015).

In the earlier order, the court held that Oyster did not meet its burden to establish how the charted product represented the non-WaveLogic 5 Nano products.[28] In its infringement contentions, Oyster said only that on "information and belief," the products "all operate in the substantially same manner for purposes of infringement of the Asserted Claims."[29] Its chart of the WaveLogic 5 Nano similarly was conclusory, saying that it is "exemplary of the infringement of the '500 Patent."[30] Ciena's Rule 30(b)(6) deponent also provided specific information about how

---

[28] Order – ECF No. 95 at 4–5.

[29] Infringement Contentions, Ex. B to Disc. Letter Br. – ECF No. 90-2 at 4.

[30] Chart for U.S. Patent No. 6,665,500, Ex. E to Disc. Letter Br. – ECF No. 90-5 at 2.

ORDER – No. 20-cv-02354-JSW (LB)   7

the products are different: the WaveLogic 5 Nano is a newly released, low-volume product that is meaningfully different from the uncharted products.[31] On that record, the court did not understand how the WaveLogic 5 Nano was representative of the uncharted non-WaveLogic 5 products.[32]

Now Oyster provides more information: the products use optical signals in two modes, and other requirements are necessary components of optical transceivers. It is an issue that the proposed supplemental charts show how the limitations appear in the non-WaveLogic 5 Nano products. By contrast, as the court explained in its earlier order, the initial contentions are conclusory. Nonetheless, Oyster contends that it has done enough:

> These charts rely on publicly available information of the sort Oyster was required to rely on under the patent rules and demonstrate Oyster's theory as to why Ciena infringes. To date, no fact depositions have been taken about these products relative to these patent claims. Further, . . . Ciena[] deci[ded] not to provide information about products other than the WaveLogic 5 Nano. In the prior brief, Ciena relied heavily on the deposition testimony from Ian Betty from the prior case which concerned different, unrelated patents, and different claim limitations. Even if Mr. Betty's testimony were correct (something which Oyster refuted in the first case with the assistance of its technical expert), this does not demonstrate that Oyster's theory that the WaveLogic 5 Nano is representative [is incorrect]. That is ultimately a fact issue to be adjudicated after the completion of fact discovery.[33]

The court considers Oyster's new arguments about why the charted product is representative. Ciena contends that Oyster relies on information available to it before its September 2020 infringement contentions.[34] But Oyster never conceded that its charting was insufficient. Instead, it offered to provide more information about why the product was representative. This is different than, for example, allowing Oyster to accuse new products with new claims charts. Courts allow plaintiffs to amend infringement contentions to show whether the products are representative. *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2015 WL 1517920, at *12 (N.D. Cal. Apr. 2, 2015).

Ciena also contends that Oyster is wrong that the WaveLogic 5 Nano was representative because it uses a "phase modulation mode" and an "amplitude modulation mode" at "separate times." Instead, it asserts, the charted product and the uncharted product use "different forms of

---

[31] Rule 30(b)(6) Dep., Ex. I to Disc. Letter Br. – ECF No. 89-4 at 4–5.

[32] Order – ECF No. 95 at 4–5.

[33] Disc. Letter Br. – ECF No. 97-3 at 5.

[34] *Id.* at 9–10.

phase and amplitude modulation" and "different 'controllers,'" and they are "different types of products (plug versus transceiver card)." These differences, it says, "are material to the claims and thus further undermine Oyster's representative allegations."[35] In roughly two and a half pages, it then explains how as a matter of fact, Oyster is wrong.

For example, Oyster refers to two enhanced performance modes (but identifies no uncharted product using the modes), and the uncharted products actually use different modulation modes.[36] Ciena characterizes Oyster's arguments as "say-so."[37] But Oyster counters that these modes are met through the use of QAM and QPSK. The rest of the numbers relate to the amount of data that can be processed and transmission speed, elements that are not claimed by the '500 patent and thus are irrelevant to the alleged infringement.[38]

Ciena's next example is that the two modes that Oyster identifies are part of the controller limitation in the claim, but Oyster never shows identical structure and functionality.[39] But Oyster disputes Ciena's characterization of the issue (identicality of hardware for products to be representative) and instead characterizes the issue as "the products must operate in the same way."[40]

Ciena also points to differences in the digital-signature processors, but Oyster counters that it is not claiming a digital-signature process, and the differences in any event "are irrelevant to how the products function relative to the claims, which is the only matter at issue."[41]

Ciena's arguments are about the validity of the claims, which is a merits issue that can be addressed after discovery. The court allows the discovery.

---

[35] *Id.* at 10.

[36] *Id.* (emphasis omitted).

[37] *Id.* at 11.

[38] *Id.* at 14.

[39] *Id.* at 11.

[40] *Id.* at 14.

[41] *Id.* at 12, 14.

# CONCLUSION

Ciena's perhaps well-placed arguments go to the merits of the case, not to Oyster's entitlement to discovery. The court allows the discovery.

This disposes of ECF Nos. 90 and 97-3.

**IT IS SO ORDERED.**

Dated: April 14, 2022

_____
LAUREL BEELER
United States Magistrate Judge