RUSS, AUGUST & KABAT
Marc A. Fenster (SBN 181067)
Email: mfenster@raklaw.com
Reza Mirzaie (SBN 246953)
Email: rmirzaie@raklaw.com
Paul A. Kroeger (SBN 229074)
Email: pkroeger@raklaw.com
Neil A. Rubin (SBN 250761)
Email: nrubin@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California  90025
Telephone:  (310) 826-7474
Facsimile:   (310) 826-6991

**Attorneys for Plaintiff Oyster Optics, LLC**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **OYSTER OPTICS, LLC,** | CASE NO. 4:20-cv-02354-JSW |
| **Plaintiff,** | |
| **vs.** | **PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF** |
| **CIENA CORPORATION,** | |
| **Defendant.** | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

PAGE(S)

I.      INTRODUCTION ................................................................................................ 4

II.     BACKGROUND OF THE PATENT-IN-SUIT ................................................ 5

        A.      Transceivers Digital Data On Light Waves Using Modulation ............................ 5

III.    CLAIM CONSTRUCTION PRINCIPLES ...................................................... 7

IV.     AGREED CONSTRUCTIONS .......................................................................... 8

V.      DISPUTED CONSTRUCTIONS FOR THE PATENTS-IN-SUIT ................... 8

        A.      "phase modulate" and variants thereof ('500 Patent, Cl. 1); .................................. 8

        B.      "phase-modulated optical signals" ('500 cl. 1, 16)) ............................................ 11

        C.      "amplitude-modulating" and variants thereof ('500 cl. 1, 16)........................... 12

        D.      "a receiver having an interferometer" ('500 Patent cl. 16) .................................. 12

        E.      "mode" ('500 Patent cl. 1, 16) ............................................................................. 14

                1.      The '500 Patent Expressly Discloses and Claims a Second "Mode" that
                        Simultaneously Amplitude Modulates and Phase Modulates................... 14

                2.      The Claims Should Not Be Narrowed for Reasons of Enablement.......... 16

                3.      The Term "Mode" Was Not Narrowed in Prosecution as Ciena Contends
                        .................................................................................................................. 17

1

**PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF**

**Cases**

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
  340 F.3d 1298 (Fed. Cir. 2003) ............................................................................ 10

*Cadence Pharm. Inc. v. Exela PharmSci Inc.*,
  780 F.3d 1364 (Fed. Cir. 2015) ............................................................................ 21

*Epistar Corp. v. ITC*,
  566 F.3d 1321 (Fed. Cir. 2009) .............................................................................. 7

*IMS Tech., Inc. v. Haas Automation, Inc.*,
  206 F.3d 1422 (Fed. Cir. 2000) ............................................................................ 20

*JVW Enters. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005) ................................................................... 5, 8, 13

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
  244 F.3d 1365 (Fed. Cir. 2001) .............................................................................. 7

*O2 Micro Int'l v. Beyond Innovation Tech.*,
  521 F.3d 1351 (Fed. Cir. 2008 ............................................................................... 7

*Omega Engineering, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ......................................................................... 8, 20

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ..................................................................... passim

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  875 F.3d 1369 (Fed. Cir. 2017) ............................................................................ 17

*SanDisk Corp. v. Memorex Prods.*,
  415 F.3d 1278 (Fed. Cir. 2005) .............................................................................. 5

*SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*,
  336 F.3d 1298 (Fed. Cir. 2003) ............................................................................ 10

*Tandon Corp. v. U.S. Intern. Trade Commn.*,
  831 F.2d 1017 (Fed. Cir. 1987) ............................................................................ 10

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) .............................................................................. 7

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) .............................................................................. 7

*Thorner v. Sony Computer Entertainment Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ......................................................................... 7, 10

**PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF**

*United States Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ................................................................................................. 7

**PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    __INTRODUCTION__

Plaintiff Oyster Optics LLC ("Oyster") respectfully submits this revised opening claim construction brief. As agreed by the parties (Dkt. 87 at 12–13) and for the convenience of the Court, this brief includes verbatim Oyster's prior briefing (Dkt. 45) of the four terms that are still at issue from the original claim construction prior to the case being stayed. This prior briefing appears at sections V.A through V.D below. Section V.E addresses a newly disputed claim term "mode."

Oyster proposes constructions that are faithful to the plain and ordinary meaning of the claim terms to one of ordinary skill in the art. In each instance, Oyster's proposals are fully consistent with the intrinsic record, including, most notably, the claim language itself. Where necessary, Oyster's proposals likewise are supported by the sworn opinion of optics and telecommunications experts Dr. Keith Goossen and Dr. Jacob Baker, who explain precisely how a POSITA would understand each claim term, particularly in light of the intrinsic record.

Indeed, in many cases, the disputed phrases and terms are similar to terms recently construed by this Court in *Oyster Optics, LLC v. Ciena Corporation*, Case No. 4:17-cv-05920, Dkt. No. 127. Ex. A[1] ("*Ciena I* Claim Construction Order"). Further, with respect to the '500 Patent, several of the disputes are identical to those that have already been construed by Magistrate Judge Roy S. Payne in related cases—*Oyster Optics v. Infinera Corporation, et al.*, Case No. 2:19-CV-00257-JRG (E.D. Tex. July 23, 2020), Ex. B ("*Infinera* Claim Construction Order") and *Oyster Optics v. Cisco Systems, Inc.*, Case No. 2:20-CV-00211-JRG (E.D. Tex. May 4, 2021), Ex. J ("*Cisco* Claim Construction Order")

Where the terms have been previously construed, either by this Court or the Eastern District of Texas, the issued constructions are, with the exception of the term "mode," precisely the ones offered by Oyster—and rejected by Defendant Ciena Corporation ("Ciena") now. As to the term "mode," the construction in the *Cisco* Claim Construction Order misreads statements in the prosecution history and misapplies the law. In short, Oyster's claim-construction methodology and proposals are consistent with the factual record and controlling law.

---

[1] All Exhibits are attached to the concurrently filed declaration of Reza Mirzaie.

**PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF**

Ciena's proposals, on the other hand, are inconsistent with the intrinsic record and in conflict with controlling law. Ciena repeatedly seeks to burden clear and ordinary terms with artificial and extraneous baggage, but cannot point to any disclaimer or lexicography to do so. This invites reversible error. *E.g.*, *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005). Indeed, many of Ciena's narrow proposals are inconsistent with the intrinsic record— and even *exclude* embodiments taught in the specifications of the patents-in-suit. As the Federal Circuit has repeatedly held, such constructions are "rarely, if ever, correct." *SanDisk Corp. v. Memorex Prods*., 415 F.3d 1278, 1285-86 (Fed. Cir. 2005). For other proposals, Ciena's proposed constructions are inconsistent with the language in the claim itself. This is also improper under controlling law.

## II.   BACKGROUND OF THE PATENT-IN-SUIT

This case involves one remaining patent: U.S. Patent No. 6,665,500 (the "'500 Patent") (Ex. E). The '500 patent is not related the patents previously construed by this Court. The '500 patent covers innovations in optical telecommunications network technology. Is is generally directed towards systems and methods for transporting information by modulating light waves transmitted and received across transparent optical fibers.

Each of the claimed systems and methods demonstrates a significant advancement over the state of the art, as they facilitate novel ways of providing a more rapid, secure, and reliable communication of enormous quantities of data over great distances.

### A.   Transceivers Digital Data On Light Waves Using Modulation

The Court is familiar with the concepts of phase modulation and amplitude modulation from the prior litigation, so this introduction to these concepts will be brief.

Modern high speed telecommunications network systems use light waves for digital data transmission. Transmitters and receivers are important components of these systems, because they perform key aspects of the encoding, transmitting, receiving and decoding functions for optical signals. In an optical telecommunications network, a transmitter transmits signals from one

PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF

location to another location, where a receiver receives the optical signals. *See* '500 patent at 1:13–22.

A light wave is defined by various properties including amplitude and phase. When depicted as in the figure below, amplitude can be understood as the height of the wave, and phase as the position of the wave at a fixed point in time.



For digital data transmission, one or more of these wave properties can be modified to represent each of two possible binary values (0 or 1). For phase modulation, this is often depicted as a relative displacement such that the peaks and troughs occur at different times. The figures below show how either amplitude or phase can be modulated to communicate a digital 0 or 1:

 

Combining modulation strategies allows for the loading of even more information on a single carrier wave. For example, a single wave can be phase- *and* amplitude-modulated so that it



6

can convey two different streams of digital data on the same carrier light wave. This is depicted in the below figure:

### III.   CLAIM CONSTRUCTION PRINCIPLES

The "claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).

When conducting a claim construction inquiry, "district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l v. Beyond Innovation Tech.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). This is because claim construction is "not an obligatory exercise in redundancy." *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Where a term is used in accordance with its plain meaning, the court should not re-characterize it using different language. *See Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) ("[T]he court properly instructed the jury that these terms should receive their ordinary meanings.").

To the contrary, there is a "heavy presumption" that claim terms carry their "full ordinary and customary meaning, unless [the accused infringer] can show the patentee expressly relinquished claim scope." *Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009). And because "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," the task of comprehending the claims often "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1313-14.

"There are only two exceptions" in which claim terms are not given their "full ordinary and customary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.") *Thorner v. Sony Computer Entertainment Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular terms." *Phillips,* 415 F.3d at 1314. And the other parts of the intrinsic record also shed light on the meaning of claim terms. *Id*. However, without clear and unambiguous disclaimer or lexicography by the

7

patentee, courts "do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment." *JVW Enters.*, 424 F.3d at 1335. Similarly, statements during patent prosecution do not limit the claims unless the statement is a "clear and unambiguous disavowal of claim scope." *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) ("[W]e have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope.").

## IV.   AGREED CONSTRUCTIONS

Oyster and Ciena have not agreed to any constructions for the claims remaining at issue in this case.

## V.   DISPUTED CONSTRUCTIONS FOR THE PATENTS-IN-SUIT

### A.   "phase modulate" and variants thereof ('500 Patent, Cl. 1);

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "phase modulate" means "alter the phase of light to create an optical signal having a phase that is representative of data" | <u>Claim 1, 8</u><br>a device that alters the phase of light to create an optical signal having a phase that is representative of data. The phase modulator does not perform amplitude modulation.<br><br><u>Claim 17, 19</u><br>altering the phase of light to create an optical signal having a phase that is representative of data, wherein the phase modulating does not include amplitude modulating. |

The parties agree that phase modulation requires "alter[ing] the phase of light to create an optical signal having a phase that is representative of data," The sole dispute is whether the construction of phase modulation should exclude use of "amplitude modulation," as proposed by Ciena. This exact dispute was recently presented to the Eastern District of Texas, which ruled in Oyster's favor. Ex. B, *Infinera* Claim Construction Order as 7-15. The dispute is similar to that decided by the Court concerning the use of "phase modulation" in the claims of the patents asserted

in the prior case, but involves different uses of phase and amplitude modulation based on the teaching and claims of the '500 patent.[2]

Specifically, in the context of the '500 patent, phase modulation and amplitude modulation are not mutually exclusive. They can both be used by the same system, and indeed at exactly the same time. This is stated explicitly and clearly in the "Summary of the Present Invention" section of the patent, which states:

> *The present invention* thus permits a phase-modulated transmission mode or an amplitude-modulated transmission mode, *or both a phase and amplitude modulated transmission mode*, which can permit the transmitter to work with different types of receivers.

'500 patent at 2:41–47 (emphasis added). A construction of "phase modulate" that "excludes" amplitude modulation, as proposed by Ciena, is contrary to this explicit disclosure of a "both a phase and amplitude modulated" mode.

The summary section goes on to describe a "second mode" where the light is amplitude modulated (*id.* at 2:63–64) and where "the optical signal may or may not also be phase modulated" (*id.* at 3:1–3). The specification also describes other ways of combining phase modulation with amplitude modulation, including in an "alternating stream" or a "mixed" signal. *Id.* at 3:27–30, 3:47–50, 3:62–64, 4:35–42. Magistrate Payne, in construing the claims, found that specifically found that the teaching a "'specialized receiver,' which 'can read a *mixed* optical signal of both phase-modulated and direct and delayed amplitude-modulated signals'" undercut the argument that phase modulation should exclude amplitude modulation. Ex. B, *Infinera* Claim Construction Order at 10.

These combinations of phase modulation and amplitude modulation are not just described in the specification, but also expressly claimed. Each of the independent claims 1, 10, 11, 16, and

---

[2] In the prior litigation, Oyster contended that "phase modulate" and "phase modulator" as used in the claims of the '327, '511, and '898 patents meant "alter the phase of light to create an optical signal having a phase that is representative of data. Use of phase modulation excludes use of amplitude modulation." Ciena contented the terms should be construed as "alter the phase of light while keeping the amplitude of light constant to create an optical signal having a phase that is representative of data." The Court resolved the dispute with the construction "alter the phase of light without substantially altering amplitude to create an optical signal having a phase that is representative of data. 'Substantially altered' means that amplitude changes are detectable by the energy level detector." Ex. A, *Ciena I* Claim Construction Order at 20.

9

**PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF**

17 requires the use of both phase modulation and amplitude modulation. Some claims require that they both be used in a single mode. For example, claim 19 claims a "second alternate transmission mode" wherein "the light is *both* amplitude-modulated *and* phase-modulated." '500 patent at 10:26–28 (emphasis added).

Ciena's proposed construction both excludes preferred embodiments and renders claims such as claim 19 incomprehensible. It cannot be that the term "phase modulate" in the context of the '500 patent "excludes" amplitude modulation, when the patent discloses and claims modes that utilize both phase modulation and amplitude modulation simultaneously. Accordingly, Ciena's proposed construction must be rejected. *See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) (construction that excludes a preferred embodiment "is rarely, if ever correct"); *Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular terms.").

Ciena's proposed construction must also be rejected under the doctrine of claim differentiation. Claim 18 claims a "first transmission mode" that is phase-modulated but is "not amplitude-modulated." *Id.* at 10:14–16, 10:22–25. If "phase modulate" in the context of the '500 patent necessarily excluded amplitude modulation, then claim 18 and its requirement that the light "is not amplitude-modulated" would be superfluous, having exactly the same scope as the parent claim 17. *Tandon Corp. v. U.S. Intern. Trade Commn.*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant."); *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003) (claim differentiation "is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim."). The Eastern District of Texas found "the doctrine of claim differentiation bolsters Oyster's position on this record." Ex. B, *Infinera* Claim Construction Order at 11.

In the absence of clear and unambiguous disclaimer or lexicography by the patentee, the term must be given its full ordinary and customary meaning. *Thorner*, 669 F.3d at 1365. There is

10

nothing in the specification or file history of the '500 patent that constitutes clear and unambiguous disclaimer or lexicography that would permit narrowing the term from this plain meaning and excludes the use of amplitude modulation.

Ciena  may argue (as did the Defendants in the Eastern District of Texas litigation) that the "phase modulation" in the '500 patent is limited because it incorporates the application that lead to the '055 patent by reference. '500 patent at 2:51–56, 3:6–11; Ex. F ('055 Patent). The '816 patent is a continuation-in-part of the '055 Patent, and was construed by the Eastern District of Texas to use phase modulation that excludes amplitude modulation. Accordingly, the Defendants may argue that the same construction applies here. In construing this term, Magistrate Payne rejected the argument that the mere incorporation by reference of the '055 Patent called for a claim construction that excluded phase modulation:

> **[T]here are key differences between these patents that do not support Defendants' conclusion.** First, contrary to Defendants' assertion, the thrusts of the two patents are fundamentally different. ***Whereas the '055 Patent is specifically directed to a "secure fiber optic data transmission system," '055 Patent at (54) (emphasis added), the '500 Patent concerns compatibility between different types of transmitters and receivers….*** True, the '500 Patent acknowledges the security benefits and drawbacks of phase- and amplitude-modulation, but only to explain the underlying problem—lack of compatibility between transmitters and receivers that use these different types of modulation. ***Second, unlike the '500 Patent, the '055 Patent does not disclose an amplitude modulator…. Third, the independent claims of the '055 Patent specifically exclude a signal that is both phase- and amplitude-***modulated… These material differences defeat any argument that Oyster's proposed construction is inconsistent with either its other patents or with the Court's prior construction of "phase modulate."

Ex. B, *Infinera* Claim Construction Order at 13-14 (emphasis added)

For these reasons, the Court should adopt Oyster's construction.

**B.     "phase-modulated optical signals" ('500 cl. 1, 16))**

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "phase modulate" means "alter the phase of light to create an optical signal having a phase that is representative of data" | "optical signals having a phase that is representative of data. The amplitude of the optical signals is not representative of data" |

These terms present the same dispute as "phase modulate" described above—whether the phase modulated optical signals must exclude the use of amplitude modulation (i.e. whether

amplitude modulation can be "representative of data"). Oyster's construction should be adopted for the same reasons. Optical signals that are phase modulated otherwise requires no construction.

### C. "amplitude-modulating" and variants thereof ('500 cl. 1, 16)

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "altering the amplitude of light to create an optical signal that is representative of data" | "altering the amplitude of light to create an optical signal having an amplitude that is representative of data. The use of amplitude modulation does not include phase modulation" |

Oyster's construction of amplitude modulation should be adopted for the same reasons concerning the construction of phase modulation. Just as phase modulation does not exclude amplitude modulation, amplitude modulation does not exclude phase modulation. As noted above, this is stated explicitly and clearly in the "Summary of the Present Invention" section of the patent, which states:

> *The present invention* thus permits a phase-modulated transmission mode or an amplitude-modulated transmission mode, *or both a phase and amplitude modulated transmission mode*, which can permit the transmitter to work with different types of receivers.

'500 patent at 2:41–47 (emphasis added). Accordingly, for all of the reasons set forth above with regard to phase modulation, Oyster's construction should be adopted.

### D. "a receiver having an interferometer" ('500 Patent cl. 16)

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "a receiver having a device that performs a measurement using the interference phenomena produced between one or more signal beams of light and one or more reference beams of light" | "a receiver having a device that splits received light into a first wave and a second wave, delays the first wave relative to the second wave, recombines the delayed first wave and the second wave, and detects an intensity of the recombined waves" |

Ciena's proposed construction should be rejected as an improper attempt to import the limitations from an embodiment taught by the specification into the claims. *Phillips*, 415 F.3d at 1314 (without clear and unambiguous disclaimer or lexicography by the patentee, courts "do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or

even describes only a single embodiment." *JVW Enters.*, 424 F.3d at 1335. Each of Ciena's imported limitations,  (1) splitting waves into two waves: (2) delaying the first wave  relative to the second wave;  (3) recombining the waves; and (4)  detecting an intensity of the recombined waves, is an attempt to  read limitations into the definition of "interferometer" based on  how the specific interferometer used in the embodiment taught by the patent operates. *See* '500 Patent at 4:44-47, 5:51-62, 6:20-39, 6:53-7:39. However, nothing in the '500 Patent disclaims the use of interferometers with only those features or disavows any claim scope concerning interferometers.

While the '500 patent provides that its receiver is "compatible with" certain transmitters, including the transmitter from the '055 Patent ('500 patent at 6:21-26), it does not teach that its receiver must be identical that used in the '055 patent or that its invention requires any particular kind of interferometer. *See* Ex. C, Goossen Del., ¶23. Moreover, the specification expressly describes alternatives to the receiver used in the '055 patent. '500 patent at 5:51-62.

Moreover, as described in the attached declaration of Dr. Keith Goossen, a person of skill in the art would not understand "interferometer" to be limited to the specific embodiment taught by the'500 patent. As Dr. Goossen explains, a person of skill would understand that "'interferometer' involves interference based on the name alone," and that the "'-meter part' of the name requires something  must measure." Ex. C, Goossen Decl., ¶¶42-43. Since the '500 patent states that the "interferometer" is "for reading the phase-modulated signals" ('500 patent at 3:50-51), "it would be clear that the '500 patent lpaced no additional constraints on what the interferometer need consist of." Ex. C, Goossen Decl., ¶43.

The extrinsic evidence, including the Handbook of Optics cited by Ciena, supports Oyster's construction that that all optical interferometers make measurements "using the interference phenomena produced by light waves." Ex. G, Handbook of Optics at 21.1. Moreover, the treatise describes that the interference is between a signal beam and a reference beam as used in Oyster's construction. Ex. G, Handbook of Optics at 21.8. *See also* Ex. C, Goossen Decl., ¶¶ 33-35.

Ciena's construction, by contrast, reads in limitations of only using two beams, "splitting" and "delaying" the light. As explained in Dr. Goossen's declaration, a Person of Skill in the Art was aware of interferometers that did not perform these actions.  For example, the Handbook of

13

Optics describes many examples of "multiple-beam interferometers." Ex. C, Goossen Decl., ¶ 37; Ex. G, Handbook of Optics at 21.2, 21.8. It likewise describes stellar interferometers which contain no splitters and no delays of light. Ex. C, Goossen Decl., ¶38; Ex. G, Handbook of Optics at 21.22.

Accordingly, a person of skill in the art would understand that an interferometer is far broader than just the embodiment disclosed in the '500 Patent. For this reason, the Court should rejected the narrow construction urged by Ciena, and adopt Oyster's broader construction.

### E.     "mode" ('500 Patent cl. 1, 16)

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| Plain and ordinary meaning, or "manner of operation" | "manner of operation during which one specific data signal is either amplitude modulated or phase modulated, but not both simultaneously" |

The dispute between the parties is not over the plain and ordinary meaning of the term "mode." Each side agrees that the term refers to a "manner of operation." Rather, the dispute is whether to laden the term with extra requirements, purportedly based upon a disclaimer made in prosecution.

#### 1.     The '500 Patent Expressly Discloses and Claims a Second "Mode" that Simultaneously Amplitude Modulates and Phase Modulates

Nothing in the claims or the specification of the '500 patent suggests that a "mode" excludes simultaneous amplitude modulation and phase modulation, as Ciena proposes. To the contrary, dependent claim 19 expressly requires that "during the second alternate transmission *mode* the light is *both* amplitude-modulated and phase-modulated." Ex. E., '500 patent at 19:26–28. The specification likewise teaches "[i]n *the second mode, the light may be amplitude modulated* . . . as a function of an output of a delayed-feedback exclusive-or gate having the electronic data stream as an input (known as the delayed second or amplitude-modulated mode.) In the delayed *second mode*, the optical signal *may* or may not *also be phase modulated*." *Id.* at 2:63–3:3 (emphasis added).

As Ciena's claim construction expert Dr. Blumenthal explained in his declaration submitted in this case, "the '500 patent discloses four configurations of the transmitter." Dkt. 50,

Ex. I, Blumenthal Decl. at 14. As he explains, these four configurations correspond to four different "bit data" values described at 3:22–27 of the '500 patent. Dkt. 50, Ex. I, Blumenthal Decl. at 13:25–14:4. As the patent explains, these four bit data values correspond to a "first mode" (which is phase modulated, '500 patent at 2:48–51), a "direct second mode" (which is amplitude modulated, '500 patent at 2:63–65), a "delayed second mode with no phase modulation" (which is also amplitude modulated, '500 patent at 2:63–3:3), and "a delayed second with phase modulation" (which is both amplitude and phase modulated, '500 patent 2:63–3:3).

Dr. Blumenthal's declaration provides several tables that describe these "four configurations of the transmitter" disclosed in the '500 patent. Dkt. 50, Ex. I, Blumenthal Decl. at 14–17, 24, 28. As he explains in these tables, the mode corresponding to the "11" bit data is an "amplitude modulate and then phase modulate" mode. *Id.* at 15:1. As he further explains, this mode corresponds to claim 19 of the patent and is "disclosed but not enabled." *Id.* at 28:19–20.

Dr. Blumenthal explains how this "amplitude modulate and then phase modulate" mode is disclosed in the following annotated version of Figure 1 of the '500 patent:



Dkt. 50, Ex. I, Blumenthal Decl. at 20:15–24. In this mode, "the 'signals OP are sent in a pulsed fashion' by pulsing the laser 12 and providing the pulsed laser to the phase modulator 16, which then phase modulates the pulsed signal." *Id.* at 24:25–28. In other words, the same light is first

pulsed (amplitude modulated) and then phase modulated, resulting in an optical signal that is simultaneously amplitude modulated and phase modulated. As Dr. Blumenthal further explains, the same signal "OP" is used to perform both the amplitude modulation and phase modulation. *Id.* at 20:12–14 (describing the "optical signal that is pulsed with the signal OP and then phase modulated with the same signal OP.") As shown in the purple path in Dr. Blumenthal's annotated figure, this signal OP is a function of a signal "input data" DSI. *See* Ex. E, '500 patent at 5:1–13.

The fact that a signal is simultaneously amplitude and phase modulated in this mode is central to Dr. Blumenthal's argument concerning enablement, as he opines that the '500 patent specification teaches how to read a "mixed optical signal" with amplitude- and phase-modulated signals sent serially, he contends that "[t]here is no disclosure of how to receiver data from a signal that is *simultaneously* amplitude and phase modulated." Dkt. 50, Ex. I, Blumenthal Decl. at 21:1–13.

### 2.    The Claims Should Not Be Narrowed for Reasons of Enablement

To the extent that Ciena argues for its narrowed construction on the grounds of enablement, that argument should be rejected. Enablement is a question of validity, not of claim construction. While there is a maxim of claim construction that claims should be construed to preserve their validity, the Federal Circuit has determined that maxim is of "limited utility," applicable only when "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous." *Phillips*, 415 F.3d at 1327–28. The term "mode" is not ambiguous in the '500 patent.

Moreover, Dr. Blumenthal's enablement opinions fail to actually demonstrate an issue of enablement. His enablement opinion is that the '500 patent fails to teach a ***receiver*** that can properly receive a signal that is simultaneously amplitude and phase modulated. But even assuming that this were true and that such an express teaching were required to enable such a receiver, that is irrelevant to whether the claims are enabled. Most of the '500 patent claims are directed solely to the transmitter, and the claims that require a receiver never use the word "mode" in connection with the receiver. Ex. E, '500 patent at 8:27–10:27. So even if there were some issue

16

with enablement of receivers in the '500 patent, narrowing the term "mode" would do nothing to solve that purported issue.

### 3. The Term "Mode" Was Not Narrowed in Prosecution as Ciena Contends

As explained above, the '500 patent expressly claims (in claim 19) and teaches in the specification, a second "mode" which simultaneously amplitude modulates and phase modulates the same light with the same signal OP. Ciena can point to nothing in the claims or specification that excludes such a mode. Rather, Ciena is likely to argue that this mode was disclaimed during prosecution.

In support of this argument, Ciena is likely to point to the claim construction order entered in litigation between Oyster and Cisco in the Eastern District of Texas, construing "mode" in the way that Ciena now proposes. Ex. J at 27. Importantly, Ciena is not taking some principled stance that all of the constructions from the E.D. Texas Oyster/Cisco case should be adopted in this case. The Oyster/Cisco court also construed the "phase modulate" and "amplitude modulate" terms addressed above in sections V.A, V.B, and V.C and construed them in the way that Oyster proposes in the present case. Ex. J at 27. While Oyster believes that the E.D. Texas claim construction order correctly construed those terms, Oyster respectfully submits that court erred in construing the term "mode."

Oyster is not collaterally estopped by the E.D. Texas claim construction. One requirement for collateral estoppel is that the "first proceeding ended in a final judgment on the merits." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1378 (Fed. Cir. 2017) (applying Ninth Circuit law). The Oyster/Cisco litigation was settled and dismissed with prejudice, without any judgment on the merits. Ex. K. At most, the E.D. Texas claim construction order is persuasive authority.

The E.D. Texas order found a prosecution disclaimer based upon a June 11, 2003 response to an office action. Ex. J at 22–26; Ex. L at 117–126. This was a response to an office action rejecting claims using a prior art reference called Djupsjöbacka. Ex. M. As Oyster's claim construction expert Dr. Baker explains, Djupsjöbacka teaches that in its transmitter, a signal "is

17

always simultaneously phase and amplitude modulated." Ex. N, Baker Decl. ¶ 27; Ex. M, Djupsjöbacka at 3:65–4:23. Indeed, "Djupsjöbacka, in contrast to the claims of the '500 Patent, teaches [only] a single manner of operation in which the signal to be transmitted is always simultaneously phase and amplitude modulated." Ex. N, Baker Decl. ¶ 29.

The applicant amended the claims to distinguish Djupsjöbacka, with its single manner of operation always involving simultaneous phase and amplitude modulation. As relevant to the disputed term "mode," the applicant's response amended the claims to require that the first mode and second mode occur at different times:

Claim 1 (currently amended)   An optical data transmitter comprising:

at least one light source a laser;

a phase modulator for phase modulating light from the light source; and

a controller having an input for receiving an electronic data stream, the controller in a first mode controlling the phase modulator so as to create phase-modulated optical signals in the light from the laser as a function of the electronic data stream and the controller in a second alternate mode amplitude-modulating the light from the laser as a function of the electronic data stream, the first mode and the second mode occurring at different times.

Claim 18 16. (currently amended): A dual-mode optical transmission system comprising:

a transmitter having a laser for transmitting amplitude-modulated signals in a first mode and phase-modulated signals in a second mode and a controller for switching an output of the laser between the first mode and the second mode, the second mode occurring at a different time than the first mode;

an optical fiber connected to the transmitter; and

a receiver having an interferometer being connected to the optical fiber.

Ex. L, Response to Office Action at 119–120.

The E.D. Texas order pointed to three statements concerning Djupsjöbacka in the June 11, 2003 response that purportedly disclaim a mode that with "both phase modulation and amplitude modulation to be performed simultaneously as to a particular data stream at a particular time. Ex. J at 23, 26. A careful review demonstrates that no such disclaimer was actually made. The first statement the court relied upon is:

Djupsjobacka discloses simultaneous transmission of optical signals in AM or PM mode, the same signal being sent in AM and PM mode at the same time.  (See for example Djupsjobacka at column 2, lines 50 to 54).

18

**PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF**

1    Ex. L, Response of Office Action at 123. This is a simple factual statement about Djupsjöbacka

2    that does not, by itself attempt to distinguish Djupsjöbacka from the amended claims. Read in

3    isolation, it no more suggests a disclaimer of simultaneous AM and PM signals than it does a

4    disclaimer of optical signals or of modes. Context is required to understand what, if anything is

5    being distinguished. That context is provided by the next paragraph, which states that "it is

6    respectfully submitted that neither [another reference] nor Djupsjöbacka disclose [the 75-word

7    third clause of claim 1]." In other words, what Djupsjöbacka discloses ("simultaneous transmission

8    of optical signals in AM or PM mode, the same signal being sent in AM and PM mode at the same

9    time") is not sufficient, alone or with the other art, to satisfy the ***entire*** claim limitation, including

10   "the first mode and the second mode occurring at different times." Nothing in these paragraphs

11   suggests that Djupsjöbacka's disclosure couldn't satisfy a ***part*** of the claim limitation, such as the

12   "first mode" or the "second mode."

13          The second statement relied on in the E.D. Texas order is:

14          radio transmissions.  Moreover, Djupsjobacka is concerned with improving an optical signal

             which is totally irrelevant to the Furuya device and also transmits AM and PM signals at exactly

15          the same time, and not in two different time modes, as now claimed.

16   Again, this statement does not disclaim all transmission of AM and PM signals at the same time.

17   It mentions that simultaneous transmission as a feature of Djupsjöbacka, just as it mentions that

18   Djupsjöbacka is concerned with "an optical signal." But mere mention of those features does not

19   mean that "optical signals" or simultaneous transmission are being excluded from use to satisfy

20   the claims by way of disclaimer. To determine whether there is a disclaimer, one must look to why

21   the features of Djupsjöbacka are being described. The "optical signal" is referred to in order to

22   explain why Djupsjöbacka would not be combined with Furuya's radio-based system. The

23   transmission of "AM and PM signals at exactly the same time" is referred to in order to explain

24   that there are not "two different time modes, as now claimed," i.e. as required by the new language

25   in the claim amendments.

26          The third and final statement relied on in the E.D. Texas order is:

27

28

                                                      19
     **PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> Neither Djupsjobacka, Kazovsky, Garthe nor Kiasaleh shows such different time modes for modulating one laser. Djupsjobacka shows simultaneous AM/PM transmission. Kazovsky shows an LED transmission mode at the same time as a laser transmission mode, and thus a laser is not modulated in two time distinct modes. Garthe shows simultaneous transmission at two different wavelengths. Kiasaleh does not show two modes.

As the first sentence of the paragraph makes clear, it is distinguishing four different references for the same reason: none shows different time modes for modulating a laser. The details of each reference (simultaneous AM/PM, simultaneous LED/laser, simultaneous use of two wavelengths, no purported two modes at all) are recited merely to demonstrate why the features of the prior art identified by the examiner fail to satisfy the amended claim's requirement of different time modes. It is not proper to read this paragraph as a disclaimer of claim scope excluding any use of these incidental features (AM/PM, LED transmission, or use of multiple wavelengths) simply because the office action response mentioned these features. Each of these prior art references was clearly being distinguished based upon a feature they lacked—different time modes—not based upon the various different features they had.

As this careful review of the statements during prosecution shows, the distinction being drawn between Djupsjöbacka and the amended claims was clearly based on the lack of different time modes, required by the amended claim language. But even if there were some lack of clarity on that point or some hint to a broader disclaimer in these statements, such unclear statements are not sufficient to find disclaimer. As the Federal Circuit taught in *Phillips*, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. Accordingly, "our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Omega*, 334 F.3d at 1326. Here, the "final product of that negotiation"—the claims requiring two different time modes—are clear and fully consistent with the arguments made in the response to the office action. It would be contrary to law to turn any statement in prosecution reciting features of a prior art reference into a disclaimer of those features. *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1433–34 (Fed. Cir. 2000) (statement that "present

20

1    invention utilizes an interactive display which operates in a question and answer format without

2    resorting to the M and G codes of the machine tool" was not a disclaimer of "M and G code" when

3    the purpose and context of the statement were considered); *Cadence Pharm. Inc. v. Exela*

4    *PharmSci Inc.*, 780 F.3d 1364, 1373 (Fed. Cir. 2015) (statement concerning "vacuum stoppering

5    step" was not a disclaimer that made vacuum stoppering mandatory in the claims because that step

6    was not "the 'contrast' that applicants were trying to make over the cited reference").

7            For these reasons, the term "mode" should be construed in accordance with its plain and

8    ordinary meaning, or "manner of operation," and not narrowed based upon an erroneous finding

9    of prosecution disclaimer.

10

11   Dated: April 25, 2021                              Respectfully submitted,

12                                                      **OYSTER OPTICS, LLC**

13                                                      By: */s/ Reza Mirzaie*
                                                        Marc A. Fenster (CA SBN 181067)
14                                                      E-mail: mfenster@raklaw.com
                                                        Reza Mirzaie (CA SBN 246953)
15                                                      E-mail: rmirzaie@raklaw.com
                                                        Paul A. Kroeger (SBN 229074)
16                                                      Email: pkroeger@raklaw.com
                                                        Neil A. Rubin (CA SBN 250761)
17                                                      Email: nrubin@raklaw.com
                                                        RUSS, AUGUST & KABAT
18                                                      12424 Wilshire Boulevard, 12th Floor
                                                        Los Angeles, CA  90025
19                                                      Telephone:    310/826-7474
                                                        Facsimile:    310/826-6991
20

21                                                      **Attorneys for Plaintiff**
                                                        **OYSTER OPTICS, LLC**
22

23

24

25

26

27

28

**PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the counsel of record who are deemed to have consented to electronic service are being served on April 25, 2022 with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail, facsimile transmission and/or first-class mail on this same date.


                                                */s/ Reza Mirzaie*

**PLAINTIFF OYSTER OPTICS LLC'S REVISED OPENING CLAIM CONSTRUCTION BRIEF**