BLAIR M. JACOBS (admitted *pro hac vice*)
bjacobs@mckoolsmith.com
CHRISTINA A. ONDRICK (admitted *pro hac vice*)
condrick@mckoolsmith.com
JOHN S. HOLLEY (admitted *pro hac vice*)
jholley@mckoolsmith.com
McKool Smith, P.C.
1999 K Street NW, Suite 600
Washington, DC 20006
T: 202.370.8300
F: 202.370.8344

ALAN P. BLOCK (SBN 143783)
ablock@mckoolsmithhennigan.com
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
T: 213.694.1200;
F: 213.694.1234

Attorneys for Defendant
CIENA CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OYSTER OPTICS, LLC,<br><br>    Plaintiff,<br><br>  vs.<br><br>CIENA CORPORATION,<br><br>    Defendant. | CASE NO. 4:20-cv-02354-JSW<br><br>**CIENA CORPORATION'S REVISED RESPONSIVE CLAIM CONSTRUCTION BRIEF** |

1

## **TABLE OF CONTENTS**

2
**Page**

3    I.    INTRODUCTION ........................................................................................... 1

4    II.   THE '500 PATENT ....................................................................................... 1

5    III.  CLAIM CONSTRUCTION PRINCIPLES ................................................... 3

     IV.   AGREED UPON CLAIM TERMS ................................................................ 4
6
     V.    DISPUTED CLAIM TERMS ........................................................................ 5
7
           A.    "phase modulator for phase modulating light from the light source" (claim 1).........5
8
           B.    "phase-modulated optical signals" (claims 1, 16) ........................................ 8
9
           C.    "amplitude-modulating the light from the laser" (claim 1) / "amplitude-modulated
                 signals" (claim 16) .................................................................................. 8
10
           D.    "a receiver having an interferometer" (claim 16) .................................... 9
11
           E.    "mode" (claims 1, 16) .............................................................................. 12
12
                 1.    The Claim Language Supports Ciena's Proposed Construction .................... 13
13
                 2.    The Specification Supports Ciena's Proposed Construction and Contradicts
                       Oyster's Proposed Construction .................................................................. 14
14
                 3.    The Prosecution History Also Supports Only Ciena's Proposed Construction
15                           ........................................................................................................... 18

16                 4.    The Extrinsic Evidence Supports Ciena's Construction and Oyster
                       Mischaracterizes The Extrinsic Evidence ..................................... 23
17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
  566 F.3d 1282 (Fed. Cir. 2009)..........................................................................................6

*ALZA Corp. v. Andrx Pharms., LLC*,
  603 F.3d 935 (Fed. Cir. 2010)............................................................................................4

*Aventis Pharma S.A. v. Hospira, Inc.*,
  675 F.3d 1324 (Fed. Cir. 2012)..........................................................................................9

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
  616 F.3d 1249 (Fed. Cir. 2010)......................................................................................8, 9

*Fenner Invs., Ltd. v. Cellco P'ship*,
  778 F.3d 1320 (Fed. Cir. 2015)..........................................................................................6

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  481 F.3d 1371 (Fed. Cir. 2007)........................................................................................12

*Liquid Dynamics Corp. v. Vaughan Co.*,
  449 F.3d 1209 (Fed. Cir. 2006)..........................................................................................4

*MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*,
  687 F.3d 1377 (Fed. Cir. 2012)..........................................................................................4

*Markman* v. *Westview Instruments, Inc.*,
  517 U.S. 370 (1996)........................................................................................................1, 3

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005)......................................................................................3, 7

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)..........................................................................................3

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003)........................................................................................11

*Openwave Sys., Inc. v. Apple Inc.*,
  808 F.3d 509 (Fed. Cir. 2015)..........................................................................................11

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007)........................................................................................12

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005).............................................................................1, 3, 6, 9

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
   824 F.3d 999 (Fed. Cir. 2016) ................................................................................ 4, 8, 9

*Schriber-Schroth Co.* v. *Cleveland Trust Co.*,
   311 U.S. 211 (1940) ................................................................................................ 3, 8

*SightSound Techs., LLC v. Apple Inc.*,
   809 F.3d 1307 (Fed. Cir. 2015) .................................................................................. 11

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008) ............................................................................... 4, 8, 9

*Trs. of Bos. Univ. v. Everlight Elecs. Co.*,
   896 F.3d 1357 (Fed. Cir. 2018) .......................................................................... 4, 8, 9, 12

*Trustees of Columbia Univ. v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016) ................................................................................... 3

*U.S. v. Masonite Corp.*,
   316 U.S. 265 (1942) .................................................................................................. 12

*United States* v. *Adams*,
   383 U.S. 39 (1966) ..................................................................................................... 3

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007) .................................................................................. 11

**TABLE OF EXHIBITS[1]**

| Exhibit | Document Description |
|---|---|
| A | **[Attached to Dkt. 113 as 113-2]** Claim Construction Order dated August 10, 2020 and entered as docket entry number 127 in Oyster Optics, LLC v. Ciena Corporation, Case No. 4:17-cv-05920. |
| B | **[Attached to Dkt. 113 as 113-3]** Claim Construction Memorandum Opinion and Order dated July 23, 2020 *Oyster Optics, LLC v. Infinera Corporation, et al.* No. 2:19-cv-00257-JRG (E.D. Texas) (Dkt. No. 88). |
| C | **[Attached to Dkt. 113 as 113-4]** Declaration of Professor Keith Goossen |
| D | **[WITHDRAWN]** U.S. Patent No. 10,554,297. |
| E | **[Attached to Dkt. 113 as 113-5]** U.S. Patent No. 6,665,500. |
| F | **[Attached to Dkt. 113 as 113-6]** U.S. Patent No. 6,594,055. |
| G | **[Attached to Dkt. 113 as 113-7]** Excerpts from the Treatise, Handbook of Optics |
| H | **[WITHDRAWN]** Declaration of Richard Gitlin, SC.D. In Support of Ciena's Preliminary Claim Constructions that was filed *Oyster Optics, Inc. v. Ciena Corporation*, Case No. 4:17-cv-05920-JSW (Dkt. No. 100-2). |
| I | **[Attached to Dkt. 50 as Confidential Ex. I]** Declaration of Professor Daniel Blumenthal, Ph.D. |
| J | **[Attached to Dkt. 113 as 113-8]** Claim Construction Memorandum Opinion and Order dated May 4, 2021 and entered as docket entry number 73 in *Oyster Optics, LLC v. Cisco System, Inc.*, No. 2:20-cv-00211-JRG (E.D. Texas). |
| K | **[Attached to Dkt. 113 as 113-9]** Agreed Motion to Dismiss with Prejudice dated February 24, 2022 and entered as docket entry number 250 in *Oyster Optics, LLC v. Cisco System, Inc.*, No. 2:20-cv-00211-JRG (E.D. Texas). |
| L | **[Attached to Dkt. 113 as 113-10]** Excerpts of the prosecution history of U.S. Patent No. 6,665,500 |
| M | **[Attached to Dkt. 113 as 113-11]** U.S. Patent No. 6,122,086 |
| N | **[Attached to Dkt. 113 as 113-12]** Declaration of Dr. R. Jacob Baker |
| O | **[Attached]** Additional Excerpts of the prosecution history of U.S. Patent No. 6,665,500 |
| P | **[Attached]** Supplemental Declaration of Daniel Blumenthal, Ph.D. |
| Q | **[Attached]** Excerpts of IPR2020-00325, Paper No. 34 Final Written Decision |
| R | **[Attached]** Oyster Optics, LLC's Objections to Claim Construction Memorandum and Order dated May 18, 2021; entered as docket entry number 75 in *Oyster Optics, LLC v. Cisco System, Inc.*, No. 2:20-cv-00211-JRG (E.D. Texas) |
| S | **[Attached]** Order dated August 31, 2021; entered as docket entry number 145 in *Oyster Optics, LLC v. Cisco System, Inc.*, No. 2:20-cv-00211-JRG (E.D. Texas) |
| T | **[Attached]** Excerpts of IPR2020-00325 Patent Owner Response |

[1] Exhibits A to C, E to G, and J to N were filed with Oyster's Opening Claim Construction Brief. Dkt. 113. Exhibits I, O and P-T are being filed concurrently with Ciena's Revised Responsive Claim Construction Brief.

Defendant Ciena Corp. ("Ciena") respectfully submits this revised brief in support of its proposed constructions for the disputed claim terms in U.S. Patent No. 6,665,500 ("the '500 patent"). This brief contains Ciena's prior arguments for the four terms that are still at issue from the original claim construction briefing. Dkt. 50. For the convenience of the Court, Ciena has updated the citations to refer to Oyster's Revised Opening Claim Construction Brief (Dkt. 113), leaving only necessary citations to Oyster's original Opening Claim Construction Brief (Dkt. 45).

## I. INTRODUCTION

The parties' *Markman* positions reflect vastly different approaches to claim construction. For its part, Ciena faithfully applies the claim construction framework that the Federal Circuit established in *Phillips* and its progeny by proposing definitions for the disputed terms that are firmly grounded in the full intrinsic record—the '500 patent's claims, specification, and prosecution history.

Oyster, in contrast, consistently argues for "ordinary meaning" detached from anything in the patent and uninformed by the specification. Oyster's broad proposed constructions wrongly divorce the claim language from express descriptions of the inventions and ignore the inventor's criticisms of prior art and inventions that pre-existed these patents. Oyster's approach runs contrary to the fundamental public policy principle that inventors should only receive protection for what they have actually invented. This is particularly apparent with regard to the disputed "mode" term. There, Oyster attempts to undo a claim construction provided by both Magistrate Judge Payne and Judge Gilstrap of the Eastern District of Texas in a case involving the same patent and Oyster and Cisco. In doing so, Oyster ignores clear statements of disavowal made during prosecution and emphasizes and misrepresents extrinsic evidence provided by Ciena's technical expert, Dr. Blumenthal concerning a different issue. Neither misrepresentations nor obfuscation can erase the clear intrinsic record regarding that term, and both Judge Payne and Judge Gilstrap have correctly analyzed and construed the "mode" term.

## II. THE '500 PATENT

Oyster grossly expands the scope of the purported invention by stating that the '500 patent is broadly directed to "transporting information by modulating light waves transmitted and

1  received across transparent optical fibers." Dkt. 113 at 5:15-16.  The concept of transporting

2  information by modulating light waves was known well before the '500 patent.  Ex. I at 7:3-

3  12:19; *see also* Ex. Q at 2 (invalidating independent claim 1, which describes transporting

4  information by providing two modes for modulating light).  Oyster is doubly wrong that claimed

5  systems "demonstrate[] a significant advancement over the state of the art."  Dkt. 113 at 5:17-19.

6  The USPTO invalidated nearly every claim it substantively considered including the dual-mode

7  aspects of claim 1 and the switch aspect of claim 4, leaving Oyster's sole innovation as a "user

8  operated switch" and a decades-old "interferometer"—far from a significant advancement.  Ex. Q

9  at 2; Ex. P at 22:12-24:2.

10      The '500 patent is directed to a "dual-mode fiber optic telecommunications system."  *See,*

11  *e.g.,* Ex. E at Title.  The transmitter is "for transmitting **either** phase-modulated **or** amplitude

12  modulated optical signals."  *Id.* at 2:27-28 (emphasis added).  The '500 patent's receiver is "for

13  receiving **either** phase-modulated **or** amplitude-modulated optical signals."  *Id.* at 2:27-31

14  (emphasis added).  This "can permit the transmitter to work with different types of receivers."  *Id.*

15  at 2:45-46.  As Oyster notes, the patent mentions that in "certain circumstances a mixture of

16  phase and amplitude modulation **could be possible**.  For example, amplitude modulated signals

17  **not related** to the input optical data stream could be transmitted during the secure phase-

18  modulation mode without necessarily affecting security."  *Id.* at 4:35-42 (emphasis added).  But

19  the patent's offhand mention of possibilities is not an actual disclosure of *how* to transmit a signal

20  that has data modulated on the amplitude and phase.  Indeed, Ciena's expert Dr. Blumenthal

21  provided the unrebutted opinion that any mode with *both* amplitude and phase modulated signals

22  is not enabled.  Ex. I at 13:22-22:12; 25:1-23 (although the '500 patent mentions "a second mode

23  that amplitude modulates and *then* phase modulates the signal, such a mode is not enabled" and

24  "requires that the receiver has a multilevel detection circuit, which is not disclosed in the

25  specification and would require undue experimentation by a POSITA").  In any event, the patent

26  does not disclose *how* one could simultaneously transmit both amplitude and phase modulated

27  signals.

28

### III.   CLAIM CONSTRUCTION PRINCIPLES

"The purpose of claim construction is to determine the meaning and *scope* of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (emphasis added).  The Supreme Court instructs that "[t]he claims of a patent are *always* to be read or interpreted in the light of its specifications." *Schriber-Schroth Co.* v. *Cleveland Trust Co.*, 311 U.S. 211, 217 (1940) (emphasis added); *see also Markman* v. *Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996) (claim construction entails an "analysis of the whole document, required by the standard construction rule that a term can be defined only in a way that comports with the instrument as a whole").  The Federal Circuit has likewise explained that words in a claim "are generally given their ordinary and customary meaning"—that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention…." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, *but in the context of the entire patent, including the specification*." *Id.*  (emphasis added).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1362-64 (Fed. Cir. 2016); *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term…in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.").

This jurisprudence establishes a fundamental canon in claim construction: the specification provides critical context for construing claim language and determining scope.  Because the claims and the written description are part of one integrated document, "it is fundamental that claims are to be construed in the light of the specification[] and both are to be read with a view to ascertaining the invention." *United States* v. *Adams*, 383 U.S. 39, 49 (1966).

As this Court explained in the first case between Oyster and Ciena, "the Court has an

1   *obligation* to assign 'a fixed, unambiguous, legally operative meaning to the claim' in order to

2   '*ensure that questions of the **scope** of the patent claims are not left to the jury.*'"   4:17-cv-05920-

3   JSW Dkt. No. 127 at 6:8-11 (emphasis added; citations omitted).  In terms of "scope," the

4   "specification...must teach those skilled in the art how to make and use the *full scope* of the

5   claimed invention...."  *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010)

6   (emphasis added).  This statutory requirement is limited to what is claimed.  For that reason, the

7   "enablement inquiry necessarily *depends on an interpretation of the claims*."  *Liquid Dynamics

8   Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224, n.2 (Fed. Cir. 2006) (emphasis added).  In other

9   words, the *full scope* of the claim, as interpreted by the Court, must be enabled.  *Trs. of Bos.

10   Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018); *Sitrick v. Dreamworks, LLC*,

11   516 F.3d 993, 999 (Fed. Cir. 2008).

12   The canon favoring constructions that preserve claim validity counsels against construing

13   claim terms so broadly that the *full scope* is not disclosed or enabled.  *See, e.g.*, *Ruckus Wireless,

14   Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) ("[T]he specification

15   makes no mention of wireless communications," thus "[t]he canon favoring constructions that

16   preserve claim validity therefore counsels against construing 'communications path' to include

17   wireless communications.").  In parallel with this canon, Federal Circuit precedent instructs that

18   claims should be invalidated when the full scope of the claim as construed is not enabled.  In

19   *MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*, 687 F.3d 1377, 1381-83 (Fed. Cir.

20   2012), the claim was interpreted to cover all changes in resistance of "10% or more" (*e.g.*, 100%

21   or 1000%), and it was the lack of any teaching of how to achieve the resistance change even a

22   little bit above 10% that rendered the claim not enabled.  In *Sitrick*, 516 F.3d at 999-1001, the

23   claim was construed to cover both video games and movies, and Court determined that moves

24   were not enabled.  In *Trustees of Boston University*, 896 F.3d at 1360, 1362-65, the parties agreed

25   that the claim covered six permutations and the Court concluded one of those permutations was

26   not enabled thus rendering the claims invalid.

27   **IV.   AGREED UPON CLAIM TERMS**

28   The parties agree that "the controller in a second alternate mode amplitude-modulating the

4

light from the laser as a function of the electronic data stream" means "the controller in a second

alternate mode amplitude-modulating the light from the laser as a function of the ***same*** electronic

data stream ***as in the first mode***." Dkt. 96 at 2:4-14.  Oyster's assertion that there is no agreement

is incorrect.  Dkt. 113 at 8:9-10.

## V.     DISPUTED CLAIM TERMS
### A.     "phase modulator for phase modulating light from the light source" (claim 1)

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "phase modulate" means "alter the phase of light to create an optical signal having a phase that is representative of data" | "Phase Modulator" Claim 1<br>a device that alters the phase of light to create an optical signal having a phase that is representative of data. The phase modulator does not perform amplitude modulation. |

Oyster offers no construction for "phase modulator."  Dkt. 113 at 8:11-11:20.  At the same

time, Oyster concedes that the claimed "phase modulator" in other patents by the same inventor

"excludes use of amplitude modulation." *Id.* at 9:24-28; *see also* Dkt. 45 at 2:10-11 (the '500

patent concerns "the same general area of technology").  Moreover, this Court has previously

acknowledged that "both parties agree that phase modulation uses phase (not amplitude) to

communicate." 4:17-cv-05920-JSW Dkt. No. 127 at 18:10-11.

Rather than honoring past positions or offering a competing construction, Oyster asserts

that the dispute with Ciena is the "exact dispute" resolved by Judge Payne in a Texas case

between Oyster and Infinera. *Id.* at 8:24-9:2.  This is incorrect.  Judge Payne construed "phase

modulate" (an action) not "phase modulator" (a physical device).  Ex. B at 16.  The distinction

between "phase modulate" and "phase modulator" is critical because, as reflected in Ciena's

proposed construction, there is no disclosure of a "phase modulator" device in the '500 patent that

performs *both phase and amplitude modulation*.  Rather, the amplitude modulation and phase

modulation are performed by *different devices* (amplitude modulation via the laser controller and

phase modulation in the phase modulator) in the '500 patent, an undisputed fact that undercuts all

of Oyster's arguments regarding this term. *See* Ex. E at 2:33-34; 4:65-67; 5:21-25; 5:35-37; Ex. I

at 24:7-25:1; *see also id.* at 15:1-7; 17:4-20:24.

Oyster's failure to address the undeniable disclosure of *different* devices serving as the

1   amplitude modulator and phase modulator exposes the fallacies in Oyster's arguments.  For

2   example, Oyster points to the '500 patent's disclosure of a "phase and amplitude modulated

3   transmission mode" and a singular instance of the phrase "mixed optical signal" at the receiver.

4   Dkt. 133 at 9:7-10:4.  But neither of these disclosures address the fact that different devices

5   modulate amplitude and phase separately and at different times.  Dr. Blumenthal explained this

6   by noting (i) that when the bit data is set to three (binary "11") the signal is amplitude modulated

7   *and then* phase modulated (Ex. I at 13:26-15:7; 17:4-12; 19:14-20:24) and (ii) that the "mixed"

8   signal is the signal 25 in Fig. 2 consisting of an amplitude 23 and phase 22 signal set serially

9   (back-to-back)[2] (*id.* at 21:1-13).  As can be seen, the patent's express disclosure refutes Oyster's

10  attorney argument that phase and amplitude modulation is "simultaneous."  Dkt. 113 at 10:6-9.

11  The fact that amplitude modulation and phase modulation are performed by *different devices* in

12  the patent makes Oyster's argument inconceivable.

13       Neither party disputes that claims must be interpreted "in view of the specification."

14  *Phillips*, 415 F.3d at 1315; *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009)

15  ("[T]he claims cannot enlarge what is patented beyond what the inventor has described as the

16  invention.").  Here, Oyster never disclosed, let alone enabled, a "phase modulator" that performs

17  *simultaneous* phase and amplitude modulation.  This is confirmed by the inventor's silence about

18  such a hypothetical modulator in the specification and by the contrary explanation that phase and

19  amplitude modulation occur in two separate "modes" via two separate devices.  Ex. E at 2:41-45;

20  3:22-27; Ex. I at Table 1; Table 2; 13:20-17:13; 20:11-22:12; 23:7-11; 24:1-25:23; 27:1-18.

21       Oyster's claim differentiation argument regarding claim 18 is a *non sequitur* because the

22  term "phase modulator" does not exist in claim 18.  Dkt. 113 at 10:13-11:13.  Moreover, claim

23  differentiation "cannot enlarge the meaning of a claim beyond that which is supported by the

24  patent documents…."  *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1327 (Fed. Cir. 2015).

25  Dr. Blumenthal studied the '500 patent and his unrebutted opinion is there is no support for a first

26  mode that includes both amplitude and phase modulation.  Ex. I at 13:25-27:18; *also compare* Ex.

27  E at 2:48-51; 5:35-49; 5:63-64; 7:12; 7:62-65 (describing phase modulation in a first mode

28  _____

[2] Oyster even refers to the "mixed" signal as an "altering stream."  Dkt. 113 at 6:15-21.

without any reference to amplitude modulation) *with id.* at 2:56-3:34; 4:5-12; 5:1-34; 5:49-50; 7:57-61 (describing amplitude modulation in a second mode).  Oyster's argument that Ciena's construction renders claim 19 incomprehensible likewise fails because, as claim 19 explains, in the "second mode" the light is both amplitude-modulated and phase-modulated.  This does not mean that a single phase modulator performs both amplitude and phase modulation and the patent describes no such scenario.  Instead, claim 19 is consistent with Dr. Blumenthal's explanation that, in the second mode (bit data = 11,) the light is pulsed ***and then*** phase modulated.  Ex. I at 15:1-25:23.  Said differently, amplitude modulation in the '500 patent is always done by **pulsing the laser**—any phase modulation that might occur in the phase modulator in the second mode when the bit data is 11 occurs later, **separate and apart from the amplitude modulation performed by pulsing the laser.**  *Id.* at 30:13-23.  For at least these reasons, the Court should adopt Ciena's proposed construction of "phase modulator."

Once the patent is properly understood to disclose *separate* amplitude and phase modulators, construction of the "phase modulating" term must logically be tied to the patent's disclosure of the modulator device that performs such modulation.  As detailed above, the specification discloses (i) phase modulating the signal, e.g., bit data = 00, (ii) amplitude modulating the signal, e.g., bit data = 01 or 10, or (iii) amplitude ***and then*** phase modulating the signal, e.g., bit data = 11.  Only Ciena's proposed construction properly excludes amplitude modulation from the phase modulation process consistent with the specification.  *Medrad*, 401 F.3d at 1319.

Oyster's untethered interpretation of claim scope is clearly erroneous and seeks to cover an invention nowhere described in the patent.  According to Oyster, "[j]ust as phase modulation does not exclude amplitude modulation, amplitude modulation does not exclude phase modulation."  Dkt. 113 at 12:9-10.  If Oyster's view were correct, then the "first" and "second" modes described in the patent would be superfluous and indistinguishable.  For example, viewing claim 17 through Oyster's lens results in: "a first transmission mode so as to transmit [amplitude and] phase-modulated optical data" and "a second alternate transmission mode so as to transmit [phase and] amplitude-modulated optical data."  This bizarre result, necessitated by the broad

scope proposed by Oyster's construction, would render claim 17 nonsensical.  *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct [elements]' of the patented invention.") (citations omitted).  Oyster's proposed construction is also inconsistent with the specification and attempts to improperly capture something other than what the patentee described as the invention.

Oyster's overly broad construction seeks to improperly capture something other than what is described in the patent.  By divorcing these terms from the description of the patent specification, Oyster's construction creates a non-enabled phase modulator that cannot be correct.  *Trs. of Bos. Univ.*, 896 F.3d at 1360, 1362-65.  In contrast, Ciena's proposed constructions stay true to the important policy consideration that inventors receive protection for only what is actually invented and disclosed.

**B.    "phase-modulated optical signals" (claims 1, 16)**

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "phase modulate" means "alter the phase of light to create an optical signal having a phase that is representative of data" | "optical signals having a phase that is representative of data. The amplitude of the optical signals is not representative of data" |

This term is similar to the "phase modulating" term above.  Again, "[t]he claims of a patent are *always* to be read or interpreted in the light of its specifications."  *Schriber-Schroth Co.*, 311 U.S. at 217.  And case law counsels against construing claim terms so broadly that the full scope includes concepts that are not even disclosed in the specification.  *Ruckus Wireless*, 824 F.3d at 1004; *Sitrick*, 516 F.3d at 999.  Ciena's construction stays true to the full and enabled scope of the term and should be adopted for the reasons detailed above.

**C.    "amplitude-modulating the light from the laser" (claim 1) / "amplitude-modulated signals" (claim 16)**

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "altering the amplitude of light to create an optical signal that is representative of data." | "altering the amplitude of light to create an optical signal having an amplitude that is representative of data. The use of amplitude modulation does not include phase modulation." |

The proper construction for these terms, similar to the two discussed above, turns on whether (i) the specification discloses and enables a scope for amplitude modulating that also includes phase modulating and whether (ii) it is proper to construe amplitude-modulating and phase-modulating to have the same broad scope. *Ruckus Wireless*, 824 F.3d at 1004; *Becton*, 616 F.3d at 1254; *Sitrick*, 516 F.3d at 999.  First, the proper construction cannot be so broad that it includes permutations of amplitude modulation that are neither disclosed nor enabled (Ex. I at 22:17-30:23), but this is exactly what Oyster urges. *Trs. of Bos. Univ.*, 896 F.3d at 1360, 1362-65.  Second, just as phase modulation cannot have a scope that is so broad that it is interchangeable with amplitude modulation, amplitude modulation cannot have a scope that is so broad that it is indistinguishable from phase modulation.  Oyster's proposed construction results in this impermissible outcome. Dkt. 113 at 13:9-12.  As with the two terms discussed above, Ciena respectfully requests the Court to adopt Ciena's construction.

### D.    "a receiver having an interferometer" (claim 16)

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "a receiver having a device that performs a measurement using the interference phenomena produced between one or more signal beams of light and one or more reference beams of light" | "A receiver having a device that splits received light into a first wave and a second wave, delays the first wave relative to the second wave, recombines the delayed first wave and the second wave, and detects an intensity of the recombined waves." |

From the outset, Oyster's arguments and proposed construction violate well-established claim construction tenets.  Critically, Federal Circuit precedent does not require explicit redefinition or disavowal as Oyster suggests.  Dkt. 113 at 13:23-28.  *See, e.g., Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) ("This clear expression need not be in *haec verba* but may be inferred from clear limiting descriptions of the invention in the specification or prosecution history.").  In *Phillips*, the Federal Circuit rejected a patentee's contention that a claim term be given its full range of ordinary meaning absent lexicography or disclaimer instead holding, *en banc*, that "the specification is **always** highly relevant to the claim construction analysis" and is, in fact "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d 1315 (emphasis added).

9

In this case, the intrinsic record supports Ciena's proposed construction while proving Oyster's incorrect.  The '500 patent describes "the present invention" as providing a receiver that "includes an interferometer" that reads the phase modulated optical signals and *delayed* amplitude modulated signals. Ex. E at 3:46-55.  Only one embodiment of the claimed interferometer is described in the specification, and the interferometer is, again, described in the context of part of the "present invention [which] provides a receiver compatible with existing transmitters." *Id.* at 6:20-25.  This description of the "present invention" goes on to explain that the patented receiver has an interferometer, and "[t]he interferometer 40 has a coupler/splitter 34, functioning as a **splitter**, and a coupler/ splitter 36, functioning as a **coupler**." *Id.* at 6:36-39.  The incoming optical signals, e.g., 22 (teal), "enter interferometer 40 [red] at an input 41 of splitter 34. Splitter 34 splits the light entering input 41, so that the signals 22 [] travel over both a first fiber 43 and a second fiber 45." *Id.* at 6:53-57.  This description of the claimed interferometer comports with the splitting of the incoming signal into a first wave and second wave as in Ciena's construction.



Fig. 2

*Id.* at FIG. 2 (annotated).

The "[s]econd fiber 45 includes a delay fiber 46 which may include a fiber loop of a desired length.  Delay fiber 46 then provides an input to coupler 36 which recombines the delayed signal (purple) with the non-delayed signal (green) propagating through fiber 43 … at output 42. The physical delay imposed by the interferometer 40 in the second light path through fiber 45, with its delay loop 46, with respect to light passing through the first light path through fiber 43." *Id.* at 6:59-67.  This description of the claimed interferometer comports with the delaying the first wave relative to the second wave and the recombining of the two waves, as in Ciena's proposed construction.  Ciena's proposed construction further requires detecting an intensity of the recombined waves, and this function of the patented interferometer is described in detail in the specification. *Id.* at 7:19-29.

1    The '500 patent further limits the scope of invention by explaining that the receiver of the

2    "present invention" is compatible with the transmitter disclosed in U.S. Application No.

3    09/765,153, which published as U.S. Patent No. 6,594,055 (Ex. F). *Id.* at 6:20-25. Just like

4    the '500 patent, the '055 patent describes only *one* interferometer that splits received light into a

5    first wave and second wave, delays the first wave relative to the second wave, recombines the two

6    waves, and detects an intensity of the recombined waves. This is consistent with only Ciena's

7    proposed construction. Ex. F at 5:7-67; *see also* Ex. I at 38:7-39:20. "When a patent …

8    describes the features of the 'present invention' as a whole, this description limits the scope of the

9    invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1308 (Fed. Cir.

10   2007).

11   Oyster's contention that claim 16 is broad enough to cover *any interferometer* that

12   measures interference between a signal beam and reference beam should be categorically

13   rejected. Dkt. 113 at 13:8-25.[3] The inventor of the '500 patent disavowed claim scope broad

14   enough to capture any interferometer by disparaging prior art describing other types of

15   interferometers. *See Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015);

16   *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1317 (Fed. Cir. 2015). Specifically, the

17   '500 patent disparages prior art communications systems that use Sagnac interferometers. *See*

18   Ex. E at 1:47-2:3. For example, the '500 patent criticizes other interferometer systems as having

19   the "disadvantage that they require the light to travel over a loop, whether back and forth in a

20   single fiber or over a long length looped fiber" and for being expensive to build and not working

21   well with existing systems. *Id.* 1:59-61; 2:1-3. Oyster's proposed construction cannot be correct

22   because it would recapture claim scope abandoned by disparaging prior art interferometric-based

23   systems, such as the prior art Sagnac interferometers, that clearly measure interference. *Omega*

24   *Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (noting that a district court

25   should protect "the public's reliance on the definitive statements made during the prosecution by

26   precluding the patentee from "recapturing" an interpretation disclaimed during prosecution

---

[3] It should not surprise that Oyster's open-ended construction is an attempt to capture Ciena's
receiver design in infringement, notwithstanding the fact that Ciena's receiver employs
fundamentally different techniques through different components than the claimed interferometer.

1    through claim construction.")

2         The '500 patent simply does not enable every possible way of recovering data in a

3    receiver and Oyster's construction fails for this separate reason. *Id.* at 39:27-40:2. Indeed,

4    Federal Circuit precedent makes clear that the specification must enable the full scope of the

5    claimed invention. *See, e.g. Trs. of Bos. Univ.*, 896 F.3d at 1360, 1362-65; *Liebel-Flarsheim Co.*

6    *v. Medrad, Inc.*, 481 F.3d 1371, 1378-79 (Fed. Cir. 2007).

7         The situation here involves a specification that in all respects tells us what the claims

8    mean, buttressed by statements made disparaging other types of interferometers. To attribute to

9    the claims a meaning broader than any indicated in the patent and its disclosure to the Patent

10   Office "would be to ignore the totality of the facts of the case and exalt slogans over real

11   meaning." *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1316 (Fed. Cir. 2007). Oyster's

12   proposed construction, unbounded by the '500 patent's disclosure, contravenes the fundamental

13   principle that inventors should receive protection only for what they have actually invented. *U.S.*

14   *v. Masonite Corp.*, 316 U.S. 265, 277 (1942) ("[T]he public policy which includes inventions

15   within the granted monopoly excludes from it all that is not embraced in the invention."). For all

16   of the reasons set forth above, only Ciena's proposed construction comports with the '500

17   patent's disclosure of "a receiver having an interferometer" and should be adopted.

18        **E.    "mode" (claims 1, 16)**

19

| Oyster's Proposed Construction | Ciena's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, or "manner of operation" | "manner of operation during which one specific data signal is either amplitude modulated or phase modulated, but not both simultaneously" |

23        The Court should adopt Ciena's proposed construction of "mode," which mirrors the

24   construction in Judge Payne's *Markman* Order in the *Cisco* case.[4] Ex. J at 26-27. In arriving at

25   Ciena's proposed construction, Judge Payne thoroughly considered and rejected many of the

---

[4] The construction of "mode" is entitled to "reasoned deference" based on its persuasive value. *See Finjan, Inc. v. Symantec Corp.*, No. 14-cv-02998-HGS, 2017 WL 550453, at *3 (N.D. Cal. Feb. 10, 2017); *but see Aircraft Technical Pub'rs v. Avantext, Inc.*, No. C 07-4154 SBA, 2009 WL 3817944, at *3 (N.D. Cal. Nov. 10, 2009).

1    same arguments Oyster raises here.  Oyster then raised nearly identical objections to Judge

2    Gilstrap, challenging Judge' Payne's construction.  Ex. R.  Judge Gilstrap overruled Oyster's

3    objections and "agree[d] with the reasoning provided within the Claim Construction Order…."

4    Ex. S.

5          Oyster now triples down on its arguments with this Court, again raising the twice-rejected

6    arguments.[5]  In doing so, Oyster conflates claims of different scopes, places undue emphasis on

7    unnecessary extrinsic evidence, and ignores statements made during prosecution to overcome a

8    prior art rejection.  In contrast, Ciena's proposed construction stays true to the actual invention as

9    informed by the claim language, specification, and Oyster's statements during prosecution.

10   Ciena's proposed construction also aligns with confirmatory extrinsic evidence.

11              **1.       The Claim Language Supports Ciena's Proposed Construction**

12          The asserted claims result from critical amendments to overcome a prior art rejection and

13   require that the first mode (phase) and the second alternate mode (amplitude) occur at different

14   times.  Ex. L at 117-126.  As amended, asserted claim 5, and similarly asserted claim 16, recite

15   two modulation modes that are a function of the same electronic data stream:

16        a controller … in a *first **mode*** controlling the phase modulator so as to create phase-
          modulated optical signals in the light from the laser as *a function of the electronic*
17        *data stream* and the controller in *a second alternate **mode*** amplitude-modulating
          the light from the laser as *a function of the electronic data stream*, the first mode
18        and the second mode occurring at different times.

19   Ex. E at claim 5 (emphasis added and relevant amendment in red).  In plain language, the

20   electronic data stream is modulated onto the laser light's phase in the first mode and onto the laser

21   light's amplitude in the second mode.  The plain language of the amended claims thus supports

22   and is consistent with Ciena's proposed construction where the first mode and the second

23   alternate mode are each separately a "manner of operation during which one specific data signal

24   is either amplitude modulated or phase modulated, but not both simultaneously."

25          Oyster's proposed construction should be rejected because it contradicts the amended

26   _____

27   [5] Oyster has advocated for this Court to adopt Texas constructions in at least seven other
     instances.  Dkt. 45 at 1:15-16 ("Where the terms have been previously construed… the issued
     constructions are precisely the ones offered by Oyster…"); *see also* 4:17-cv-05920-JSW at Dkt.
28   97 at 1:9-23 (arguing that the Texas "constructions are precisely the ones offered by Oyster").

claim language by permitting both the first mode and the second alternative mode to *simultaneously* amplitude and phase modulate a specific data signal.  Dkt. 113 at 14.  *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  When considered in the context of the claim and intrinsic evidence as a whole, Oyster's proposed mode conflation renders the full scope of the two modes indistinguishable.

Finally, Oyster's interpretation is in conflict with legal precedent stating that "when an applicant uses different terms in a claim," i.e., first mode and second alternate mode, "it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).

### 2. The Specification Supports Ciena's Proposed Construction and Contradicts Oyster's Proposed Construction

"[C]laims 'must be read in view of the specification, of which they are a part,'" *Phillips*, 415 F.3d at 1315, and "[t]he construction that stays true to the claim language and *most naturally aligns with the patent's description of the invention* will be, in the end, the correct construction," *id*. at 1316 (emphasis added).  Here, Ciena's proposed construction "most naturally aligns with the patent's description of the invention."  *Phillips*, 415 F.3d at 1316.  In contrast, Oyster's proposed construction erases the purported benefit of the invention—switching between a forward-looking secure transmission and backward-compatible non-secure transmission—by allowing the two modes to be so broad that they merge into one another, becoming indistinguishable and rendering the "innovative" operator activated switch superfluous.  Ex. E at 6:8-25; Ex. Q at 2 (invalidating the "dual-mode" (claim 1) and "switch" concepts (claim 4).

#### a. *The Specification Discloses Either Phase Modulation for Secure Transmission or Amplitude Modulation for Non-Secure Transmission*

The first sentence in the Summary of the Invention clearly states that an object of the *invention* was to "provide a transmitter for transmitting ***either*** phase-modulated ***or*** amplitude-modulated optical signals."  Ex. E at 2:25-28 (emphasis added).  "Either" connotes that the purported invention transmits a phase-modulated optical signal or an amplitude-modulated optical

1   signal, not both simultaneously.  The Background of the Invention supports this plain meaning,

2   noting that "optical fiber may be tapped" and that amplitude-modulated signals are "non-secure"

3   because "only a small amount of energy" needs to "be tapped" to recover the electronic data

4   stream.  *Id.* at 1:28-38.  Phase modulation was known to be more secure.  *Id.* at 1:39-57.  But

5   "phase-modulated based systems" were "not compatible with existing receivers, a major

6   disadvantage."  *Id.* at 2:20-23.

7        The specification then indicates that the invention solves this problem with the state of the

8   art by providing a transmitter that is "backwards-compatible with existing receivers in the

9   amplitude-modulated mode and yet can provide a secure and non-secure mode with receivers

10   having an interferometer…."  *Id.* at 6:8-13; *see also id.* at 6:13-25 (touting backward

11   compatibility and secure and non-secure modes).  By phase-modulating the light, the "first mode

12   is thus a highly secure data transmission mode," *id.* at 2:48-52, whereas, in the "second mode,"

13   the amplitude-modulated light is not secure.  *Id.* at 2:56-59; *see also id.* at 1:29-39.  Thus, the

14   inventor sought to provide a dual-mode system with (i) a forward-looking, **secure phase-**

15   **modulation** transmission and (ii) a backward-compatible, **non-secure amplitude-modulation**

16   transmission.  The inventor did not disclose or invent a dual-mode system where both modes can

17   include simultaneous amplitude and phase modulation of the same data signal.  Yet, Oyster now

18   contends that "mode" includes "simultaneous amplitude modulation and phase modulation,"

19   expressly ignoring the distinction between the modulation modes discussed in the specification.

20   Dkt. 113 at 14:17-20.  Oyster's proposed construction eviscerates the specification's teaching of a

21   backward-compatible transmitter because a second alternate mode that simultaneously phase and

22   amplitude modulates "the light from the laser as a function of the electronic data stream" is not

23   backward compatible with existing photodetector receivers that cannot read the light's phase.  *Id.*

24   at 1:22-28.

25        The specification further explains the benefit of the purported invention as service

26   flexibility for different customer needs—"telecommunications providers can provide customers

27   differentiated services, for example a secure mode and a non-secure mode…."  *Id.* at 3:35-38.

28   With differentiated services, a "telecommunications service provider thus could charge certain

1    customers for an enhanced secure mode service for their packet-based data, while permitting

2    other customers to send data in a non-secure mode in their packets."  *Id.* at 8:11-17.  From

3    Oyster's perspective, however, the claims cover non-flexible services, such as a first mode and a

4    second alternative mode, each indistinguishable with simultaneous amplitude and phase

5    modulation.  But this perspective cannot be correct because it eliminates the multilevel service

6    tier benefits detailed in the specification.

7         Ciena's proposed construction suffers none of these maladies and should be adopted

8    because it "capture[s] the scope of the actual invention, rather than allow the claim language to

9    become divorced from what the specification conveys is the invention."  *Intel Corp. v. Qualcomm*

10   *Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021).

11            b.    *Oyster's Citations to the Specification Support Ciena's Construction, Not*
              *Oyster's Overly Broad Construction*
12

13        Nowhere does the specification suggest or even allow for a mode where the *same*

14   *electronic data stream signal* is *simultaneously* amplitude and phase modulated onto a lightwave.

15   Oyster misleadingly cites a vague statement for this proposition, where the specification discloses

16   that "the optical signal may … also be phase modulated" in the "*delayed second mode*."  Dkt 113

17   at 14:21-25 (citing Ex. E at 2:63-3:3).  But that statement is later clarified when the specification

18   states that in the *delayed second mode* with phase modulation" the "transmitter thus produces an

19   *alternating* amplitude-modulated and phase-modulated data stream…."  Ex. E at 3:26-29.  This

20   "alternating signal" is a *serial*, non-simultaneous transmission of amplitude-modulated light 23

21   and then phase-modulated light 22, e.g., signal 25 is "a combination of amplitude-modulated

22   signals 23 and phase-modulated signals…."  *Id.* at 7:62-65.

23



24

25   *Id.* at Fig. 2 (excerpting the "alternating signal" 25 having an amplitude modulated portion 23 and

26   a phase modulated portion 22).  Critically, this is *seriatim* modulation, not simultaneous

27   modulation as proposed by Oyster.  *See, e.g.,* Ex. J at 11-12.

28        Oyster's brief also refers to another scenario where a mixture of phase and amplitude

16

modulation could be possible.  Dkt 113 at 9:13-17 (citing Ex. E at 3:27–30, 3:47–50, 3:62–64, 4:35–42).  Those "mixed signals" are irrelevant to the mode dispute.  The specification confirms the "mixture of phase and amplitude modulation" occurs when "amplitude modulated signals *not related to the input optical data stream* could be transmitted during the secure phase-modulation mode…." Ex. E at 4:36-42 (emphasis added).[6]  The specification also refers to another type of "mixed signals" involving separately modulating and thereafter combining amplitude modulated light and phase modulated light from separate sources, not the simultaneous amplitude and phase modulation of the same light and data stream as Oyster urges. *Id.* at 3:40–46.  These "mixed signal" disclosures are irrelevant to the mode dispute and the asserted claims, which require modulating the same data onto the same laser light. *Id.* at claims 1, 16.

        c.    *The '500 Patent Does Not Disclose or Claim Any "Mode" That Simultaneously Amplitude and Phase Modulates As a Function of the Electronic Data Stream*

Oyster argues that "mode" includes "simultaneous amplitude modulation and phase modulation…." Dkt. 113 at 14:17-20.  Oyster supports this argument by referring to unasserted claim 19.  Oyster's "support" is a red herring because dependent claim 19 has a different scope and does not mirror the asserted claims.  Specifically, claim 19 recites "*the light*" is both phase and amplitude modulated, not that the phase and amplitude modulation is "*a function of the electronic data stream*" as required by claims 1 and 16:

> during the second alternate transmission mode **the light** is both amplitude-modulated and phase-modulated.

Ex. E at claim 19 (emphasis added).  As discussed above in Section V.E.2.b, the "alternate signal" permits "the light" to be amplitude-modulated and phase-modulated *at separate times*.  The "mixed signal" permits "the light" to be amplitude-modulated with one type of data and phase-modulated with different data.  This is consistent with claim 19's scope.

As Judge Payne correctly found, "the recital that 'the *light* is both amplitude-modulated

---

[6] The other citations referred to in Dkt 113 at 9:13-17 refer to the above-described delayed amplitude mode with alternative amplitude and phase modulation, the receiver's dual-abilities with phase modulated signals and amplitude modulated signals, and the receiver's purported ability to receive mixed signals.

and phase-modulated' does not compel finding that a particular 'data stream' could be both amplitude-modulated and phase-modulated." Ex. J at 18 (emphasis original). And this recital certainly does not compel a finding of *simultaneous* amplitude and phase modulation of a data stream onto a laser's light. *Fenner*, 778 F.3d at 1327; *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016) ("claim differentiation does not serve to broaden claims beyond their meaning in light of the patent as a whole, and it cannot override clear statements of claim scope found in the specification and prosecution history").

Thus, Oyster's argument that "the '500 patent expressly claims (in claim 19)… a second 'mode' which *simultaneously* amplitude modulates and phase modulates the same light *with the same signal OP*" should be rejected because claim 19 does not use the word "simultaneously" and is silent about the data modulated onto "the light." Dkt 113 at 17:4-7 (emphasis added).

### 3. The Prosecution History Also Supports Only Ciena's Proposed Construction

Oyster's repeated and consistent statements during prosecution and its corresponding claim amendments completely undercut the construction now urged by Oyster. "The doctrine of prosecution disclaimer . . . preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega*, 334 F.3d at 1323. "Prosecution disclaimer can arise from both claim amendments and arguments." *SpeedTrack*, 998 F.3d at 1379. And "[a]n applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well." *Id*. at 1380.

Oyster concedes that Judges Payne and Gilstrap "found a prosecution disclaimer." Dkt 113 at 17:24-25. As explained by Judge Payne, "the patentee provided notice to the public that the claimed 'first transmission mode,' for example, does not allow for both phase modulation and amplitude modulation to be performed simultaneously as to a particular data stream at a particular time." Ex. J at 26; *see also id.* at 25 (the dispute is "whether the patentee disclaimed modulating a *single data stream* using both amplitude modulation and phase modulation *at the same time*.") (emphasis in original; internal citations omitted).

Oyster argues that the Eastern District of Texas' finding of disclaimer was incorrect (Dkt 113 at 18:25) because "one must look to *why* the features of Djupsjöbacka are being described" (*id*. at 19:20-21).  Oyster then spends two-and-a-half pages attempting to confuse or rewrite the disavowal through further explanation.  As Judge Payne observed, "[p]erhaps the patentee *could* have made those arguments, but during prosecution the patentee focused on the **simultaneous** use of phase modulation and amplitude modulation for a particular signal in Djupsjöbacka."  Ex. J at 25.  Even if the patentee could have presented a narrower argument, the patentee is bound by the argument *actually made*:

> [T]he scope of surrender is not limited to what is absolutely necessary to avoid a prior art reference; patentees may surrender more than necessary. When this happens, we hold patentees to the actual arguments made, not the arguments that could have been made. The question is what a person of ordinary skill would understand the patentee to have disclaimed during prosecution, not what a person of ordinary skill would think the patentee needed to disclaim during prosecution.

*Tech. Props. Ltd. v. Huawei Techs. Co.*, 849 F.3d 1349, 1359 (Fed. Cir. 2017)

> a.  *Before the Claims Were Ever Rejected, the Patentee Told the USPTO that its Claims Do Not Cover Combined AM/PM Signals But Rather Alternate AM and PM Signals at Different Times*

The "totality of the prosecution history" informs the disavowal inquiry.  *Comp. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008).  Since one purpose of prosecution disclaimer is to ensure that competitors can rely on the patentee's representations to the patent office, disclaimer applies if "the sum of the patentees' statements during prosecution would lead a competitor to believe that the patentee had disavowed coverage."  *Id.*

Here, the applicant made the disavowal eminently clear before the claims were ever rejected.  Specifically, the applicant submitted two Petitions to Make Special under an Accelerated Examination Procedure. Ex. O at 473, 479.  In the first Petition, patentee argued that the prior art does not disclose "dual **alternate** transmission modes" with "phase-modulating signals representative of an input data stream *during one time period* and amplitude-modulated mode signals representative of an input data stream *during another time*."  *Id.* at 474-75. (colors added for emphasis); *see also* Ex. P at 24:8-19.

Patentee later found additional prior art and submitted another Petition to distinguish over

19

1    a system with AM/PM signals that were *not alternate* AM and PM signals, as claimed, but rather

2    "a **combined** analog signal." *Id.* at 479-80 (emphasis added).  Patentee explained that this

3    combined AM/PM signal was different from "phase-modulating signals representative of an input

4    data stream during one time period" and "amplitude-modulated mode signals representative of an

5    input data stream during another time period…." *Id.* at 480.  This is a concession that the

6    patented invention does not cover simultaneous (*i.e.* "combined") transmission of amplitude and

7    phase modulated signals in the same data stream.  The USPTO granted the petitions given the

8    patentee's "detailed discussion of the references, which [] point[] out…how the claimed subject

9    matter is patentable over the references." *Id.* at 485.

10       Notably, Judge Payne found disclaimer without considering the patentee's statements in

11   the Petitions to Make Special, and this evidence was not in front of Judge Payne.  This additional

12   evidence shows that patentee was clear from the beginning—the invention is a phase-modulation

13   (secure) mode switchably alternated with a separate-in-time amplitude-modulation (non-secure)

14   mode.  The invention is not directed to a combined AM/PM signal. *Id.* at 479-80.  The patentee

15   distinguished systems that simultaneously use phase modulation and amplitude modulation for a

16   particular signal and should be bound by the statements made to the Patent Office.

17       b.   *During Prosecution, Patentee Argued that, Unlike the Amended Claims,*
18            *the Prior Art Discloses Simultaneous AM and PM Transmission*

19       As discussed above, the evidence of a clear and unambiguous surrender of claim scope is

20   clear from the amended claim language alone, and, as detailed below, the prosecution history

21   confirms that disavowal.  (Ex. J at 26.)  But even if the "prosecution history statements do not rise

22   to the level of unmistakable disavowal, they do inform the claim construction." *Shire Dev., LLC*

23   *v. Watson Pharm., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015).  For example, a patentee's

24   "repeated and consistent remarks during prosecution can define a claim term by demonstrating

25   how the inventor understood the invention." *Personalized Media Commc'ns, LLC v. Apple Inc.*,

26   952 F.3d 1336, 1340 (Fed. Cir. 2020).  Such repeated remarks together with an "amendment to

27   the same effect, are decisive as to the meaning of the disputed claim term—even if those

28   statements do not rise to the level of a disclaimer." *Id.* at 1346.  Thus, even if the Court decides

1   that the disavowal was not clear and unambiguous, the patentee's repeated statements about what

2   the claims do not cover, combined with claim amendments to that effect, are still decisive as to

3   the meaning of the claims.

4         Here, in response to an office action rejecting the claims, the patentee amended the claims

5   to distinguish them over the art, resulting in the issuance of the '500 patent.  Ex. L at 117-126.

6   Claim 1 is representative of the disclaimer and was amended to clarify that the phase (secure)

7   mode occurs at a different time from the amplitude (non-secure) mode, and that the secure and

8   non-secure modes use light from the same laser:

Claim 1 (currently amended)   An optical data transmitter comprising:

~~at least one light source~~ a laser;

a phase modulator for phase modulating light from the light source; and

a controller having an input for receiving an electronic data stream, the controller in a

first mode controlling the phase modulator so as to create phase-modulated optical signals in the

light from the laser as a function of the electronic data stream and the controller in a second

alternate mode amplitude-modulating the light from the laser as a function of the electronic data

stream, the first mode and the second mode occurring at different times.

14   *Id.* at 118.

15         The patentee argued that the amendment was to clarify that the laser is "for two alternate

16   modes."  *Id.* at 122.  This argument disclaimed the two-laser, mixed-mode embodiment described

17   above in §V.E.2.b.  Patentee also argued that the "second mode occurs at a different point in time

18   than the first mode."  *Id.*  This argument disclaimed any embodiment where the first mode

19   (phase-modulation) and the second alternate mode (amplitude-modulation) occur simultaneously.

Claim 1 has been amended to recite the laser limitation of claim 9, which was rejected

as unpatentable over Furuya in view of Djupsjobacka.  (Gartha does not show a laser for two

alternate modes, but rather two different wavelengths at the same time being modulated).  Claim

1 also has been amended to clarify that the second mode occurs at a different point in time than

the first mode.

23   *Id.* (emphasis added).

24         Regarding the disclaimer of simultaneous AM and PM transmission, patentee explained

25   that the prior art discloses "simultaneous transmission of optical signals in AM *or* PM mode"

26   where the "same signal" is "sent in AM *and* PM mode at the same time."

27

28

> Djupsjobacka discloses simultaneous transmission of optical signals in AM or PM mode, the same signal being sent in AM and PM mode at the same time. (See for example Djupsjobacka at column 2, lines 50 to 54).

*Id.* (emphasis added).  Patentee re-explained that Djupsjöbacka transmits AM and PM signals at exactly the same time, unlike the newly amended claims where the AM and PM signals are sent at different time "modes," i.e., a secure PM time mode and a non-secure AM time mode.

> radio transmissions.  Moreover, Djupsjobacka is concerned with improving an optical signal which is totally irrelevant to the Furuya device and also transmits AM and PM signals at exactly the same time, and not in two different time modes, as now claimed.

*Id.* at 123 (emphasis added).  Patentee reiterated, for a third time, that unlike the claims of the '500 patent as now amended, the art uses "simultaneous AM/PM transmission."

> Neither Djupsjobacka, Kazovsky, Garthe nor Kiasaleh shows such different time modes for modulating one laser.  Djupsjobacka shows simultaneous AM/PM transmission.  Kazovsky

*Id.* (emphasis added).  The Patentee emphasized for a fourth time that, unlike the purported invention, the art uses simultaneous AM/PM transmission.

> Djupsjobacka shows simultaneous AM/PM transmission.

*Id.* at 124 (emphasis added).

Oyster's proposed construction now seeks to recapture everything surrendered during this back and forth with the Patent Office and seeks to define the scope of invention as covering simultaneous AM/PM transmission, just like Djupsjobacka.  But as Judge Payne explained, the "patentee distinguished Djupsjöbacka as disclosing 'the same signal being sent in AM and PM mode at the same time' (also referred to as 'transmit[ting] AM and PM signals at exactly the same time' or 'simultaneous AM/PM transmission') rather than transmitting AM and PM signals 'in two different time modes, as now claimed.'"  Ex. J at 25.  By repeatedly making the above-discussed statements, the patentee provided notice to the public that the claimed mode "does not allow for both phase modulation and amplitude modulation to be performed simultaneously as to a particular data stream at a particular time."  *Id.* at 26 (citing Ex. L at 123–25); *see also Omega*, 334 F.3d at 1323; *Shire*, 787 F.3d at 1366; *Personalized Media*, 952 F.3d at 1340.  And, as a result, the doctrine of prosecution disclaimer now "ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers."  *SpeedTrack*,

998 F.3d at 1380.

   c. *Oyster's Non-Disclaimer Arguments Overlook that Oyster is Advocating for A Claim Scope that Would Read on the Distinguished Art*

  Oyster argues that it did "not disclaim all transmission of AM and PM signals at the same time." Dkt 113 at 19. This Court should find, consistent with Judge Payne, this line of argument[7] "unpersuasive at least because Djupsjöbacka discussed 'modes' in the context of 'orthogonal polarization modes,' wherein different types of modulation could be employed simultaneously. Ex. J at 24 (citing Ex. M at *Abstract*, 1:28–30). But, assuming for a moment that Oyster was correct and "mode" included "simultaneous amplitude modulation and phase modulation," as Oyster advocates (Dkt. 113 at 14:17-20), the claims would read on the very Djupsjöbacka feature Oyster distinguished during prosecution and the '500 patent and would thus be invalid.

  Specifically, under Oyster's proposed construction, the breadth of the claimed modes would swallow one another, thus reading on Djupsjöbacka's "simultaneous AM/PM transmission" for any two arbitrary time periods. Oyster's construction cannot be correct and Oyster should be held to its words at the Patent Office to overcome a rejection. *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372-73 (Fed. Cir. 2005) ("Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language."). Oyster cannot recapture "through claim interpretation specific meanings disclaimed during prosecution." *Omega*, 334 F.3d at 1323.

   **4.** **The Extrinsic Evidence Supports Ciena's Construction and Oyster Mischaracterizes The Extrinsic Evidence**

  Extrinsic evidence is "less significant" than the claims, the specification, and the prosecution history in determining the "legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317. It is also "less reliable than the patent and its prosecution history," as it was not "created at the time of patent prosecution for the purpose of explaining the patent's scope and

---

[7] Oyster argued to Judge Payne that "nothing that Oyster did to distinguish Djupsjöbacka would exclude [a mode with simultaneous amplitude and phase modulation] from the scope of the claims." Ex. J at 24; *see also* Ex. T at 1, 3-4 (Oyster explaining to the USPTO that the controller causes phase modulation in the first mode and amplitude modulation in the second mode).

1   meaning." *Id.* at 1318.  For these reasons, courts resort to expert declarations only when the

2   claims, specification, and prosecution history are "equivocal" and "further guidance" is

3   necessary. *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1222 (Fed. Cir. 2020).

4       Here, the extrinsic record not only supports Ciena's construction but is unnecessary to

5   consider given the clarity of the intrinsic record. Ex. P at 2:13-32:27.  Oyster wrongly attempts to

6   alter the plain meaning supplied in the intrinsic record by proffering a conclusory expert opinion

7   that merely disagrees with Judge Payne's claim construction decision. Ex. N at ¶¶33-36.  Given

8   the futility of an expert disagreeing with an earlier court's finding of disclaimer, Oyster cites and

9   grossly mischaracterizes Dr. Blumenthal's (Ciena's technical expert) declaration on non-mode

10  terms—such as "receiver having an interferometer.  Oyster's attempt to confuse the issues cannot

11  overcome the clarity of the intrinsic record and should be rejected.  Dkt. 113 at 14:27-16:20.

12  There is nothing contradictory in Dr. Blumenthal's opinions, and Oyster never addresses Dr.

13  Blumenthal's declaration on "mode," which are entirely consistent with the intrinsic record and

14  Ciena's proposed construction.  Dkt. 113 at 14:17-17:2.

15      As to Dr. Blumenthal's Table 1 discussion, Oyster correctly notes that the transmitter

16  having a "bit-data activated" switch (*see, e.g.,* unasserted claim 6) has one phase modulation

17  mode (bit data = 00) and three amplitude modulation modes (bit data = "01," "10," and "11").  *Id.*

18  at 14:26-15:7 (citing Ex. I at 13-14).  Oyster also correctly notes that Dr. Blumenthal discusses

19  the part of the specification providing that the final bit-data amplitude-mode corresponds to the

20  "delayed second amplitude-modulated," which, as detailed above, can include the "*alternate*

21  *signal*" 25 as shown in Figure 2. *Id.* at 15:8-12 (citing Ex. I at 15).  But Oyster wholly

22  mischaracterizes Dr. Blumenthal's discussion of the non-enabled receiver. *Id.* at 15:13-16:12.

23  Specifically, according to Oyster's Brief, Dr. Blumenthal explains that:

24          [T]he same light is first pulsed (amplitude modulated) and then phase modulated,
            resulting in an optical signal that is ***simultaneously amplitude modulated and***
25          ***phase modulated***…[and the] fact that the signal is ***simultaneously*** amplitude and
            phase modulated in [the bit data = 11] mode is central to Dr. Blumenthal's argument
26          concerning enablement….

27  *Id.* at 15:27-16:12 (emphasis added).  But this misrepresents Dr. Blumenthal's declaration.  Dr.

28  Blumenthal never explained that the signal is *simultaneously* amplitude and phase modulated

1   when the bit data is 11.  To the contrary, he explained that "[a]ny phase modulation that occurs in

2   the second mode, i.e., when bit data is 11 (purple), ***occurs later; separate and apart*** from the

3   amplitude modulation performed by pulsing the laser." Ex. I at 30:15-17 (emphasis added).  Dr.

4   Blumenthal explained that the '500 patent does not disclose amplitude and phase modulating

5   *simultaneously* and that the modulations are performed in "a time altering fashion where only one

6   or the other is perform[ed] for a period of time," consistent with Figure 2 depicted above.  Ex. P

7   at 21:10-15.  Dr. Blumenthal even explained that simultaneous amplitude and phase modulation,

8   as Oyster urges, is inconsistent with the '500 patent's disclosure.  *Id.* at 15:26-21:25 (reviewing

9   the inventor's concession that the specification does not disclose simultaneously amplitude and

10  phase modulating the optical signal, explaining how such a feat could be achieved using an IQ

11  modulator and a bit-to-symbol mapper, reviewing the inventor's testimony that the '500 patent

12  does not disclose any techniques for IQ modulation, and confirming that the specification does

13  not disclose how to simultaneously amplitude and phase modulate).

14         In short, the claims, claim amendments, specification, prosecution history, inventor

15  testimony, and extrinsic evidence support Ciena's proposed construction, which mirrors Judge

16  Payne's construction.  As such, the Court should disregard Oyster's last-ditch-effort to create

17  confusion by mischaracterizing Dr. Blumenthal's extrinsic opinions.

18
19  DATED: May 9, 2022                          McKool Smith, P.C.

20                                              By:  */s/  Blair M. Jacobs*
21                                              Blair M. Jacobs
                                                *Attorney for Defendant Ciena Corporation*
22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that the counsel of record who are deemed to have consented to electronic service are being served on May 9, 2022 with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

 /s/ *Blair M. Jacobs*