UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OYSTER OPTICS, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>CIENA CORPORATION,<br><br>    Defendant. | Case No. 20-cv-02354-JSW<br><br>**CLAIMS CONSTRUCTION ORDER**<br><br>Re: Dkt. Nos. 113, 116, 120 |

The Court has been presented with a technology tutorial and briefing leading up to a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). This Order construes three of the disputed claim terms selected by the parties, which appear in the patent at issue in this case, United States Patent No. 6,665,500 (the "'500 Patent"): (1) phase modulate (and variants); (2) amplitude modulate (and variants); and (3) interferometer. The Court will issue a supplemental order construing the term "mode" after the supplemental briefing on that term is closed. The Court will set the date for a further case management conference in that supplemental order.

**BACKGROUND**

**A.    Procedural History.**

Plaintiff, Oyster Optics, LLC ("Oyster") originally alleged that Defendant, Ciena Corporation ("Ciena"), infringed U.S. Patent No. 6,665,500 (the "'500 Patent") and U.S. Patent No. 10,554,297 (the "'297 Patent").[1] However, after the parties filed their *Markman* briefs, Ciena

---

[1]    This is one of three related cases before this Court, in which Oyster alleges Ciena infringes its patents. On August 10, 2020, the Court issued a claim construction order in the first case, *Oyster Optics, LLC v. Ciena Corp.*, 17-cv-5920-JSW ("*Oyster I*"), in which it construed claims

moved to stay pending inter partes reviews ("IPR") of both patents. The Court granted that motion on April 22, 2021. (Dkt. No. 65.) On August 27, 2021, the parties stipulated to dismiss claims and counterclaims relating to the '297 Patent. The parties also stipulated that they would jointly move to terminate the IPR proceedings on that patent. (Dkt. No. 71.)

On September 10, 2021, the parties filed a joint status report and advised the Court that the Patent Trial and Appeal Board ("PTAB") issued a final written decision with respect to the first IPR relating to the '500 Patent and found claims 1, 2, 4, 6-9, and 17-19 invalid. The PTAB concluded that the petitioner in that IPR did not prove that dependent claim 5 was invalid. The parties filed cross-appeals of that decision with the United States Court of Appeals for the Federal Circuit. The PTAB denied, on procedural grounds, a second IPR which challenged independent claim 16. Oyster then moved to lift the stay and represented it would limit its claims to Claims 5 and 16. The Court granted that motion over Ciena's objection. (Dkt. No. 84.)

**B.     The Technology At Issue and Claims of the '500 Patent.**

The '500 Patent pertains to a "dual-mode optic telecommunications system and method" and relates to "transmitters and receivers for fiber optic networks." (Mirzaie Decl., ¶ 6, Ex. E ('500 Patent Title, 1:9-10).)[2] In general,

---

asserted in U.S. Patent Nos. 7,620,327 and 8,374,511, including two of the terms at issue here: "phase modulate" and "phase modulator." (Dkt. No. 113-1, Declaration of Reza Mirzaie ("Mirzaie Decl."), ¶ 2, Ex. A ("*Oyster I* Markman" at 18:3-20:25).) The parties stipulated to dismiss the third case, *Oyster Optics v. Ciena Corp.*, 21-cv-2241-JSW, on February 4, 2022.

In addition to this action, Oyster has two actions pending in the United States District Court for the Eastern District of Texas asserting infringement of the '500 Patent against (1) Infinera Corporation, Coriant (USA) Inc,, Coriant North America, LLC, and Coriant Operations, Inc. ("*Infinera*") and (2) Cisco Systems, Inc. ("*Cisco*"). On July 23, 2022, the *Infinera* court issued a claim construction order construing the term "phase modulate", and its variants, as used in Claims 1 and 16 of the '500 Patent. (Mirzaie Decl., ¶ 3, Ex. B ("*Infinera* Order" at 16.)

On May 4, 2021, the *Cisco* court issued a claim construction order in which it construed the terms "phase-modulated" (and its variants), "amplitude-modulated" (and its variants), "amplitude-modulated signals", "phase-modulated signals," and "mode." (*Id.* ¶ 9, Ex. G ("*Cisco* Markman" at 27).) The parties stipulated to dismiss the *Cisco* case on February 24, 2022. (*Id.* ¶ 10, Ex. K.) The Court will address those opinions in the analysis.

[2]     The specifications of the patents at issue in *Oyster I* described a transceiver card for secure communications over fiber optic networks. (*Oyster I* Markman at 1:23-24.)

2

> optical communications system[s] communicate[] data by modulating light, which is a form of electromagnetic wave. A continuous light wave is defined by certain characteristics, including its amplitude, frequency, and phase. … Modulation is the process of encoding the data that is to be communicated in the light wave, by changing one or more of the characteristics of the light wave as a representative of data," including phase or amplitude.

(Declaration of Michael Lebby, Ph.D., D. Eng., ¶¶ 24-25)[3]; *see also Oyster I* Markman at 1:24-2:2.)

> In current[4] fiber optic networks, an electronic data stream is fed to a laser amplitude modulator. The laser amplitude modulator typically pulses or alters the laser output to create an amplitude-modulated optical signal representative of the electronic data stream. The laser amplitude modulator and laser thus define a transmitter for transmitting the optical signal over an optical fiber, which is then received by a receiver. The receiver for the amplitude-modulated optical signals of the optical data typically includes a photodiode to convert the optical signals back into the electronic data stream.
>
> The reading of the amplitude-modulated optical data signals using a photodiode is straightforward: the optical signals either produce an electric output at the photodiode or they do not. As a result, an output electronic data stream of zeroes and ones is generated.

('500 Patent at 1:12-27.)

However, amplitude-modulated signals can be tapped easily; therefore, they are not always secure. (*Id.* at 1:28-37.) In contrast, phase-modulated signals are more secure: "any tap to obtain enough light to read the phase-modulated signal is easily detectable." (*Id.* at 5:45-48.) According to the patentee, although phase-modulation was more secure, prior art "phase-modulated based systems" were not "compatible with existing receivers." (*Id.* at 2:21-23.)

The patentee then explained that an object of the '500 Patent was to provide transmitters and receivers for transmitting and receiving "*either* phase-modulated *or* amplitude modulated optical signals." (*Id.* at 2:26-31 (emphasis added).) The '500 Patent also provides for a "dual

---

[3]   The Lebby Declaration is located at Dkt. No. 116-3, ECF pp. 103-133, as Exhibit F to the Supplemental Declaration of Daniel Blumenthal. Dr. Lebby was addressing the term phase modulate and its variants in the U.S. Patent 6,594,055 ("the '055 Patent") Patent in connection with *Oyster III*.

[4]   The '500 Patent issued in 2001.

3

mode-optical transmission system" and a method for transporting optical data in two modes. (*Id.* at 4:4-26; *see also id.* at 2:41-46, 3:46-51.)

Claim 1 of the '500 Patent, from which asserted claim 5 depends, recites:

> 1. An optical data transmitter comprising:
>
> a laser;
>
> *a phase modulator for phase modulating* light from the light source; and
>
> a controller having an input for receiving an electronic data stream, the controller in a first *mode* controlling the phase modulator so as to create *phase-modulated optical signals* in the light from the laser as a function of the electronic data stream and the controller in a second alternate *mode amplitude-modulating* the light from the laser as a function of the electronic data stream, the first *mode* and the second *mode* occurring at different times.

(*Id.* at 8:28-40 (disputed terms emphasized).)

Claim 5 recites "[t]he transmitter as recited in claim **4** ["[t]he transmitter as recited in claim **1** wherein the controller has a switch for switching between the first and second modes"] wherein the switch is operator-activated." (*Id.* at 8:48-50.) The parties agreed that, for claim 5, the term "the controller in a second alternate mode amplitude-modulating the light from the laser as a function of the electronic data stream" means "the controller in a second alternating mode amplitude-modulating the light from the laser as a function of the *same* electronic data stream as in the first mode." (Dkt. No. 119, Amended Final Joint Claim Construction Statement at 2:10-14 (emphasis added).)

Claim 16 recites:

> 16. A dual-mode optical transmission system comprising:
>
> a transmitter having a laser for transmitting *amplitude-modulated signals* in a first *mode* and *phase-modulated* signals in a second *mode* and a controller for switching an output of the laser between the first *mode* and the second *mode*, the second *mode* occurring at a different time than the first *mode*;
>
> an optical fiber connected to the transmitter; and
>
> a receiver having an *interferometer* being connected to the optical fiber.

4

1  (*Id.* at 10:1-10 (disputed terms emphasized).)

2  The Court will address additional facts as necessary in the analysis.

## ANALYSIS

**A.  Legal Standard.**

Claim construction is a question of law for the Court. *Markman*, 517 U.S. at 384. "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). The Court has an obligation "to ensure that questions of the scope of the patent claims are not left to the jury." *Every Penny Counts, Inc. v. American Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) (quotation omitted). Accordingly, the Court must ensure that the parties' disputes are "fully resolved" and assign "a fixed, unambiguous, legally operative meaning to the claim." *Id.*

Claim terms are generally given "their ordinary and customary meaning" – *i.e.*, "the meaning that the terms would have to a person of ordinary skill in the art at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*). There are only two exceptions to this rule: "1) when a patentee sets out a definition and acts as [their] own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The Federal Circuit does "not require explicit redefinition or disavowal." *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016).

In determining the ordinary and customary meaning, the claim language "provide[s] substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. However, a person of ordinary skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The scope of the claims must always be "determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Soceta' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). The construction that "stays true to the claim

5

language and most naturally aligns with the patent's description of the invention" governs. *Id.* Accordingly, the specification "is always highly relevant to the claim construction analysis" and usually "dispositive." *Id.* at 1315.

In addition to the claims and the specification, the prosecution history may be used "to provide[] evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. "Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the actual invention that is disclosed, described and patented." *Fenner Inv., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (internal citations and quotations omitted). The claims, specification, and prosecution history together constitute the "intrinsic evidence" that forms the primary basis for claim construction. *Phillips*, 415 F.3d at 1312-17 (citation omitted). Courts may also consider extrinsic evidence, such as technical dictionaries and expert testimony, "if the court deems it helpful in determining the true meaning of language used in the patent claims" and if it does not contradict the intrinsic evidence. *Id.* at 1318 (internal quotations and citations omitted).

**B.     Claims Construction.**

**1.     Claim term: "phase modulate" and variants.**

The term "phase modulate" and variants on that term are used in claim 5, through independent claim 1, and in claim 16. The parties propose the following constructions:

| Oyster's Proposed Constructions | Ciena's Proposed Constructions [emphasis denotes Ciena's competing proposal] |
|---|---|
| "phase modulate" means "alter the phase of light to create an optical signal having a phase that is representative of data" | "phase modulate[ing]" means "alter[ing] the phase of light to create an optical signal having a phase of light that is representative of data, **wherein the phase modulating does not include amplitude modulating**" |
| "phase modulator" – no construction other than construction for "phase modulate" | "phase modulator" means "**a device** that alters the phase of light to create an optical signal that is representative of data. **The phase modulator does not perform amplitude modulation.**" |
| "phase modulated [optical] signals" – no construction other than construction for phase modulate | "phase modulated [optical] signals" means "[optical] signals having a phase that is representative of data. **The amplitude of the** |

| | |
|---|---|
| | [optical] signals is not representative of data." |

        a.      "phase modulate"

In contrast to *Oyster I,* the parties' primary dispute about the term "phase modulate" is whether the term excludes amplitude modulation.[5] The Court begins by resolving that dispute and then proceeds to construe the specific variants addressed by the parties. The text of the asserted claims does not provide clear guidance. Claim 17 provides for phase modulating light in a first mode, whereas in dependent claim 18, "during the first transmission mode the light is *not* amplitude modulated," and in dependent claim 19, during the second transmission mode the light is "*both* amplitude-modulated and phase-modulated." Thus, the phrase as used in unasserted claims 17-19 provides some support for Oyster's construction. *Cf. SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003) (noting general presumption that each claim has a different scope and doctrine of claim differentiation is "especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim").

The specification also provides support for Oyster's construction. For example, in the Summary of the Invention, the patentee stated that "[t]he present invention thus permits a phase-modulated transmission mode or an amplitude-modulated transmission mode, or *both* a phase and amplitude modulated transmission mode, which can permit the transmitter to work with different types of receivers." ('500 Patent at 2:41-47 (emphasis added).) The patentee also described a "receiver for receiving optical signals, the optical signals including *both* phase-modulated optical signals and direct amplitude-modulated optical signals" and stated that "under certain circumstances a mixture of phase and amplitude modulation could be possible. (*Id.* at 3:47-50 (emphasis added), 4:37-41; *see also id.* at 3:62-64.)

---

[5]    In *Oyster I*, Oyster argued that the term "phase modulated" excluded the use of amplitude modulation." (*See Oyster I* Markman at 18:5-7.) This Court construed the term "phase modulate" and "phase modulator" to mean "alter the phase of light without substantially altering amplitude to create an optical signal having a phase that is representative of data. 'Substantially altered' means that amplitude changes are detectable by the energy level detector." (*Id.* at 20:22-25.) However, the patents at issue in that suit were directed to different inventions, and the Court based its construction in part on statements in the specifications of those patents that are not present in the specification of the '500 Patent. Accordingly, the Court concludes its prior definition of "phase modulate" is not binding in this case.

7

Oyster also argues that the *Infinera* and *Cisco* courts each adopted the construction it proposes here. (*Infinera* Markman at 16; *Cisco* Markman at 27.) "In the interest of uniformity and correctness," a court may consult "the claim analysis of different district courts on the identical terms in the context of the same patent. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008). Because the *Infinera* and *Cisco* opinions are "interjurisdictional" opinions, the Court has given them "reasoned deference, with such deference turning on the persuasiveness of the order[s]." *Visto Corp. v. Sproqit Techs., Inc.*, 445 F. Supp. 2d 1104, 1108-09 (N.D. Cal. 2006) (internal citation and quotations omitted). The Court finds each order highly persuasive and the courts' reasoning in those cases further support this Court's construction of the term "phase modulate."

Accordingly, the Court construes the term "phase modulate" to mean "alter the phase of light to create an optical signal having a phase that is representative of data."

### b. "phase modulated [optical] signals"

Ciena proposes that these terms be construed to include the requirement that "the amplitude of the [optical] signal is not representative of data," and it incorporates the arguments presented on the term "phase modulate." For the reasons set forth above, the Court does not find Ciena's arguments persuasive.

Accordingly, the Court provides no construction for these terms other than its construction of the term "phase modulate."

### c. "phase modulator"

Finally, Ciena argues that that Oyster's proposed construction of phase modulate does not account for the grammatical distinction between the noun form ("claim modulator") and the verb form ("claim modulate") of the term. Oyster does not dispute that a phase modulator is "something" that phase modulates, and it agreed with the Court's proposal at the *Markman* hearing to add "a device that" to the construction.

Accordingly, the Court construes the term "phase modulator" to mean "a device that alters the phase of light to create an optical signal having a phase that is representative of data"

### 2. Claim term: "amplitude-modulat[ed][ing]"

8

The term "amplitude-modulate" and variants thereof also are used in both of the asserted claims. The parties propose the following constructions:

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "altering the amplitude of light to create an optical signal that is representative of data." | "altering the amplitude of light to create an optical signal having an **amplitude** that is representative of data. **The use of amplitude modulation does not include phase modulation.**" |

For the reasons articulated above, the Court is not persuaded by Ciena's argument that construction of this term should exclude phase-modulation. However, the Court does concur with Ciena's proposal that this phrase should be construed to mirror the construction of the term "phase modulate," and Oyster agreed with that proposal at the hearing.

Accordingly, the Court construes the term "amplitude-modulate[ing] to mean "alter[ing] the amplitude of light to create an optical signal having an amplitude that is representative of data."

### 3. Claim term: "a receiver having an interferometer"[6]

This phrase appears in claim 16, and the parties agree that the construction of this phrase should include the phrase "a receiver having a device that." They disagree about how to construe what the interferometer does, and their proposed constructions are:

| Oyster's Proposed Construction | Ciena's Proposed Construction |
|---|---|
| "…performs a measurement using the interference phenomena produced by one or more signal beams of light and one or more reference beams of light" | "… splits received light into a first wave and a second wave, delays the first wave relative to the second wave, recombines the delayed first wave and the second wave, and detects an intensity of the recombined waves" |

Neither party supports their proposed construction based on specific claim language. Oyster argues that the specification does not teach the use of any particular type of interferometer

---

[6] This term was not construed by the *Infinera* and *Cisco* courts.

9

and argues that Ciena's proposed construction impermissibly limits the term to a preferred embodiment. Ciena argues that its construction reflects the fact that neither the '500 Patent, nor the '055 Patent", describe any interferometer other than the one described in the specification as part of "the present invention."[7]

The specification provides that the "receiver includes an interferometer for reading the phase-modulated signals" and provides that "the receiver also may read delayed amplitude-modulated signals through the interferometer." ('500 Patent at 3:50-55.) A preferred embodiment of a receiver of the invention is depicted in Figure 2 and reproduced below with the interferometer outlined. The description of that preferred embodiment contains repeated references to splitting beams and delayed signals. ('500 Patent at 6:36-39, 6:59-67.)



Fig. 2

The patentee concludes the description of the interferometer as follows:

> The interferometer **40** comprising coupler/splitter **34** and **36**, fibers **43** and **45**, delay fiber **46**, and depolarizer **48** functions as an optical exclusive-or gate with one input leg delayed for signals arriving at input **41** of coupler **34**. Interferometer **40** as a whole thus optically and physically "decodes" the signal OP produced by the delayed-feedback exclusive-or gate **118**.

---

[7] The '055 Patent is incorporated by reference into the '500 Patent. *See* '500 Patent at 2:51-56.

(*Id.* at 7:19-29.)

Ciena argues, in part, that its construction is supported by the fact that the patentee disparaged prior art using "Sagnac interferometer-based systems."[8] ('500 Patent at 1:47-2:3.) According to the specification Sagnac interferometers are "expensive to build and operate, and do not work particularly well with existing systems." (*Id.* at 2:1-3.) Oyster does not dispute that the patentee criticized the use of those systems for the reasons stated. It also notes the patentee also distinguished Sagnac interferometer-based systems because the receiver in those systems contain the light source, "as opposed to the current installed base where the transmitter has the light source." (*Id.* at 1:65-67.) Claim 16 expressly provides that the laser, *i.e.* the light source, is part of the transmitter. (*Id.* at 10:2.)

In *Openwave Sys. v. Apple Inc.*, on which Ciena relies, the patents-in-suit were directed to mobile intelligent devices (*e.g.,* early smart phone technology), and the parties disputed whether the term "mobile device" included mobile devices containing "computer modules." 808 F.3d 509, 512 (Fed. Cir. 2015). The district court determined the inventor had limited the claims to mobile devices that used microcontrollers by disparaging prior art devices for a number of reasons, including their size and cost. The Federal Circuit affirmed. *Id.* at 512, 517. It noted the specification was "rife with remarks that disparage and, therefore, disclaim mobile devices that incorporate computer modules," a point the plaintiff conceded. *Id.* at 514; *see also id.* ("Such remarks permeate the specification."). In contrast to *Openwave*, the specification of the '500 Patent is not "rife" with criticisms of prior art interferometers; nor can the Court conclude the few disparaging remarks permeate the specification that warrant adopting Ciena's proposed construction. The Court also is not persuaded that Oyster's proposed construction is broad enough to recapture Sagnac based interferometers.

Ciena also argues the repeated references to delays and splitting as well as the disclosure of a single embodiment support its construction. The Federal Circuit has "repeatedly warned against confining claims to" preferred embodiments, even when those embodiments are specifically

---

[8] In contrast to its argument regarding the term "mode," Ciena has not relied on the prosecution history to support its position

11

described, unless it is clear that "the patentee … intends for the claims and the embodiments in the specification to be strictly coextensive." *Phillips*, 415 F.3d at 1323; *see also Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1332 (Fed. Cir. 2007) ("A patent that discloses only one embodiment is not necessarily limited to that embodiment."). In addition, use of the term "the present invention" can, but does not "automatically", limit the meaning of claim terms. *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1398 (Fed. Cir. 2008).

Although the Court will not adopt Ciena's proposed construction in full, it is persuaded by Ciena's argument that, when read in context, the specification suggests the interferometer must split and recombine light to measure interference phenomena. Indeed, in its reply brief, Oyster argues that "Ciena has not justified limiting the interferometer of claim 16 to one specific configuration, *excluding other ways of splitting and combining light to make measurements using interference*." (Reply Br. at 6:2-5 (emphasis added).)[9] The inventor's testimony about his definition of an interferometer also supports a construction that provides for separating and recombining light. (*See, e.g.,* December 15, 2017 Deposition of Peter Snawertd at 51:14-23 (testifying that "interferometer has a reference leg, a signal leg and the two are recombined to re-create a signal from an input. The Oyster patents have an interferometer in them," and in his definition signal leg is delayed).)[10] Finally, the specification provides that, in the secure data transmission mode, "[t]he phase-modulated signal must be read with an interferometer *having a proper delay path*…." ('500 Patent at 5:45-48 (emphasis added).)

Accordingly, the Court modifies its proposed construction and construes the term "receiver having an interferometer" to mean "a receiver having a device that performs a measurement using the interference phenomena produced by the splitting and recombining of one or more beams of light where at least one of those beams of light is delayed before recombining with other beams of

---

[9] Construing the term to require separation and combination of light also would comport with standard dictionary definitions. *See, e.g.,* www.collinsdictionary.com (defining interferometer in optics as a "device that separates a beam of light into two ray beams, usually by means of reflection, and that brings the rays together to produce interference, used to measure wavelength, index of refraction, and astronomical distances") (last visited July 6, 2022).

[10] The excerpts of this deposition is attached to Dkt. No. 49-7 as Ex. G to the Declaration of Dan Blumenthal, Ph.D, dated January 15, 2021

light."

**IT IS SO ORDERED**.

Dated: July 11, 2022

_____
JEFFREY S. WHITE
United States District Judge